No. 15-1458, No. 15-1515

# United States Court of Appeals
# for the First Circuit

KIMBERLY P. DECAMBRE
Plaintiff - Appellant/Cross-Appellee

v.

BROOKLINE HOUSING AUTHORITY;
MATTHEW S. BARONAS; JANICE MCNIFF; CAROLE BROWN
Defendants - Appellees/Cross-Appellants

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

REPLY BRIEF OF
PLAINTIFF-APPELLANT KIMBERLY DECAMBRE

J. WHITFIELD LARRABEE
COA #1050744
LAW OFFICES OF J. WHITFIELD LARRABEE
251 Harvard Street, Suite 9
Brookline, Massachusetts 02446
(617) 566-3670
jw.larrabee@verizon.net

*Counsel for Plaintiff-Appellant*

Dated: January 15, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      THE BHA'S STATEMENT OF FACTS IS INCORRECT.. . . . . . . . 3

II.     THE BHA HAS REQUESTED THAT THE COURT USE
        THE WRONG STANDARD OF REVIEW.. . . . . . . . . . . . . . . . . . . . 5

        A.      The BHA's Argument for "Chevron Review" Fails
                Because The New England HUD Advisory Letter
                And The BHA Decision Lack The Required Formality.. . . . . . 5

        B.      The BHA's Argument for "Chevron Review" Fails
                Because Any Deference Is Owed To HUD, Not To
                the BHA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      The BHA's Argument for "Chevron Review" Fails
                Because 24 C.F.R. § 5.603(c)(3), The Lump Sum
                Exclusion, Is Not Ambiguous.. . . . . . . . . . . . . . . . . . . . . . . . . 8

        D.      The BHA's Argument for Deference Fails Because
                The New England HUD Advisory Letter And The
                BHA Decision Lack The "Power To Persuade.". . . . . . . . . . . 9

III.    THE BHA FAILS TO IDENTIFY AN APPROPRIATE
        SOURCE IN HUD REGULATIONS FOR INCLUDING
        THE PURCHASE PRICE OF AUTOMOBILES OWNED
        BY THE TRUST IN DECAMBRE'S INCOME... . . . . . . . . . . . . . . 10

i

IV. THE BHA'S TREATMENT OF LUMP SUM SETTLE-
MENTS FAILS BECAUSE IT HAS NO BASIS IN HUD
REGULATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V. THE BHA'S TREATMENT OF LUMP SUM SETTLE-
MENTS FAILS BECAUSE IT UNREASONABLY
CREATES AN UNTENABLE DILEMMA FOR
PEOPLE WITH DISABILITIES WHO WANT TO
PARTICIPATE IN THE SECTION 8 PROGRAM.. . . . . . . . . . . . 13

VI. THE ASSUMPTION OF THE BHA AND THE LOWER
COURT, THAT DECAMBRE NEEDED TO PROVE A
DEPRIVATION OF SUBSTANTIVE DUE PROCESS IN
ORDER TO PREVAIL UNDER 42 U.S.C. §1983, FAILS,
BECAUSE A VIOLATION OF THE RENT CEILING IS
AN INDEPENDENT BASIS OF LIABILITY UNDER
§ 1983. ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VII. THE BHA'S DEFENSES TO DECAMBRE'S
DISCRIMINATION CLAIMS ARE UNFOUNDED.. . . . . . . . . . . 19

  A. The BHA's Argument, That There Was No Record
Evidence That the BHA's Policy and Method of
Calculating Income Tends to Screen out Disabled
Tenants, Disregards Undisputed Evidence. .. . . . . . . . . . . . . 19

  B. The BHA's Argument, That Decambre's Requests
for Reasonable Modifications Were Not Proper or
Sufficient, Fails, Where Her Requests Were Specific,
Supported with Medical Proof and Made Within the
Deadline Set By The BHA.. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

  C. The BHA's Contention, That it Correctly Denied
Decambre's Requests for Reasonable Accommodation,
Fails Because it Is Based on Incorrectly Identified
Essential Eligibility Requirements.. . . . . . . . . . . . . . . . . . . . . 27

D.     The BHA's Contention, That the Modifications
Requested by Decambre Would Result in a
Fundamental Alteration of The Section 8 Program,
Fails, Because the Reasonable Changes in Methods,
Practices and Policies Requested by Decambre Fall
Within the Area of Discretion Vested in Public
Housing Agencies.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VIII.  THE LOWER COURT DENIED MEANINGFUL REVIEW AND
ACTED UNREASONABLY IN ENTERING JUDGMENT FOR
THE BHA ON EVERY CAUSE OF ACTION IN DECAMBRE'S
COMPLAINT... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Alexander v. Choate*,
    469 U.S. 287 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Amisub (PSL), Inc. v. State of Colorado Dept. of Social Services*,
    879 F.2d 789 (10th Cir.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Attorney General v. Assistant Commissioner of the Real Property
Department of Boston*,
    380 Mass. 623 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boston Housing Authority v. Bridgewaters*,
    452 Mass. 833 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Chase Bank USA, NA v. McCoy*,
    131 S. Ct. 871 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Clark v. Alexander*,
    85 F.3d 146 (4th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Davis v. Mansfield Metropolitan Housing Authority*,
    751 F. 2d 180 (6th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ellis v. Apfel*,
    147 F.3d 139 (2d Cir.1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Figgs v. Boston Housing Authority*,
    469 Mass. 354 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*General Elec. Co. v. USEPA*,
    53 F. 3d 1324 (D.C. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iv

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hayes v. Retirement Bd. of Newton,*
    425 Mass. 468 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Johnson v. Housing Authority of Jefferson Parish,*
    442 F. 3d 356 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Johnson v. Watts Regulator Co.,*
    63 F. 3d 1129 (1st Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Kenaitze Indian Tribe v. Alaska,*
    860 F.2d 312 (9th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kvorjak v. State of Maine,*
    259 F. 3d 48 (1st Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Mayburg v. Sec'y of HHS,*
    40 F.2d 100 (1st Cir.1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*MCI Telecomm. Corp. v. Bell Atlantic Pennsylvania,*
    271 F.3d 491 (3rd Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*National Family Planning and Reproductive Health*
 *Ass'n v. Sullivan,*
    979 F. 2d 227 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*National Tower v. Plainville Zoning Bd. of Appeals,*
    297 F. 3d 14 (1st Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Orthopaedic Hosp. v. Belshe,*
    103 F. 3d 1491 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rivas v. Chelsea Housing Authority,*
    464 Mass. 329 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 30

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Stevenson v. Willis*,
    579 F. Supp. 2d 913 (Dist. Ohio 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Taylor v. Phoenixville School District*,
    184 F. 3d 296 (3rd Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Tennessee v. Lane*,
    541 U.S. 509 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Turner v. Perales*,
    869 F.2d 140 (2nd Cir.1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Lachman*,
    387 F. 3d 42 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

*United States v. Mead Corp.*,
    533 US 218 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Nixon*,
    418 U. S. 683 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wright v. Roanoke Redevelopment and Housing Authority*,
    479 US 418 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18

**FEDERAL STATUTES**

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

42 U.S.C. § 1437a(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1437f(o)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

**MASSACHUSETTS STATUTES**

G.L. ch. 30A § 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 30, 31

G.L. ch. 93 § 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

G.L. ch. 249 § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

**REGULATIONS**

20 C.F.R. § 416.1110(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

20 C.F.R. § 416.1205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

24 C.F.R. § 5.603(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

24 C.F.R. § 5.609(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24 C.F.R. § 5.609 (b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

24 C.F.R. § 5.609(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

24 C.F.R. § 5.609(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

24 C.F.R. § 5.609(c)(17). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

24 C.F.R. § 982.53. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 C.F.R. § 982.505. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 C.F.R. § 982.517. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 C.F.R. § 982.552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 C.F.R. § 982.555. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 24

**OTHER AUTHORITIES**

EEOC Enforcement Guidance on Reasonable Accommodation
and Undue Hardship Under the Americans with Disabilities Act,
EEOC Notice Number 915.002
(October 17, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Program Operations Manual System (POMS), SI 01120.200E(1)(b)
(December 11, 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Quadel Consulting Corp., Housing Choice Voucher Program Guidebook,
(2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

# SUMMARY OF THE ARGUMENT

The BHA's assertion that "Chevron review" applies to the BHA's decision is fundamentally flawed.   Chevron review is inapplicable because: 1) the decision was informal and non-public, 2) it was made by a local public housing agency, not HUD, 3) the regulation is not ambiguous and, 4) the decision was based on an informal, non-public and unpersuasive HUD Advisory letter.

There is no basis in HUD regulations for the BHA's decision to include the purchase price of automobiles owned by the trust in DeCambre's income.  The BHA cannot identify any legitimate regulatory basis for this decision.

The BHA's contention that lump sums are excluded from income in the year received, but are included in participants' income in subsequent years, if the money is "withdrawn," has no basis in HUD regulations and is contrary to § 5.609(b)(3).

The BHA's income counting practices unreasonably force disabled participants to either forgo the receipt of lump sums, or to choose between SSI and Section 8 eligibility.  Inhibiting people with disabilities from receiving lumps sums, in this manner, denigrates their stature as equal citizens by effectively excluding them from the civil justice system and from the system of inheritance.

1

Based on the Supreme Court's decision in *Wright v. Roanoke*, the BHA violated § 1983 and the Housing Act by establishing DeCambre's TTP at over 30% of her adjusted monthly income.  DeCambre did not need to prove a violation of due process to prevail on her claims under § 1983.

There is evidence in the record to show that the BHA's interpretation of HUD's regulations screened out DeCambre and tends to screen out people with disabilities.   There is also evidence that this practice falls more harshly on people with disabilities.

Letters from DeCambre's physicians and a physician's certification, in combination with several detailed requests for reasonable accommodation, timely notified the BHA of its duty to make reasonable modifications.

 The BHA excluded DeCambre from the Section 8 program because it erroneously concluded that 30% of DeCambre's income exceeded the contract rent and that she therefore was not entitled to any subsidy.  DeCambre never requested that she should pay less than 30% of her income in rent.  With modification of the BHA's unlawful and discriminatory income counting practices, 30% of DeCambre's income would not have exceeded the contract rent.   DeCambre met the eligibility requirements of the Section 8 program with the reasonable modifications she requested.

2

## ARGUMENT

I.   THE BHA'S STATEMENT OF FACTS IS INCORRECT.

The BHA incorrectly stated in its brief that "[n]either Ms. DeCambre nor Attorney Larrabee disclosed the existence of the Trust, or the funds which formed the corpus of the Trust, to the BHA until 2013." BHA Brief, p. 13. The record indicates that, in a letter to the BHA dated September 22, 2010, Larrabee stated: "Enclosed, per your request, please find the most recent statement related to the Bank of America account for the Kimberly P. DeCambre Supplemental Needs Trust." App. 300.

The BHA incorrectly stated in its brief that $330,000 in settlements were used to fund DeCambre's trust. BHA Brief, p. 5. The parties stipulated that "Ms. DeCambre's settlements were for approximately $330,000, and the proceeds of the settlements, less attorney's fees, costs and taxes, were used to fund [DeCambre's Special Needs Trust]." (emphasis supplied). App. 222, ¶ 7. The trust was funded with far less than $330,000. App. 222, ¶ 7; App. 564.

The BHA incorrectly stated in its brief, and the lower court found (based on assertions made by the BHA's attorneys), that "DeCambre had received approximately $200,000 in distributions from the trust between 2011 and 2013." BHA Brief, p. 7; App. 179, 491. In making this allegation, the BHA referred to

Janice McNiff's letter asserting that, in 2011, DeCambre declared $108,222.00 in income on her tax return, that there were trust distributions in 2012 totaling $31,749.01, and trust distributions in 2013 totaling $62,828.99.  App. 256.   The trust "distributions" identified for 2012 and 2013 seem close to accurate (if one includes the $37,001 automobile purchase in 2013).  However, the $108,222.00 in income, declared on DeCambre's 2011 tax return, reflects the SSI she was receiving and some of the  personal injury and property damages settlements she received that year.   App. 222, ¶ 7.   Because income listed on DeCambre's personal tax return does not equal trust distributions, the factual record does not support the lower court's finding or the BHA's assertion that "DeCambre had received approximately $200,000 in distributions from the trust between 2011 and 2013."  BHA Brief, p. 7; App. 132, 179, 256, 491.

The BHA incorrectly stated in its brief that the present action was filed in Norfolk Superior Court on August 8, 2014.  BHA Brief, P. 16.  The filing of the case was recorded by the Norfolk Superior Court as occurring on July 9, 2014.  Dkt. # 12, pp. 33-34.  This was 30 days after the date of the BHA written decision.  App. 353.  A complaint seeking judicial review of an administrative decision generally must be filed within 30 days under G.L.c. 30A, § 14.

4

II.   THE BHA HAS REQUESTED THAT THE COURT USE THE WRONG
      STANDARD OF REVIEW.

      A.   The BHA's Argument for "Chevron Review" Fails Because The New
           England HUD Advisory Letter And The BHA Decision Lack The
           Required Formality.

The New England HUD advisory letter and the BHA decision are not

subject to "Chevron Review" because they are informal understandings of agency

officials that were not subject to public notice or comment.  "The non-public or

informal understandings of agency officials concerning the meaning of a

regulation are ... not relevant."  *US v. Lachman*, 387 F. 3d 42, 54 (1st Cir. 2004).

"So too, under *Chevron*, the Supreme Court has made clear that informal agency

interpretations of statutes, even if public, are not entitled to deference."  *US v.*

*Lachman*, 387 F. 3d at 55; *United States v. Mead Corp*., 533 US 218

(2001)(Interpretive rules that involved no public notice or comment not entitled to

*Chevron* deference.)  There is no evidence that the New England HUD advisory

letter was disseminated to the public or issued after any public notice or comment.

App. 452-455. It appears to be an interdepartmental memorandum.  *Id*.   There is

no evidence that the BHA's decision was subject to public notice or comment.

HUD refers to the procedure at a local public housing agency leading up to a

decision as an "informal hearing."  See generally, 24 C.F.R. § 982.555.   As public

housing agency decisions deal with participants' receipt of government assistance,

5

they are not public records and are not distributed to the public. *Attorney General v. Assistant Commissioner of the Real Property Department of Boston*, 380 Mass. 623, 626 n. 2 (1980).

B.     The BHA's Argument for "Chevron Review" Fails Because Any Deference Is Owed To HUD, Not To the BHA.

Because HUD, not the BHA is charged with primary responsibility for administering the Housing Act, any deference regarding interpretation of regulations is due HUD, not the BHA.   Deference is only owed to an agency's interpretation of its own ambiguous regulation. *Chase Bank USA, NA v. McCoy*, 131 S. Ct. 871, 880-881 (2011)(where the regulation is ambiguous, the court defers to "an agency's interpretation of its own regulation" unless the interpretation is plainly erroneous or inconsistent with the regulation); *Johnson v. Watts Regulator Co.*, 63 F. 3d 1129, 1134-1135 (1st Cir. 1995); *Rivas v. Chelsea Housing Authority*, 464 Mass. 329, 333-335 (2013)*; Hayes v. Retirement Bd. of Newton*, 425 Mass. 468, 470 (1997) (deference given to statutory interpretation of State agencies charged with administration of pension statute, not that of local retirement board).

The 2nd, 3rd, 9th and 10th Circuits do not tend to give deference to state or local interpretations of federal regulations. *Turner v. Perales*, 869 F.2d 140, 141 (2d Cir.1989) (decision of state agency interpreting federal statute not subject to

deference pursuant to *Chevron*); *MCI Telecomm. Corp. v. Bell Atlantic Pennsylvania*, 271 F.3d 491, 515-16 (3rd Cir. 2001)(no deference to a state utility commission interpretation of federal Telecommunications Act of 1996); *Orthopaedic Hosp. v. Belshe*, 103 F. 3d 1491, 1495 (9th Cir. 1997)("A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes"); *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 316 (9th Cir. 1988), cert. denied, 491 U.S. 905, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989)(deference is not owed to a state agency that "lacks the expertise in implementing federal laws and policies and the nationwide perspective characteristic of a federal agency."); *Amisub (PSL), Inc. v. State of Colorado Dept. of Social Services*, 879 F.2d 789 (10th Cir.1989), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990)("The state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency.")

In *Clark v. Alexander*, relied on by the defendants, the 4th Circuit erred in deferring to a local housing agency's interpretation of HUD regulations set forth in the housing agency's informal decision. *BHA brief,* p. 24*; Clark v. Alexander*, 85 F.3d 146 (4th Cir. 1996). The 4th Circuit's decision in *Clark* is out of step with other circuits in the extent to which it was willing to give deference to a local

agency's informal interpretation of federal regulations.  The 4th Circuit's
application of *Chevron* review in this context is also more expansive than the
scope of deference given to informal administrative interpretations in the 1st
Circuit.  *US v. Lachman*, 387 F. 3d at 54-55; *Johnson v. Watts Regulator Co.*, 63
F. 3d at 1134-1135.

     C.     The BHA's Argument for "Chevron Review" Fails Because 24 C.F.R.
            § 5.609(c)(3), The Lump Sum Exclusion, Is Not Ambiguous.

Due to a lack of ambiguity in the regulation excluding lump sum
settlements, it is unnecessary to look to either HUD or BHA interpretations.  24
C.F.R. § 5.609(c)(3).  A court looks "to agency interpretations only when the
statute or regulation remains ambiguous after [it has] employed the traditional
tools of construction."  *US v. Lachman*, 387 F. 3d at 54.  § 5.609(c) provides in
relevant part: "Annual income does not include the following:...(3) Lump-sum
additions to family assets, such as...settlement for personal or property losses."  24
C.F.R. § 5.609(c)(3).  The lower court found HUD's rules to be "clear and
unambiguous."   In light of the regulatory purposes and scheme established by
HUD, the meaning of § 5.609(c)(3) is plain.   The regulation unambiguously
excludes lump sum settlements from income.  All that was needed was a
straightforward application of this regulation so as to exclude lump sum
settlements expended through the DeCambre trust from her income.

D.   The BHA's Argument for Deference Fails Because The New England
     HUD Advisory Letter And The BHA Decision Lack The "Power To
     Persuade."

An agency's interpretation is entitled to respect under *Skidmore* only to the

extent that it has the power to persuade.  *Mayburg v. Sec'y of HHS*, 740 F.2d 100,

106 (1st Cir.1984).   One factor effecting a informal statement's persuasive power

is the thoroughness of the agency's investigation.  *Skidmore v. Swift & Co.*, 323

U.S. 134, 140 (1944).  There is little evidence that any "investigation" took place

prior to issuing the Advisory.   Where there are ten regional HUD offices, the

persuasive power of the Advisory is also diminished as there is no indication that

it was issued with the knowledge, approval or assistance of the national office.

http://portal.hud.gov/hudportal/HUD?src=/localoffices/regions.

The Advisory is also unpersuasive, in the present case, because it is focused

on third-party special needs trusts that are funded with income.  App. 452.  The

second paragraph of HUD Advisory letter states:

> A Special-Needs Trust a/k/a a Supplemental-Needs Trust
> is a trust established to provide supplemental income for
> a disabled beneficiary who is receiving or may be
> eligible to receive government benefits.  This type of
> irrevocable trust is often used by parents or guardians of
> disabled children to ensure the beneficiary's eligibility or
> continued eligibility for pubic benefits.

9

App. 452.  As DeCambre's self settled first-party special needs trust was funded

with assets, her lump sum settlements, it was not intended to provide additional

income.    Trusts funded by parents or guardians to provide additional income may

warrant quite different treatment in many cases than do first party trusts funded by

a participant's personal injury and property settlement.    Where an individual self

funds a trust with her own assets, in compliance with exacting SSI and Medicaid

standards, there is no possibility that the trust is being used as pass through for

income.

III.   THE BHA FAILS TO IDENTIFY AN APPROPRIATE SOURCE IN HUD
       REGULATIONS FOR INCLUDING THE PURCHASE PRICE OF
       AUTOMOBILES OWNED BY THE TRUST IN DECAMBRE'S INCOME.

The BHA's decision to include the purchase price of trust property in

DeCambre's annual income when determining her TTP was not authorized by

HUD regulations and is contrary to the regulatory scheme.  24 C.F.R. §

5.603(b)(2); 24 C.F.R. §§5.609(b)(2) - 5.609(b)(3); App. 353-357.   Families

seeking admission to or continuing assistance in the Section 8 program do not

have to comply with any general limitation on the amount and type of assets they

can own.  24. C.F.R. 5.609(b)(3);  Housing Choice Voucher Program Guidebook,

Determining Income from Assets, Section 5.4 and Exhibit 5.3,  http://www.

hud.gov/offices/pih/programs/hcv/forms/guidebook.cfm .  However, some family

10

assets are considered in the "annual income" determination and, in some circumstances, may affect eligibility and total tenant payment. 24 C.F.R. 5.609(b)(3). Because of the requirement to include the greater of the actual interest/dividend income earned or a percentage based upon a HUD published passbook savings rate when certain assets are greater than $5,000, the value of these assets may affect the family's annual income. *Id*. However, when countable assets are placed in an irrevocable trust, they are no longer considered an asset because they are not accessible to the family for the payment of housing expenses. 24. C.F.R. 5.603(b)(2). In this case, only income generated by the asset that was placed in trust and that is distributed to the family will count toward the "annual income" determination. Id. The inclusion of the value of trust assets in DeCambre's "annual income" was unreasonable because there is no provision for this in HUD regulations, and because DeCambre lacked title to the automobiles and could not sell them and use the money for housing expenses.[1]

IV.     THE BHA'S TREATMENT OF LUMP SUM SETTLEMENTS FAILS
        BECAUSE IT HAS NO BASIS IN HUD REGULATIONS.

---

[1] This conclusion is consistent with 42 U.S.C. § 1437a(b)(4), which excludes from the income of public housing tenants "any amounts not actually received by the family" and is made applicable to Section 8 tenants by 24 C.F.R. § 5.609(c)(17).

11

The treatment of lump sum additions to family assets utilized by the BHA, where a lump sum is excluded from income in the year received, but is counted in income in subsequent years if the money is "withdrawn," is not provided for in HUD regulations.   BHA Brief, p. 34 n. 24; App. 552-553.   When the BHA described its treatment of lump sums in this manner to the lower court, Judge Young asked, "So what's your authority for that?"  App. 552-553.   Defense counsel candidly responded: "Well, there's not a lot to go on."  App. 553, line 16. The lower court held, "[t]he Court cannot accept BHA's theory that a lump-sum is only a lump-sum for the first year, as it simply has no basis in the regulations." App. 509.

The BHA's treatment of lump sums is inconsistent with § 5.609(b)(3), which provides in relevant part that "[a]ny withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family.  Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from all net family assets or a percentage of the value of such assets .... as determined by HUD."  24 C.F.R. § 5.609(b)(3).  The BHA uses a different formula, essentially rewriting the regulations, to provide that 100% of the value of assets "withdrawn" after the year of receipt are to be included in income.

12

BHA Brief, p. 34 n. 24; App. 550-553. HUD makes no provision for BHA's "one year rule" in its Guidebook. Housing Choice Voucher Program Guidebook, Determining Income from Assets, Section 5.4.

The BHA must abide by HUD regulations as written until HUD rescinds or amends them. See *United States v. Nixon*, 418 U. S. 683, 695-696 (1974). Deference has its bounds. An agency "may not constructively rewrite the regulation, which was expressly based upon a specific interpretation of the statute, through internal memoranda or guidance directives that incorporate a totally different interpretation and effect a totally different result." *National Family Planning and Reproductive Health Ass'n v. Sullivan*, 979 F. 2d 227, 236 (D.C. Cir. 1992). DeCambre had no notice or reason to believe that the BHA would interpret the regulations in the manner it did, and the BHA's interpretation obliterates the distinction between assets and income found in HUD's regulations. 24 C.F.R. § 5.609(b)(3). DeCambre was deprived of due process because she was not given fair and adequate notice of the BHA's practice of including lump sums and assets in income. *General Elec. Co. v. USEPA*, 53 F. 3d 1324, 1329 (D.C. Cir. 1995).

V.     THE BHA'S TREATMENT OF LUMP SUM SETTLEMENTS FAILS
       BECAUSE IT UNREASONABLY CREATES AN UNTENABLE
       DILEMMA FOR PEOPLE WITH DISABILITIES WHO WANT TO
       PARTICIPATE IN THE SECTION 8 PROGRAM.

The BHA's treatment of lump sum settlements placed in special needs trusts, and the lower court's holding, creates a dilemma for disabled participants, where, contrary to Congressional intent, they are damned if they do and damned if they don't.  Under the BHA's policy, if participants keep their settlements in the bank or place them under their mattress, they will remain eligible for the Housing Choice Voucher Program, but they will lose their SSI eligibility because of resource limits.  20 C.F.R. § 416.1205.  On the other hand, if participants keep their settlements and place them in a special needs trust, they will be unable to benefit from their settlements without being denied Section 8 benefits and potentially being excluded from all participation in the program at the BHA.

The BHA's policy erroneously assumes money in special needs trusts is available for housing expenses.  This assumption is false because SSI regulations restrict payments for the costs of food and shelter by special needs trusts.  20 C.F.R. § 416.1110(a)(3).  "Food or shelter received as a result of disbursements from the trust by the trustee to a third party are income," which results in reduction of SSI benefits.  Program Operations Manual System (POMS), SI 01120. 200E(1)(b);  *Ellis v. Apfel*, 147 F.3d 139 (2d Cir.1998) (payments made to plaintiff's landlord by a third-party were in-kind support and maintenance and thus reduced plaintiff's SSI benefits); 20 C.F.R. § 416.1110(a)(3).  Without their SSI

benefits, disabled Section 8 participants normally have insufficient income to pay their 30% share of the rent under the Section 8 program, as well as being unable to pay for food and other necessities.  *Id*.  Because of SSI restrictions on payments for food and shelter by special needs trusts, the prospect of homelessness and hunger is real for SSI recipients, who cannot work.  App. 463-464.

According to the Supreme Court, "[t]he Americans with Disabilities Act of 1990 (ADA or Act), 42 U. S. C. §§ 12101-12213, is a measure expected to advance equal-citizenship stature for persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 536 (2004)(Ginsberg, Souter and Breyer, concurring).  If the methods and practices endorsed by the lower court and followed by the BHA are upheld, people with disabilities, unless they are willing to forfeit their needed SSI and Section 8 benefits, will be denied the stature of equal citizens because they will tend to be prevented from enjoying any meaningful participation in the civil justice system and in other important legal opportunities.[2]

Because lump sum settlements placed in a special needs trust are unavailable to participants for use in payment of the costs of shelter under SSI regulations, it is not reasonable that HUD would presume them to be available for

---

[2] As the lump sum exclusion also applies to inheritances, disabled SSI recipients would also uniquely be limited in their ability to benefit from inheritances under the lower court's reasoning.  24 C.F.R. § 5.603(c)(3).

housing expenses.   Program Operations Manual System (POMS), SI

01120.200E(1)(b); 20 C.F.R. § 416.1110(a)(3).  According to the 2007 New

England HUD advisory, "[t]hose amounts and expenditures that do not fall under

an exclusion or deduction are presumed by the regulations to be available for

housing expenses and are therefore counted towards annual income."  App. 251.

HUD excludes from annual income lump sums that are placed in the bank or under

a mattress and that are under the control of participants, presuming that they are

unavailable for housing expenses.  24 C.F.R. § 5.603(c)(3).  It would be

unreasonable for HUD to presume that the same lump sums which are placed in

irrevocable trusts, and that are not under the control of participants, are available

for housing expenses.   The construction of the regulations upheld by the lower

court assumes an unreasonable antipathy on the part of HUD toward irrevocable

trusts in general and toward special needs trusts in particular.  The BHA has failed

to provide any reason why HUD would be so hostile to special needs trusts.

VI.   THE ASSUMPTION OF THE BHA AND THE LOWER COURT, THAT
      DECAMBRE NEEDED TO PROVE A DEPRIVATION OF
      SUBSTANTIVE DUE PROCESS IN ORDER TO PREVAIL UNDER 42
      U.S.C. §1983, FAILS, BECAUSE A VIOLATION OF THE RENT
      CEILING IS AN INDEPENDENT BASIS OF LIABILITY UNDER §1983.

The lower court  and the BHA erroneously assumed that DeCambre needed

to establish a deprivation of substantive due process in order to prevail under 42

16

U.S.C. §1983.  App. 511-514; BHA Brief, pp. 41-43.   When a housing authority

violates the rent ceiling set forth at § 1437f(o)(2), tenants have an unambiguous

right under the Housing Act that they may enforce by means of a private suit under

§ 1983, without any need to show a violation of substantive due process under the

U.S. Constitution.  DeCambre Brief, pp. 30-32; *Johnson v. Housing Authority of*

*Jefferson Parish*, 442 F. 3d 356 (5th Cir. 2006); See also, *Wright v. Roanoke*

*Redevelopment and Housing Authority*, 479 US 418,423-424 (1987).  "Once a

plaintiff demonstrates that a statute confers an individual right, the right is

presumptively enforceable by § 1983." *Gonzaga University v. Doe*, 536 U.S. 273,

284-285 (2002).

In the lower court, DeCambre asserted that the BHA's was liable under

§1983 for violating the rent ceiling provisions of the Housing Act.   App. 103-105,

467-468.   Count 1 of DeCambre's First Amended Verified Complaint, for

violation of  42 U.S.C. §1983, states in relevant part, "The defendants'

determination of the plaintiff's TTP and their calculation of the plaintiff's family

income violated 42 U.S.C. § 1437f(o)(2) and other related sections of the United

States Housing Act of 1937 by establishing the Plaintiff's TTP at an unlawful

level far in excess of 30 percent of the monthly adjusted income of the family."

App. 104, ¶ 56.   Furthermore, DeCambre's Trial Brief stated:

>In the present case, the Brookline Housing Authority
>violated HUD regulations by increasing DeCambre's
>Total Tenant Payment above the rent ceiling imposed by
>42 U.S.C. § 1437f(o)(2). The plaintiff relies on the
>following cases in support her request in Count I of the
>First Amended Complaint that the court remedy this
>deprivation of her federal rights. *Wright v. Roanoke
>Redevelopment and Housing Authority*, 479 US
>418,423-424 (1987); *Johnson v. Housing Authority of
>Jefferson Parish*, 442 F. 3d 356 (5th Cir. 2006)(holding
>that violation of the rent ceiling for Section 8 tenants
>under the United States Housing Act of 1937,42 U.S.C. §
>1437f( o )(2) states a cognizable claim under Section
>1983).

App. 468.

Although DeCambre did not need to establish a violation of substantive due

process to prevail under §1983, she should have prevailed on her theory that she

was denied due process.   In denying her due process claims, the lower court

erroneously concluded that  "[s]imply because DeCambre had been an eligible

Section 8 tenant prior to her SNT expenditures does not create a property interest

in Section 8 assistance."  App. 513-514.   On the contrary, participation in a

public housing program is a property interest protected by due process.  *Davis v.

Mansfield Metropolitan Housing Authority*, 751 F. 2d 180, 184 (6th Cir. 1984);

*Stevenson v. Willis*, 579 F. Supp. 2d 913 (Dist. Ohio 2008).   The lower court's

erroneous understanding of DeCambre's due process rights in combination with

18

other errors rendered its decision invalid.

VII.   **THE BHA'S DEFENSES TO DECAMBRE'S DISCRIMINATION CLAIMS ARE UNFOUNDED.**

    A.   The BHA's Argument, That There Was No Record Evidence That the BHA's Policy and Method of Calculating Income Tends to Screen out Disabled Tenants, Disregards Undisputed Evidence.

DeCambre strenuously disputes the BHA's contention that DeCambre "points to no evidence in the record to support her argument" that the BHA's interpretation HUD's regulations tends to screen out the disabled and that this practice falls more harshly on people with disabilities.  BHA brief, p. 44-45.  The record contained ample evidence showing how the BHA's treatment of lump sums distributed through special needs trusts resulted in DeCambre being excluded from the Section 8 program and how the policy tended to exclude similarly situated people with disabilities.  App. 222-230, 358, 360-364, 367, 387, 456-460. DeCambre likewise disputes the lower court's conclusion that "no evidence has been presented to this Court as to whether the BHA's interpretation tends to screen out disabled tenants..."  App. 518.

Based on the stipulated record, DeCambre showed that the BHA's method of operation and practice of including the expenditure of lump sums made through a special needs trust in her income resulted in her exclusion from the Section 8 program.  App. 353-356, 358.  There was also undisputed evidence that Sheila

19

Finley, another disabled person, was screened out of the Section 8 program in

Santa Monica in the same manner as DeCambre screened out of the Section 8

program in Brookline.  App. 335-345.   DeCambre's "Updated Request For

Reasonable Accommodation of Disability," which was part of the Stipulated

Factual Record and was provided to the BHA on July 17, 2014, identifies the

process by which the BHA's practice screened out DeCambre because of her

disability.  It states:

> If Mrs. DeCambre had not placed the settlement funds in
> the Kimberly DeCambre Supplemental Needs Trust, a
> special needs trust and disability trust, her benefits under
> SSI and MassHealth would have been lost or diminished
> under federal law and regulations. Under SSI, the
> "countable" resource limits are $2,000 for an eligible
> individual. 20 CFR §416.1205. Funds not held in the
> SNT would be counted as assets of Mrs. DeCarmbre and
> would result in the loss or reduction in SSI under federal
> law and regulations. If Mrs. DeCambre were to lose her
> SSI, her eligibility for MassHealth would then be
> jeopardized. The way that the Brookline Housing
> Authority interpreted and applied HUD regulations in
> Mrs. DeCambre's case created a barrier to her
> participation in the Section 8 program because of her
> disability. Because she needs her SSI benefit and
> MassHealth due to her disability, she needed to place her
> settlements in the SNT. Non-disabled people in Mrs.
> DeCambre's circumstances are able to hold funds
> received from lump sum settlements outside of a Special
> Needs Trust and can therefor fully enjoy the benefits of
> the Section 8 Program."

App. 387; App. 367 (transmitting email).  The mechanism by which the BHA's

20

policy excluded DeCambre and tended to exclude the disabled from the Section 8 program was also set forth in other documents made part of the Stipulated Factual Record and in DeCambre's memorandum.  App. 10, 12, 360-364, 456-460.

The fact that other types of non-revocable trusts might be included within the sweep of the BHA's practice does not relieve the BHA of liability under the ADA and other anti-discrimination laws (although the lower court implied that it did). App. 517.  For example, a housing authority could reasonably have a policy that prohibits people from carrying "sticks and like objects" because of the risk that they may be used as weapons.  However, it would still be required by the ADA to draw an exception for people with ambulatory disabilities who require canes.   In the same vein, even if the BHA could properly include expenditures of lump sums from irrevocable trusts in income for the non-disabled, it would still need to draw an exception for people with special needs trusts, especially for expenditures that are needed to accommodate their specific disabilities.

B.     The BHA's Argument, That Decambre's Requests for Reasonable Modifications Were Not Proper or Sufficient, Fails Where Her Requests Were Specific, Supported with Medical Proof and Made Within the Deadline Set By The BHA.

The BHA erroneously asserts that DeCambre's request for reasonable accommodation "was not properly before the hearing officer during the May 27, 2014 hearing."  BHA Brief, p. 45.  It is well established that, "a family member,

21

friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability." EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice Number 915.002, October 17, 2002; *Taylor v. Phoenixville School District*, 184 F. 3d 296, 313 (3rd Cir. 1999). An individual seeking reasonable accommodations for a disability need not use "magic" words. *Boston Housing Authority v. Bridgewaters*, 898 N.E.2d 848, 859 (Mass. 2009). A generalized request for assistance conveyed by a close family member is ordinarily sufficient. *Taylor*, 184 F.3d at 313. On February 7, 2014, in a sworn affidavit, DeCambre's trustee and attorney specifically requested reasonable accommodations, asking that the BHA exclude all trust expenditures in calculating DeCambre's income, and that it specifically exclude the cost of her car, which was needed as protection from heat due to her medical conditions. App. 267-268, ¶¶ 11-14. Larrabee stated: "the automobile was needed to prevent Mrs. DeCambre from overheating in the summer." Id. On March 14, 2014, Larrabee made a more detailed request for reasonable accommodation, supported by letters from DeCambre's physicians describing her disabilities and need for accommodations. App. 282-283, 288, 290. In March 2014, DeCambre's physician verified that she has "numerous medical conditions that require her to

have access to heat and central air conditioning to ensure temperature regulation"
and that require her to have access to cell phones and a lifeline in case of
emergency. App. 290.  These requests were before the hearing officer.  App. 377-
385.  The hearing officer specifically found that the BHA's attorney, Mr. Driscoll,
said that "Ms. DeCambre's request for reasonable accommodation to exclude as
income her vehicle, telephone and expenditures for her cats are not reasonable."
App. 355.   The BHA's attorney did not indicate in any manner at the informal
hearing that DeCambre's request for reasonable accommodation was not properly
before the hearing officer, nor did he contend that there was no nexus between Ms.
DeCambre's disabilities and her requests for accommodation.  App. 353-357.  The
claim that DeCambre's reasonable accommodation request "was not properly
before the hearing officer during the May 27, 2014 hearing" was only raised by the
BHA after the informal hearing occurred and the BHA had issued its decision.
The BHA had detailed and well substantiated requests for reasonable
accommodation at the time of the hearing.  App. 303-304 ¶¶ 11 & 14, 377-387.

As part of ongoing dialogue between DeCambre's attorney and the BHA's
attorney, the BHA advised DeCambre that she needed to provide a certification
signed by a physician by August 7, 2014.   App. 390.  Courts have consistently
encouraged parties to engage in dialogue and an "interactive process" in

23

reasonable accommodation cases.  *Kvorjak v. State of Maine*, 259 F. 3d 48, 52-53

(1st Cir. 2001).   On July 21, 2014, in an email to the BHA's attorney,

DeCambre's attorney stated, "Although I will try to meet your deadline of August

7, I don't know if this is possible.  Doctors don't necessarily hand out appointments

on short notice." App. 393.   On August 6, 2015, DeCambre's attorney provided

the BHA with a certification from DeCambre's physician that the requested

accommodations were needed "because of" her disabilities, on the form provided

by the BHA. App. 428-432.   Although this certification undoubtedly provided the

information requested by the BHA within the time limit set by the BHA, the

reasonable accommodations were never provided.  App. 213, ¶ 30.   The BHA's

contention, that DeCambre's request for reasonable accommodation was denied

because Larrabee initially submitted the form that he signed rather than one that

was signed by DeCambre's physician, is disproved by the fact that the form with

the physician's signature was signed, sealed and delivered within the deadline set

by the BHA.  BHA brief, p. 15-16; App. 428-432.[3]

---

[3] DeCambre pressed her requests for reasonable accommodation after the
BHA made its decision because: 1) the hearing officer's decision was not binding
under 24 C.F.R. 982.555(f)(2) to the extent that it is "contrary to HUD regulations
or requirements, or otherwise contrary to federal, State or local law," and, 2)
because the BHA's duty not to discriminate under the ADA, § 504, the Fair
Housing Act and G.L. ch. 93 sec. 103 are distinct from its obligations under the
Housing Act and are not limited by the hearing process established for the Section

The BHA's demand for additional proof of a nexus between DeCambre's disability and the accommodations she requested was an obstacle thrown up by the BHA to evade compliance with the ADA.   In demanding further medical proof, the BHA falsely indicated: "all three (3) of the doctors' letters fail to address the accommodation you have requested, i.e., they make no mention of the nexus between the patient's disability and the accommodation she claims to need. Your client's request for reasonable accommodation will not be decided upon until the BHA receives a certification from a 'medical or rehabilitation professional or expert.'" App. 391.   Yet, when medical certification was provided undeniably linking the reasonable accommodation requests to DeCambre's disabilities within the time frame specified by the BHA, no accommodation was offered.   App. 428-432.

In its brief, the BHA edited statements concerning DeCambre's requests for reasonable accommodation, made in an email sent by Larrabee, in a way that altered the email's meaning.  BHA Brief, p. 16; App. 393-394.  The BHA's brief incorrectly states: "Attorney Larrabee responded to the denial with the following explanation, in which he explicitly conceded that there was no nexus between the request for reasonable accommodation and Ms. DeCambre's disability..." BHA

8 program.  App. 315.

25

Brief, p. 16.  In reference to the email quoted by the BHA, the complete first

sentence of the email reads, "<u>For the portion of our request for reasonable</u>

<u>accommodation that the Housing Authority exclude from income all assets and</u>

<u>disbursements from the trust</u>, this request is not based on any particular physical

limitation of Mrs. DeCambre or on the nexus between her particular physical or

psychological limitations and the need for modification of the Housing Authority's

policies, practices, rules and procedures." (emphasis supplied) App. 393.  The

email states, in relevant part:

> Also, the letter from Dr. Crombie indicating that Mrs.
> DeCambre requires access to cell phones and a lifeline
> device because of her medical condition <u>draws an</u>
> <u>adequate nexus</u> between her disabilities and our request
> for reasonable accommodation regarding expenditures
> for cell phones and her landline.  She needs her landline
> to have the lifeline device installed.   Also, Dr. Crombie
> indicates she needs access to heat and air conditioning to
> ensure temperature regulation.   Obviously, if she is
> outside in the hot or cold, without her car, she will not
> have access to heat or air conditioning, and this aspect of
> her disability will not be accommodated.   I will make
> some effort to provide additional information about her
> need for a car, but, I think the need for a car to
> accommodate her disability is implicit in Dr. Crombie's
> letter.   It obviously gets very hot here in Boston in the
> summer and very cold in the winter.  (emphasis
> supplied).

App. 393; *See also*, App. 290 (Dr. Crombie letter dated 3/3/14).  Elsewhere in the

email, Larrabee stated:  "There is a nexus between our requests."   App. 394.  By

26

truncating the first clause in a sentence, by editing out other statements from the email, and by ignoring relevant portions of the email, the BHA removed Larrabee's statements from their mooring, attributing a meaning to them that a fair reading of either the complete sentence or the entire email does not bear.  App. 393-394.

> C.    The BHA's Contention, That it Correctly Denied
>        Decambre's Requests for Reasonable Accommodation,
>        Fails Because it Is Based on Incorrectly Identified
>        Essential Eligibility Requirements.

The BHA denied benefits to DeCambre and excluded her from the Section 8 program based on its conclusion that she failed to meet two eligibility requirements.  App. 130, 255, 353-358.   First, it determined that 30% of DeCambre's income exceeded the contract rent and that therefore she was not entitled to any subsidy under HUD rules.  App. 130, 255, 353-358.  Second, the BHA excluded DeCambre from the Section 8 program because she did not receive a subsidy for 6 consecutive months.  App. 358.  DeCambre does not contend that she should pay less than 30% of her income in rent.  If the BHA had made the appropriate housing assistance payment, she would not have failed to receive her subsidy for 6 consecutive months, and she would have remained eligible for the program.   DeCambre never requested or required modification of these eligibility requirements.  Rather, she requested modification of the BHA's

27

idiosyncratic income counting methods and practices, which were  not essential

eligibility requirements.  App. 237, 245, 267-268, 282-283, 285, 288, 290,

430-432.

The overly broad definition of essential eligibility requirements proposed by

the BHA would gut the ADA and other anti-discrimination laws.   The BHA

broadly states: "The income requirement is the most essential eligibility

requirement of the Section 8 program."  BHA Brief, p. 47.  Beyond this vague

description, the BHA does not specifically identify the "income requirement" to

which it refers.  *Id.*  However, it seems to contend that any change in its methods

and practices in determining annual income is, by definition, a fundamental

alteration of the Section 8 program, and, as a consequence, DeCambre cannot meet

the essential eligibility requirements for the program.  BHA Brief, pp. 45-47.

"Antidiscrimination legislation can obviously be emptied of meaning if every

discriminatory policy is 'collapsed' into one's definition of the relevant

benefit."(internal quotation marks omitted).  *Alexander v. Choate*, 469 U.S. 287,

301 & n.21 (1985).   Under the analytic framework apparently proposed by the

BHA, DeCambre could never challenge the criteria used by the BHA to determine

income, no matter how flawed, because all criteria selected by the BHA to

determine income constitute essential eligibility requirements.

D.   The BHA's Contention, That the Modifications Requested by
Decambre Would Result in a Fundamental Alteration of the Program,
Fails Because the Reasonable Changes in Methods, Practices and
Policies Requested  by Decambre Fall Within the Area of Discretion
Vested in Public Housing Agencies.

In administering the Section 8 Program, HUD gives local public housing

agencies broad discretion, while prohibiting disability discrimination.  24 C.F.R. §

982.53; App. 453.  As indicated in the 2007 HUD Advisory letter, public housing

agencies make the "ultimate determination of whether each of the above

expenditures counts toward annual income or falls within an exclusion or

deduction."  App. 453.  As a consequence of this broad discretion, public housing

agencies such as the BHA have flexibility in their policies, practices, procedures

and methods of administration to apply or impose HUD regulations, related to the

calculation of a family's annual income, in a manner that does not disadvantage or

exclude people with disabilities. App. 453; 24 C.F.R. § 982.552.   Under Section 8

regulations, HUD requires housing authorities to grant reasonable accommodation

so as to comply with the Fair Housing Act, § 504 and Title II of the ADA,

particularly where the Agency is determining whether to deny or terminate

assistance for the family.  24 C.F.R. § 982.552; 24 C.F.R. 982.505 (higher

payment standard allowable as reasonable accommodation); 24 C.F.R. 982.517

(higher utility allowance allowable as reasonable accommodation).  DeCambre

29

was subjected to discrimination because the BHA abused its discretion in

unnecessarily imposing eligibility criteria in an inflexible and discriminatory

manner.

VIII.  THE LOWER COURT DENIED MEANINGFUL REVIEW AND ACTED
UNREASONABLY IN ENTERING JUDGMENT FOR THE BHA ON
EVERY CAUSE OF ACTION IN DECAMBRE'S COMPLAINT.

By entering judgment for the BHA on all counts, while also entering an

unenforceable order remanding the matter for reconsideration to the to the BHA,

the lower Court denied DeCambre meaningful review, leaving her to the whim and

caprice of the BHA.  *Rivas v. Chelsea Housing Authority*, 464 Mass. at 333-335;

See also, *Figgs v. Boston Housing Authority*, 469 Mass. 354, 361-362 (2014);

G.L. ch. 30A, § 14; G. L. ch. 249, § 4; 42 U.S.C. § 1983.  The lower court decision

identifies errors of law, decisions unsupported by substantial evidence, arbitrary

and capricious actions and abuses of discretion by the BHA that required the lower

court to render judgment for DeCambre on Count 6 of the Amended Complaint.

App. 109-110, 516, 520-523.  The court identified legal error concerning the

BHA's inclusion of the purchase price of automobiles in DeCambre's income.

App. 521.  The court also found fault with the BHA's inclusion of trust

expenditures related to veterinary costs, telephone, cable, internet and travel in her

income.  App. 516, 520-523.  Under the circumstances, the Court should have

30

employed its inherent powers, its powers under § 1983 and its power of review

under state law to correct these errors of law and to reverse the BHA's decision by

ordering the BHA to correct the errors and to reinstate DeCambre's benefits.

*National Tower v. Plainville Zoning Bd. of Appeals*, 297 F. 3d 14, 21-22 (1st Cir.

2002); G.L. ch. 30A, § 14; G. L. ch. 249, § 4.  42 U.S.C. § 1983.

Dated:  January 15, 2016

                            Respectfully submitted,
                            Kimberly P. DeCambre,
                            By her attorney,


                            /s/ J. Whitfield Larrabee
                            J. Whitfield Larrabee, No. 1050744
                            251 Harvard Street, Suite 9
                            Brookline, MA 02446
                            (617) 566-3670

31

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because this brief contains 6,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the Wordperfect X3 program.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Wordperfect X3 version 2005 in 14 point Times New Roman.

/s/ J. Whitfield Larrabee
J. Whitfield Larrabee

Dated: January 15, 2016

## **CERTIFICATE OF SERVICE**

I, J. Whitfield Larrabee, certify that on January 15, 2016, the document(s) filed through the ECF system will be sent electronically to the below registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

John Egan, Esq.
Amy McCallen, Esq.
Rubin & Rudman
50 Rowes Wharf
Boston, MA 02110

Ron Landsman, Esq.
Ron M. Landsman, P.A.
200-A Monroe Street, Suite 110
Rockville, Maryland 20850

Emily S. Starr, Esq.
Starr Vander Linden, LLP
625 Main Street
Fitchburg MA. 01420

/s/ J. Whitfield Larrabee
J. Whitfield Larrabee, No. 1050744
251 Harvard Street, Suite 9
Brookline, MA 02446
(617) 566-3670

No. 15-1458, No. 15-1515

# United States Court of Appeals
# for the First Circuit

KIMBERLY P. DECAMBRE
Plaintiff - Appellant/Cross-Appellee

v.

BROOKLINE HOUSING AUTHORITY;
MATTHEW S. BARONAS; JANICE MCNIFF; CAROLE BROWN
Defendants - Appellees/Cross-Appellants

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

## ADDENDUM TO REPLY BRIEF OF
## PLAINTIFF-APPELLANT KIMBERLY DECAMBRE

J. WHITFIELD LARRABEE
COA #1050744
LAW OFFICES OF J. WHITFIELD LARRABEE
251 Harvard Street, Suite 9
Brookline, Massachusetts 02446
(617) 566-3670
jw.larrabee@verizon.net

*Counsel for Plaintiff-Appellant*

Dated: January 15, 2016

# TABLE OF CONTENTS TO ADDENDUM

<u>Page</u>

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 1

42 U.S.C. § 1437f(o)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 2

42 U.S.C. § 1437a(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 5

G.L. ch. 30A § 14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 18

G.L. ch. 93 § 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 21

G.L. ch. 249 § 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 22

20 C.F.R. § 416.1110. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 23

20 C.F.R. § 416.1205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 25

24 C.F.R. § 5.603. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 26

24 C.F.R. § 5.609. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 28

24 C.F.R. § 982.53. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 31

24 C.F.R. § 982.505. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 32

24 C.F.R. § 982.517. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 35

24 C.F.R. § 982.552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 37

 24 C.F.R. § 982.555. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 40

Section Addressing "Requesting A Reasonable Accommodation,"
Excerpt From, EEOC Enforcement Guidance on Reasonable
Accommodation and Undue Hardship Under the Americans
with Disabilities Act, EEOC Notice Number 915.002
(October 17, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD. 43

Program Operations Manual System (POMS),
SI 01120.200E(1)(b) (December 11, 2013). . . . . . . . . . . . . . . . . . . . . . .  ADD. 50

Quadel Consulting Corp.,
Housing Choice Voucher Program Guidebook,
Section 5.4 and Exhibit 5.3(2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . .  ADD. 54

Case:Case:1-5455-1450cDocumDoneureno0t63846262Page:Page:4Page:4Date DateFileeFile:di052019/201FentryEntry:596099347015970159

42 USC 1983

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

## TITLE 42 - THE PUBLIC HEALTH AND WELFARE
### CHAPTER 21 - CIVIL RIGHTS
#### SUBCHAPTER I - GENERALLY

### § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(R.S. § 1979; Pub. L. 96–170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104–317, title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

### Codification

R.S. § 1979 derived from act Apr. 20, 1871, ch. 22, § 1, 17 Stat. 13.

Section was formerly classified to section 43 of Title 8, Aliens and Nationality.

### Amendments

1996—Pub. L. 104–317 inserted before period at end of first sentence ", except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable".

1979—Pub. L. 96–170 inserted "or the District of Columbia" after "Territory", and provisions relating to Acts of Congress applicable solely to the District of Columbia.

### Effective Date of 1979 Amendment

Amendment by Pub. L. 96–170 applicable with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after Dec. 29, 1979, see section 3 of Pub. L. 96–170, set out as a note under section 1343 of Title 28, Judiciary and Judicial Procedure.

**(j) Repealed. Pub. L. 105–276, title V, §550(a)(6), Oct. 21, 1998, 112 Stat. 2609**

**(k) Verification of income**

The Secretary shall establish procedures which are appropriate and necessary to assure that income data provided to public housing agencies and owners by families applying for or receiving assistance under this section is complete and accurate. In establishing such procedures, the Secretary shall randomly, regularly, and periodically select a sample of families to authorize the Secretary to obtain information on these families for the purpose of income verification, or to allow those families to provide such information themselves. Such information may include, but is not limited to, data concerning unemployment compensation and Federal income taxation and data relating to benefits made available under the Social Security Act [42 U.S.C. 301 et seq.], the Food and Nutrition Act of 2008 [7 U.S.C. 2011 et seq.], or title 38. Any such information received pursuant to this subsection shall remain confidential and shall be used only for the purpose of verifying incomes in order to determine eligibility of families for benefits (and the amount of such benefits, if any) under this section.

**(*l*), (m) Repealed. Pub. L. 98–181, title II, §209(a)(5), Nov. 30, 1983, 97 Stat. 1183**

**(n) Repealed. Pub. L. 105–276, title V, §550(a)(7), Oct. 21, 1998, 112 Stat. 2609**

**(*o*) Voucher program**

**(1) Authority**

**(A) In general**

The Secretary may provide assistance to public housing agencies for tenant-based assistance using a payment standard established in accordance with subparagraph (B). The payment standard shall be used to determine the monthly assistance that may be paid for any family, as provided in paragraph (2).

**(B) Establishment of payment standard**

Except as provided under subparagraph (D), the payment standard for each size of dwelling unit in a market area shall not exceed 110 percent of the fair market rental established under subsection (c) of this section for the same size of dwelling unit in the same market area and shall be not less than 90 percent of that fair market rental.

**(C) Set-aside**

The Secretary may set aside not more than 5 percent of the budget authority made available for assistance under this subsection as an adjustment pool. The Secretary shall use amounts in the adjustment pool to make adjusted payments to public housing agencies under subparagraph (A), to ensure continued affordability, if the Secretary determines that additional assistance for such purpose is necessary, based on documentation submitted by a public housing agency.

**(D) Approval**

The Secretary may require a public housing agency to submit the payment standard of the public housing agency to the Secretary for approval, if the payment standard is less than 90 percent of the fair market rental or exceeds 110 percent of the fair market rental.

**(E) Review**

The Secretary—

(i) shall monitor rent burdens and review any payment standard that results in a significant percentage of the families occupying units of any size paying more than 30 percent of adjusted income for rent; and

(ii) may require a public housing agency to modify the payment standard of the public housing agency based on the results of that review.

**(2) Amount of monthly assistance payment**

ADD. 2

Case:Case4:15-14Document:00tDentertD6314626Page:Page: 42ate Eilate:File/l502010/20Entry EntryID:9609570159

Subject to the requirement under section 1437a(a)(3) of this title (relating to minimum rental amount), the monthly assistance payment for a family receiving assistance under this subsection shall be determined as follows:

### (A) Tenant-based assistance; rent not exceeding payment standard

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) does not exceed the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the rent (including the amount allowed for tenant-paid utilities) exceeds the greatest of the following amounts, rounded to the nearest dollar:

    (i) 30 percent of the monthly adjusted income of the family.

    (ii) 10 percent of the monthly income of the family.

    (iii) If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the actual housing costs of the family, is specifically designated by that agency to meet the housing costs of the family, the portion of those payments that is so designated.

### (B) Tenant-based assistance; rent exceeding payment standard

For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) exceeds the applicable payment standard established under paragraph (1), the monthly assistance payment for the family shall be equal to the amount by which the applicable payment standard exceeds the greatest of amounts under clauses (i), (ii), and (iii) of subparagraph (A).

### (C) Families receiving project-based assistance

For a family receiving project-based assistance, the rent that the family is required to pay shall be determined in accordance with section 1437a(a)(1) of this title, and the amount of the housing assistance payment shall be determined in accordance with subsection (c)(3) of this section.

## (3) 40 percent limit

At the time a family initially receives tenant-based assistance under this section with respect to any dwelling unit, the total amount that a family may be required to pay for rent may not exceed 40 percent of the monthly adjusted income of the family.

## (4) Eligible families

To be eligible to receive assistance under this subsection, a family shall, at the time a family initially receives assistance under this subsection, be a low-income family that is—

    (A) a very low-income family;

    (B) a family previously assisted under this subchapter;

    (C) a low-income family that meets eligibility criteria specified by the public housing agency;

    (D) a family that qualifies to receive a voucher in connection with a homeownership program approved under title IV of the Cranston-Gonzalez National Affordable Housing Act; or

    (E) a family that qualifies to receive a voucher under section 223 or 226 of the Low-Income Housing Preservation and Resident Homeownership Act of 1990 [12 U.S.C. 4113, 4116].

## (5) Annual review of family income

### (A) In general

Reviews of family incomes for purposes of this section shall be subject to the provisions of section 3544 of this title and shall be conducted upon the initial provision of housing assistance for the family and thereafter not less than annually.

### (B) Procedures

Each public housing agency administering assistance under this subsection shall establish procedures that are appropriate and necessary to ensure that income data provided to the

Case:Case4:13-1456ocumeDocument:658462e2Page: 49ate Filed:Filed05/20/10/20Entry EntryD:59699570159

agency and owners by families applying for or receiving assistance from the agency is complete and accurate. Each public housing agency shall, not less frequently than annually, conduct a review of the family income of each family receiving assistance under this subsection.

### (6) Selection of families and disapproval of owners

#### (A) Preferences

##### (i) Authority to establish

Each public housing agency may establish a system for making tenant-based assistance under this subsection available on behalf of eligible families that provides preference for such assistance to eligible families having certain characteristics, which may include a preference for families residing in public housing who are victims of a crime of violence (as such term is defined in section 16 of title 18) that has been reported to an appropriate law enforcement agency.

##### (ii) Content

Each system of preferences established pursuant to this subparagraph shall be based upon local housing needs and priorities, as determined by the public housing agency using generally accepted data sources, including any information obtained pursuant to an opportunity for public comment as provided under section 1437c–1(f) of this title and under the requirements applicable to the comprehensive housing affordability strategy for the relevant jurisdiction.

#### (B) Selection of tenants

Each housing assistance payment contract entered into by the public housing agency and the owner of a dwelling unit) [6] shall provide that the screening and selection of families for those units shall be the function of the owner. In addition, the public housing agency may elect to screen applicants for the program in accordance with such requirements as the Secretary may establish. That an applicant or participant is or has been a victim of domestic violence, dating violence, or stalking is not an appropriate basis for denial of program assistance or for denial of admission if the applicant otherwise qualifies for assistance or admission. Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

#### (C) PHA disapproval of owners

In addition to other grounds authorized by the Secretary, a public housing agency may elect not to enter into a housing assistance payments contract under this subsection with an owner who refuses, or has a history of refusing, to take action to terminate tenancy for activity engaged in by the tenant, any member of the tenant's household, any guest, or any other person under the control of any member of the household that—

(i) threatens the health or safety of, or right to peaceful enjoyment of the premises by, other tenants or employees of the public housing agency, owner, or other manager of the housing;

(ii) threatens the health or safety of, or right to peaceful enjoyment of the residences by, persons residing in the immediate vicinity of the premises; or

(iii) is drug-related or violent criminal activity.

### (7) Leases and tenancy

Each housing assistance payment contract entered into by the public housing agency and the owner of a dwelling unit—

(A) shall provide that the lease between the tenant and the owner shall be for a term of not less than 1 year, except that the public housing agency may approve a shorter term for an initial lease between the tenant and the dwelling unit owner if the public housing agency determines that such shorter term would improve housing opportunities for the tenant and if such shorter term is considered to be a prevailing local market practice;

(B) shall provide that the dwelling unit owner shall offer leases to tenants assisted under this

Case: 19-1458 Document: 00116862662 Page: 50 Date Filed: 05/20/2019 Entry ID: 6259970159

and shall conduct the analysis on a nationwide and regional basis and in a manner such that accurate per unit cost comparisons may be made between Federal assisted housing programs, including grants, direct subsidies, tax concessions, Federal mortgage insurance liability, periodic renovation and rehabilitation, and modernization costs, demolition costs, and other ancillary costs such as security; and

"(2) measure and evaluate qualitative differences among Federal assisted housing programs in accordance with applicable standards of the Department of Housing and Urban Development.

"(c) PROHIBITION OF RECOMMENDATIONS.—In conducting the study under this section and reporting under subsection (e), the Comptroller General may not make any recommendations regarding Federal housing policy.

"(d) FEDERAL ASSISTED HOUSING PROGRAMS.—For purposes of this section, the term 'Federal assisted housing programs' means—

"(1) the public housing program under the United States Housing Act of 1937 [42 U.S.C. 1437 et seq.], except that the study under this section shall differentiate between and compare the development and construction of new public housing and the assistance of existing public housing structures;

"(2) the certificate program for rental assistance under section 8(b)(1) of the United States Housing Act of 1937 [42 U.S.C. 1437f(b)(1)];

"(3) the voucher program for rental assistance under section 8(o) of the United States Housing Act of 1937 [42 U.S.C. 1437f(o)];

"(4) the programs for project-based assistance under section 8 of the United States Housing Act of 1937 [42 U.S.C. 1437f];

"(5) the rental assistance payments program under section 521(a)(2)(A) of the Housing Act of 1949 [42 U.S.C. 1490a(a)(2)(A)];

"(6) the program for housing for the elderly under section 202 of the Housing Act of 1959 [12 U.S.C. 1701q];

"(7) the program for housing for persons with disabilities under section 811 of the Cranston-Gonzalez National Affordable Housing Act [42 U.S.C. 8013];

"(8) the program for financing housing by a loan or mortgage insured under section 221(d)(3) of the National Housing Act [12 U.S.C. 1715l(d)(3)] that bears interest at a rate determined under the proviso of section 221(d)(5) of such Act [12 U.S.C. 1715l(d)(5)];

"(9) the program under section 236 of the National Housing Act [12 U.S.C. 1715z–1];

"(10) the program for construction or substantial rehabilitation under section 8(b)(2) of the United States Housing Act of 1937 [42 U.S.C. 1437f(b)(2)], as in effect before October 1, 1983; and

"(11) any other program for housing assistance administered by the Secretary of Housing and Urban Development or the Secretary of Agriculture, under which occupancy in the housing assisted or housing assistance provided is based on income, as the Comptroller General may determine.

"(e) REPORT.—Not later than 12 months after the date of the enactment of this Act [Oct. 21, 1998], the Comptroller General shall submit to the Congress a final report which shall contain the results of the study under this section, including the analysis and estimates required under subsection (b).

"(f) EFFECTIVE DATE.—This section shall take effect on the date of the enactment of this Act [Oct. 21, 1998]."

LIMITATION ON WITHHOLDING OR CONDITIONING OF ASSISTANCE

Assistance provided for in Housing and Community Development Act of 1974 [42 U.S.C. 5301 et seq.], National Housing Act [12 U.S.C. 1701 et seq.], United States Housing Act of 1937 [42 U.S.C. 1437 et seq.], Housing Act of 1949 [see Short Title note set out under section 1441 of this title], Demonstration Cities and Metropolitan Development Act of 1966 [see Short Title note set out under section 3331 of this title], and Housing and Urban Development Acts of 1965, 1968, 1969, and 1970

not to be withheld or made subject to conditions by reason of tax-exempt status of obligations issued or to be issued for financing of assistance, except as otherwise provided by law, see section 817 of Pub. L. 93–383, set out as a note under section 5301 of this title.

## § 1437a. Rental payments

**(a) Families included; rent options; minimum amount; occupancy by police officers and over-income families**

(1) Dwelling units assisted under this chapter shall be rented only to families who are low-income families at the time of their initial occupancy of such units. Reviews of family income shall be made at least annually. Except as provided in paragraph (2) and subject to the requirement under paragraph (3), a family shall pay as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(o) or (y) of this title or paying rent under section 1437f(o)(3)(B)[1] of this title) the highest of the following amounts, rounded to the nearest dollar:

(A) 30 per centum of the family's monthly adjusted income;

(B) 10 per centum of the family's monthly income; or

(C) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

(2) RENTAL PAYMENTS FOR PUBLIC HOUSING FAMILIES.—

(A) AUTHORITY FOR FAMILY TO SELECT.—

(i) IN GENERAL.—A family residing in a public housing dwelling unit shall pay as monthly rent for the unit the amount determined under clause (i) or (ii) of subparagraph (B), subject to the requirement under paragraph (3) (relating to minimum rents). Each public housing agency shall provide for each family residing in a public housing dwelling unit owned, assisted, or operated by the agency to elect annually whether the rent paid by such family shall be determined under clause (i) or (ii) of subparagraph (B). A public housing agency may not at any time fail to provide both such rent options for any public housing dwelling unit owned, assisted, or operated by the agency.

(ii) AUTHORITY TO RETAIN FLAT AND CEILING RENTS.—Notwithstanding clause (i) or any other provision of law, any public housing agency that is administering flat rents or ceiling rents pursuant to any authority referred to in section 519(d) of the Quality Housing and Work Responsibility Act of 1998 before the effective day of such Act may continue to charge rent in accordance with such rent provisions after such effective date, except that the agency shall provide for families residing in public housing dwelling units owned or operated by the agency to elect annually whether to pay rent under such provisions or in accordance with one of

[1] See References in Text note below.

the rent options referred to in subparagraph (A).

(B) ALLOWABLE RENT STRUCTURES.—

(i) FLAT RENTS.—Except as otherwise provided under this clause, each public housing agency shall establish, for each dwelling unit in public housing owned or operated by the agency, a flat rental amount for the dwelling unit, which shall—

(I) be based on the rental value of the unit, as determined by the public housing agency; and

(II) be designed in accordance with subparagraph (D) so that the rent structures do not create a disincentive for continued residency in public housing by families who are attempting to become economically self-sufficient through employment or who have attained a level of self-sufficiency through their own efforts.

The rental amount for a dwelling unit shall be considered to comply with the requirements of this clause if such amount does not exceed the actual monthly costs to the public housing agency attributable to providing and operating the dwelling unit. The preceding sentence may not be construed to require establishment of rental amounts equal to or based on operating costs or to prevent public housing agencies from developing flat rents required under this clause in any other manner that may comply with this clause.

(ii) INCOME-BASED RENTS.—

(I) IN GENERAL.—The monthly rental amount determined under this clause for a family shall be an amount, determined by the public housing agency, that does not exceed the greatest of the amounts (rounded to the nearest dollar) determined under subparagraphs (A), (B), and (C) of paragraph (1). This clause may not be construed to require a public housing agency to charge a monthly rent in the maximum amount permitted under this clause.

(II) DISCRETION.—Subject to the limitation on monthly rental amount under subclause (I), a public housing agency may, in its discretion, implement a rent structure under this clause requiring that a portion of the rent be deposited to an escrow or savings account, imposing ceiling rents, or adopting income exclusions (such as those set forth in subsection (b)(5)(B) of this section), or may establish another reasonable rent structure or amount.

(C) SWITCHING RENT DETERMINATION METHODS BECAUSE OF HARDSHIP CIRCUMSTANCES.—Notwithstanding subparagraph (A), in the case of a family that has elected to pay rent in the amount determined under subparagraph (B)(i), a public housing agency shall immediately provide for the family to pay rent in the amount determined under subparagraph (B)(ii) during the period for which such election was made upon a determination that the family is unable to pay the amount determined under subparagraph (B)(i) because of financial hardship, including—

(i) situations in which the income of the family has decreased because of changed circumstances, loss of[2] reduction of employment, death in the family, and reduction in or loss of income or other assistance;

(ii) an increase, because of changed circumstances, in the family's expenses for medical costs, child care, transportation, education, or similar items; and

(iii) such other situations as may be determined by the agency.

(D) ENCOURAGEMENT OF SELF-SUFFICIENCY.— The rental policy developed by each public housing agency shall encourage and reward employment and economic self-sufficiency.

(E) INCOME REVIEWS.—Notwithstanding the second sentence of paragraph (1), in the case of families that are paying rent in the amount determined under subparagraph (B)(i), the agency shall review the income of such family not less than once every 3 years.

(3) MINIMUM RENTAL AMOUNT.—

(A) REQUIREMENT.—Notwithstanding paragraph (1) of this subsection, the method for rent determination elected pursuant to paragraph (2)(A) of this subsection by a family residing in public housing, section 1437f(o)(2) of this title, or section 206(d) of the Housing and Urban-Rural Recovery Act of 1983 (including paragraph (5) of such section), the following entities shall require the following families to pay a minimum monthly rental amount (which amount shall include any amount allowed for utilities) of not more than $50 per month, as follows:

(i) Each public housing agency shall require the payment of such minimum monthly rental amount, which amount shall be determined by the agency, by—

(I) each family residing in a dwelling unit in public housing by the agency;

(II) each family who is assisted under the certificate or moderate rehabilitation program under section 1437f of this title; and

(III) each family who is assisted under the voucher program under section 1437f of this title, and the agency shall reduce the monthly assistance payment on behalf of such family as may be necessary to ensure payment of such minimum monthly rental amount.

(ii) The Secretary shall require each family who is assisted under any other program for rental assistance under section 1437f of this title to pay such minimum monthly rental amount, which amount shall be determined by the Secretary.

(B) EXCEPTION FOR HARDSHIP CIRCUMSTANCES.—

(i) IN GENERAL.—Notwithstanding subparagraph (A), a public housing agency (or the Secretary, in the case of a family described in subparagraph (A)(ii)) shall immediately grant an exemption from application of the minimum monthly rental under such subparagraph to any family unable to pay such amount because of financial hardship, which shall include situations in which (I) the family has lost eligibility for or is awaiting an

---

[2] So in original. Probably should be "or".

eligibility determination for a Federal, State, or local assistance program, including a family that includes a member who is an alien lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C. 1101 et seq.] who would be entitled to public benefits but for title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 [8 U.S.C. 1601 et seq.]; (II) the family would be evicted as a result of the imposition of the minimum rent requirement under subparagraph (A); (III) the income of the family has decreased because of changed circumstance, including loss of employment; (IV) a death in the family has occurred; and (V) other situations as may be determined by the agency (or the Secretary, in the case of a family described in subparagraph (A)(ii)).

(ii) WAITING PERIOD.—If a resident requests a hardship exemption under this subparagraph and the public housing agency (or the Secretary, in the case of a family described in subparagraph (A)(ii)) reasonably determines the hardship to be of a temporary nature, an exemption shall not be granted during the 90-day period beginning upon the making of a request for the exemption. A resident may not be evicted during such 90-day period for nonpayment of rent. In such a case, if the resident thereafter demonstrates that the financial hardship is of a long-term basis, the agency (or the Secretary) shall retroactively exempt the resident from the applicability of the minimum rent requirement for such 90-day period.

(4) OCCUPANCY BY POLICE OFFICERS.—

(A) IN GENERAL.—Subject to subparagraph (B) and notwithstanding any other provision of law, a public housing agency may, in accordance with the public housing agency plan for the agency, allow a police officer who is not otherwise eligible for residence in public housing to reside in a public housing dwelling unit. The number and location of units occupied by police officers under this paragraph and the terms and conditions of their tenancies shall be determined by the public housing agency.

(B) INCREASED SECURITY.—A public housing agency may take the actions authorized in subparagraph (A) only for the purpose of increasing security for the residents of a public housing project.

(C) DEFINITION.—In this paragraph, the term "police officer" means any person determined by a public housing agency to be, during the period of residence of that person in public housing, employed on a full-time basis as a duly licensed professional police officer by a Federal, State, or local government or by any agency thereof (including a public housing agency having an accredited police force).

(5) OCCUPANCY BY OVER-INCOME FAMILIES IN CERTAIN PUBLIC HOUSING.—

(A) AUTHORITY.—Notwithstanding any other provision of law, a public housing agency that owns or operates less than 250 units may, on a month-to-month basis, lease a dwelling unit in a public housing project to an over-income family in accordance with this paragraph, but only if there are no eligible families applying for housing assistance from the public housing agency for that month and the agency provides not less than 30-day public notice of the availability of such assistance.

(B) TERMS AND CONDITIONS.—The number and location of dwelling units of a public housing agency occupied under this paragraph by over-income families, and the terms and conditions of those tenancies, shall be determined by the public housing agency, except that—

(i) notwithstanding paragraph (2), rent for a unit shall be in an amount that is not less than the costs to operate the unit;

(ii) if an eligible family applies for residence after an over-income family moves in to the last available unit, the over-income family shall vacate the unit in accordance with notice of termination of tenancy provided by the agency, which shall be provided not less than 30 days before such termination; and

(iii) if a unit is vacant and there is no one on the waiting list, the public housing agency may allow an over-income family to gain immediate occupancy in the unit, while simultaneously providing reasonable public notice and outreach with regard to availability of the unit.

(C) DEFINITION.—For purposes of this paragraph, the term "over-income family" means an individual or family that is not a low-income family at the time of initial occupancy.

**(b) Definition of terms under this chapter**

When used in this chapter:

(1) The term "low-income housing" means decent, safe, and sanitary dwellings assisted under this chapter. The term "public housing" means low-income housing, and all necessary appurtenances thereto, assisted under this chapter other than under section 1437f of this title. The term "public housing" includes dwelling units in a mixed finance project that are assisted by a public housing agency with capital or operating assistance. When used in reference to public housing, the term "low-income housing project" or "project" means (A) housing developed, acquired, or assisted by a public housing agency under this chapter, and (B) the improvement of any such housing.

(2) The term "low-income families" means those families whose incomes do not exceed 80 per centum of the median income for the area, as determined by the Secretary with adjustments for smaller and larger families, except that the Secretary may establish income ceilings higher or lower than 80 per centum of the median for the area on the basis of the Secretary's findings that such variations are necessary because of prevailing levels of construction costs or unusually high or low family incomes. The term "very low-income families" means low-income families whose incomes do not exceed 50 per centum of the median family income for the area, as determined by the Secretary with adjustments for smaller and larger families, except that the Secretary may establish income ceilings higher or lower than 50 per centum of the median for the area on the basis

Case:Case:4:58-14:58-1Document:Document:0001-59462:62age:Page: 53ate Date:Filed:05/05/2015/20/16entry ID:ntry ID:5969470159

§1437a                    TITLE 42—THE PUBLIC HEALTH AND WELFARE                    Page 3714

of the Secretary's findings that such variations are necessary because of unusually high or low family incomes. Such ceilings shall be established in consultation with the Secretary of Agriculture for any rural area, as defined in section 1490 of this title, taking into account the subsidy characteristics and types of programs to which such ceilings apply. In determining median incomes (of persons, families, or households) for an area or establishing any ceilings or limits based on income under this chapter, the Secretary shall determine or establish area median incomes and income ceilings and limits for Westchester and Rockland Counties, in the State of New York, as if each such county were an area not contained within the metropolitan statistical area in which it is located. In determining such area median incomes or establishing such income ceilings or limits for the portion of such metropolitan statistical area that does not include Westchester or Rockland Counties, the Secretary shall determine or establish area median incomes and income ceilings and limits as if such portion included Westchester and Rockland Counties. In determining areas that are designated as difficult development areas for purposes of the low-income housing tax credit, the Secretary shall include Westchester and Rockland Counties, New York, in the New York City metropolitan area.

(3) PERSONS AND FAMILIES.—

(A) SINGLE PERSONS.—The term "families" includes families consisting of a single person in the case of (i) an elderly person, (ii) a disabled person, (iii) a displaced person, (iv) the remaining member of a tenant family, and (v) any other single persons. In no event may any single person under clause (v) of the first sentence be provided a housing unit assisted under this chapter of 2 or more bedrooms.

(B) FAMILIES.—The term "families" includes families with children and, in the cases of elderly families, near-elderly families, and disabled families, means families whose heads (or their spouses), or whose sole members, are elderly, near-elderly, or persons with disabilities, respectively. The term includes, in the cases of elderly families, near-elderly families, and disabled families, 2 or more elderly persons, near-elderly persons, or persons with disabilities living together, and 1 or more such persons living with 1 or more persons determined under the public housing agency plan to be essential to their care or well-being.

(C) ABSENCE OF CHILDREN.—The temporary absence of a child from the home due to placement in foster care shall not be considered in determining family composition and family size.

(D) ELDERLY PERSON.—The term "elderly person" means a person who is at least 62 years of age.

(E) PERSON WITH DISABILITIES.—The term "person with disabilities" means a person who—

(i) has a disability as defined in section 423 of this title,

(ii) is determined, pursuant to regulations issued by the Secretary, to have a physical, mental, or emotional impairment which (I) is expected to be of long-continued and in-

definite duration, (II) substantially impedes his or her ability to live independently, and (III) is of such a nature that such ability could be improved by more suitable housing conditions, or

(iii) has a developmental disability as defined in section 15002 of this title.

Such term shall not exclude persons who have the disease of acquired immunodeficiency syndrome or any conditions arising from the etiologic agent for acquired immunodeficiency syndrome. Notwithstanding any other provision of law, no individual shall be considered a person with disabilities, for purposes of eligibility for low-income housing under this subchapter, solely on the basis of any drug or alcohol dependence. The Secretary shall consult with other appropriate Federal agencies to implement the preceding sentence.

(F) DISPLACED PERSON.—The term "displaced person" means a person displaced by governmental action, or a person whose dwelling has been extensively damaged or destroyed as a result of a disaster declared or otherwise formally recognized pursuant to Federal disaster relief laws.

(G) NEAR-ELDERLY PERSON.—The term "near-elderly person" means a person who is at least 50 years of age but below the age of 62.

(4) The term "income" means income from all sources of each member of the household, as determined in accordance with criteria prescribed by the Secretary, in consultation with the Secretary of Agriculture, except that any amounts not actually received by the family and any amounts which would be eligible for exclusion under section 1382b(a)(7) of this title or any deferred Department of Veterans Affairs disability benefits that are received in a lump sum amount or in prospective monthly amounts may not be considered as income under this paragraph.

(5) ADJUSTED INCOME.—The term "adjusted income" means, with respect to a family, the amount (as determined by the public housing agency) of the income of the members of the family residing in a dwelling unit or the persons on a lease, after any income exclusions as follows:

(A) MANDATORY EXCLUSIONS.—In determining adjusted income, a public housing agency shall exclude from the annual income of a family the following amounts:

(i) ELDERLY AND DISABLED FAMILIES.—$400 for any elderly or disabled family.

(ii) MEDICAL EXPENSES.—The amount by which 3 percent of the annual family income is exceeded by the sum of—

(I) unreimbursed medical expenses of any elderly family or disabled family;

(II) unreimbursed medical expenses of any family that is not covered under subclause (I), except that this subclause shall apply only to the extent approved in appropriation Acts; and

(III) unreimbursed reasonable attendant care and auxiliary apparatus expenses for each handicapped member of the family, to the extent necessary to enable any member of such family (including such handicapped member) to be employed.

(iii) CHILD CARE EXPENSES.—Any reasonable child care expenses necessary to enable a member of the family to be employed or to further his or her education.

(iv) MINORS, STUDENTS, AND PERSONS WITH DISABILITIES.—$480 for each member of the family residing in the household (other than the head of the household or his or her spouse) who is less than 18 years of age or is attending school or vocational training on a full-time basis, or who is 18 years of age or older and is a person with disabilities.

(v) CHILD SUPPORT PAYMENTS.—Any payment made by a member of the family for the support and maintenance of any child who does not reside in the household, except that the amount excluded under this clause may not exceed $480 for each child for whom such payment is made; except that this clause shall apply only to the extent approved in appropriations Acts.

(vi) SPOUSAL SUPPORT EXPENSES.—Any payment made by a member of the family for the support and maintenance of any spouse or former spouse who does not reside in the household, except that the amount excluded under this clause shall not exceed the lesser of (I) the amount that such family member has a legal obligation to pay, or (II) $550 for each individual for whom such payment is made; except that this clause shall apply only to the extent approved in appropriations Acts.

(vii) EARNED INCOME OF MINORS.—The amount of any earned income of a member of the family who is not—

(I) 18 years of age or older; and

(II) the head of the household (or the spouse of the head of the household).

(B) PERMISSIVE EXCLUSIONS FOR PUBLIC HOUSING.—In determining adjusted income, a public housing agency may, in the discretion of the agency, establish exclusions from the annual income of a family residing in a public housing dwelling unit. Such exclusions may include the following amounts:

(i) EXCESSIVE TRAVEL EXPENSES.—Excessive travel expenses in an amount not to exceed $25 per family per week, for employment- or education-related travel.

(ii) EARNED INCOME.—An amount of any earned income of the family, established at the discretion of the public housing agency, which may be based on—

(I) all earned income of the family,[3]

(II) the amount earned by particular members of the family;

(III) the amount earned by families having certain characteristics; or

(IV) the amount earned by families or members during certain periods or from certain sources.

(iii) OTHERS.—Such other amounts for other purposes, as the public housing agency may establish.

(6) PUBLIC HOUSING AGENCY.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the term "public housing agency" means any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing.

(B) SECTION 1437f PROGRAM.—For purposes of the program for tenant-based assistance under section 1437f of this title, such term includes—

(i) a consortia of public housing agencies that the Secretary determines has the capacity and capability to administer a program for assistance under such section in an efficient manner;

(ii) any other public or private nonprofit entity that, upon the effective date under section 503(a) of the Quality Housing and Work Responsibility Act of 1998, was administering any program for tenant-based assistance under section 1437f of this title (as in effect before the effective date of such Act), pursuant to a contract with the Secretary or a public housing agency; and

(iii) with respect to any area in which no public housing agency has been organized or where the Secretary determines that a public housing agency is unwilling or unable to implement a program for tenant-based assistance [4] section 1437f of this title, or is not performing functions—

(I) the Secretary or another public or private nonprofit entity that by contract agrees to receive assistance amounts under section 1437f of this title and enter into housing assistance payments contracts with owners and perform the other functions of public housing agency under section 1437f of this title; or

(II) notwithstanding any provision of State or local law, a public housing agency for another area that contracts with the Secretary to administer a program for housing assistance under section 1437f of this title, without regard to any otherwise applicable limitations on its area of operation.

(7) The term "State" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, and the Trust Territory of the Pacific Islands.

(8) The term "Secretary" means the Secretary of Housing and Urban Development.

(9) DRUG-RELATED CRIMINAL ACTIVITY.—The term "drug-related criminal activity" means the illegal manufacture, sale, distribution, use, or possession with intent to manufacture, sell, distribute, or use, of a controlled substance (as such term is defined in section 802 of title 21).

(10) MIXED-FINANCE PROJECT.—The term "mixed-finance project" means a public housing project that meets the requirements of section 1437z–7 of this title.

(11) PUBLIC HOUSING AGENCY PLAN.—The term "public housing agency plan" means the plan of a public housing agency prepared in accordance with section 1437c–1 of this title.

(12) CAPITAL FUND.—The term "Capital Fund" means the fund established under section 1437g(d) of this title.

---

[3] So in original. The comma probably should be a semicolon.

[4] So in original. Probably should be "assistance under".

(13) OPERATING FUND.—The term "Operating Fund" means the fund established under section 1437g(e) of this title.

**(c) Definition of terms used in reference to public housing**

When used in reference to public housing:

(1) The term "development" means any or all undertakings necessary for planning, land acquisition, demolition, construction, or equipment, in connection with a low-income housing project. The term "development cost" comprises the costs incurred by a public housing agency in such undertakings and their necessary financing (including the payment of carrying charges), and in otherwise carrying out the development of such project, but does not include the costs associated with the demolition of or remediation of environmental hazards associated with public housing units that will not be replaced on the project site, or other extraordinary site costs as determined by the Secretary. Construction activity in connection with a low-income housing project may be confined to the reconstruction, remodeling, or repair of existing buildings.

(2) The term "operation" means any or all undertakings appropriate for management, operation, services, maintenance, security (including the cost of security personnel), or financing in connection with a low-income housing project. The term also means the financing of tenant programs and services for families residing in low-income housing projects, particularly where there is maximum feasible participation of the tenants in the development and operation of such tenant programs and services. As used in this paragraph, the term "tenant programs and services" includes the development and maintenance of tenant organizations which participate in the management of low-income housing projects; the training of tenants to manage and operate such projects and the utilization of their services in project management and operation; counseling on household management, housekeeping, budgeting, money management, child care, and similar matters; advice as to resources for job training and placement, education, welfare, health, and other community services; services which are directly related to meeting tenant needs and providing a wholesome living environment; and referral to appropriate agencies in the community when necessary for the provision of such services. To the maximum extent available and appropriate, existing public and private agencies in the community shall be used for the provision of such services.

(3) The term "acquisition cost" means the amount prudently required to be expended by a public housing agency in acquiring property for a low-income housing project.

(4) The term "congregate housing" means low-rent housing with which there is connected a central dining facility where wholesome and economical meals can be served to occupants. Expenditures incurred by a public housing agency in the operation of a central dining facility in connection with congregate housing (other than the cost of providing food and service) shall be considered a cost of operation of the housing.

(5) The terms "group home" and "independent living facility" have the meanings given such terms in section 8013(k) of this title.

**(d) Disallowance of earned income from rent determinations**

**(1) In general**

Notwithstanding any other provision of law, the rent payable under subsection (a) of this section by a family described in paragraph (3) of this subsection may not be increased as a result of the increased income due to such employment during the 12-month period beginning on the date on which the employment is commenced.

**(2) Phase-in of rent increases**

Upon the expiration of the 12-month period referred to in paragraph (1), the rent payable by a family described in paragraph (3) may be increased due to the continued employment of the family member described in paragraph (3)(B), except that during the 12-month period beginning upon such expiration the amount of the increase may not be greater than 50 percent of the amount of the total rent increase that would be applicable but for this paragraph.

**(3) Eligible families**

A family described in this paragraph is a family—

(A) that—

(i) occupies a dwelling unit in a public housing project; or

(ii) receives assistance under section 1437f of this title; and

(B)(i) whose income increases as a result of employment of a member of the family who was previously unemployed for 1 or more years;

(ii) whose earned income increases during the participation of a family member in any family self-sufficiency or other job training program; or

(iii) who is or was, within 6 months, assisted under any State program for temporary assistance for needy families funded under part A of title IV of the Social Security Act [42 U.S.C. 601 et seq.] and whose earned income increases.

**(4) Applicability**

This subsection and subsection (e) of this section shall apply beginning upon October 1, 1999, except that this subsection and subsection (e) of this section shall apply with respect to any family described in paragraph 3(A)(ii)[5] only to the extent provided in advance in appropriations Acts.

**(e) Individual savings accounts**

**(1) In general**

In lieu of a disallowance of earned income under subsection (d) of this section, upon the request of a family that qualifies under subsection (d) of this section, a public housing agency may establish an individual savings account in accordance with this subsection for that family.

**(2) Deposits to account**

The public housing agency shall deposit in any savings account established under this

---

[5] So in original. Probably should be paragraph "(3)(A)(ii)".

subsection an amount equal to the total amount that otherwise would be applied to the family's rent payment under subsection (a) of this section as a result of employment.

**(3) Withdrawal from account**

Amounts deposited in a savings account established under this subsection may only be withdrawn by the family for the purpose of—

(A) purchasing a home;

(B) paying education costs of family members;

(C) moving out of public or assisted housing; or

(D) paying any other expense authorized by the public housing agency for the purpose of promoting the economic self-sufficiency of residents of public and assisted housing.

**(f) Availability of income matching information**

**(1) Disclosure to PHA**

A public housing agency, or the owner responsible for determining the participant's eligibility or level of benefits, shall require any family described in paragraph (2) who receives information regarding income, earnings, wages, or unemployment compensation from the Department of Housing and Urban Development pursuant to income verification procedures of the Department to disclose such information, upon receipt of the information, to the public housing agency that owns or operates the public housing dwelling unit in which such family resides or that provides the housing assistance under this chapter on behalf of such family, as applicable, or to the owner responsible for determining the participant's eligibility or level of benefits.

**(2) Families covered**

A family described in this paragraph is a family that resides in a dwelling unit—

(A) that is a public housing dwelling unit;

(B) for which tenant-based assistance is provided under section 1437f of this title,[6] or

(C) for which project-based assistance is provided under section 1437f of this title, section 1437bb[7] of this title, or section 811.[7]

(Sept. 1, 1937, ch. 896, title I, §3, as added Pub. L. 93–383, title II, §201(a), Aug. 22, 1974, 88 Stat. 654; amended Pub. L. 94–375, §2(f), Aug. 3, 1976, 90 Stat. 1068; Pub. L. 95–557, title II, §206(c), Oct. 31, 1978, 92 Stat. 2091; Pub. L. 96–153, title II, §202(a), Dec. 21, 1979, 93 Stat. 1106; Pub. L. 97–35, title III, §322(a), Aug. 13, 1981, 95 Stat. 400; Pub. L. 98–181, title II, §§202, 206(a)–(c), Nov. 30, 1983, 97 Stat. 1178, 1179; Pub. L. 98–479, title I, §102(b)(1)–(3), Oct. 17, 1984, 98 Stat. 2221; Pub. L. 100–242, title I, §§102(a), 111, 170(c), Feb. 5, 1988, 101 Stat. 1821, 1823, 1867; renumbered title I and amended Pub. L. 100–358, §§4, 5, June 29, 1988, 102 Stat. 680, 681; Pub. L. 101–235, title III, §302, Dec. 15, 1989, 103 Stat. 2043; Pub. L. 101–625, title V, §§515(b), 572, 573(a)–(d), 574, Nov. 28, 1990, 104 Stat. 4199, 4236–4238; Pub. L. 102–550, title I, §§102–103(a)(2), 185(c)(4), title VI, §§621, 622(c), 625(a)(1), Oct. 28, 1992, 106 Stat. 3683, 3748, 3812, 3817, 3820; Pub. L. 103–233, title III, §301, Apr. 11, 1994, 108 Stat. 369;

---

[6] So in original. The comma probably should be a semicolon.

[7] See References in Text notes below.

---

Pub. L. 104–99, title IV, §402(b)(1), (c), Jan. 26, 1996, 110 Stat. 40, 41; Pub. L. 104–330, title V, §501(b)(1), Oct. 26, 1996, 110 Stat. 4041; Pub. L. 105–276, title V, §§506, 507(a), (c), 508(a), (b)(1), (c)(1), (d)(1), 520(a), 523, 524(a), 546, Oct. 21, 1998, 112 Stat. 2523–2529, 2562, 2565–2567, 2604; Pub. L. 106–74, title II, §214(a), Oct. 20, 1999, 113 Stat. 1074; Pub. L. 106–402, title IV, §401(b)(7), Oct. 30, 2000, 114 Stat. 1738; Pub. L. 110–289, div. B, title VI, §2608, July 30, 2008, 122 Stat. 2862.)

REFERENCES IN TEXT

Section 1437f(c)(3)(B) of this title, referred to in subsec. (a)(1), was repealed by Pub. L. 105–276, title V, §550(a)(3)(A)(ii), Oct. 21, 1998, 112 Stat. 2609.

Section 519(d) of the Quality Housing and Work Responsibility Act of 1998, referred to in subsec. (a)(2)(A)(ii), is section 519(d) of Pub. L. 105–276 which is set out as a note below.

The effective day of such Act and the effective date of such Act, referred to in subsecs. (a)(2)(A)(ii) and (b)(6)(B)(ii), probably means the general effective date for the Quality Housing and Work Responsibility Act of 1998, Pub. L. 105–276, title V, included in section 503 of the Act which is set out as an Effective Date of 1998 Amendment note under section 1437 of this title.

Section 206(d) of the Housing and Urban-Rural Recovery Act of 1983, referred to in subsec. (a)(3)(A), is section 206(d) of Pub. L. 98–181, which is set out as a note below.

The Immigration and Nationality Act, referred to in subsec. (a)(3)(B)(i)(I), is act June 27, 1952, ch. 477, 66 Stat. 163, as amended, which is classified principally to chapter 12 (§1101 et seq.) of Title 8, Aliens and Nationality. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of Title 8 and Tables.

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in subsec. (a)(3)(B)(i)(I), is Pub. L. 104–193, Aug. 22, 1996, 110 Stat. 2105. Title IV of the Act is classified principally to chapter 14 (§1601 et seq.) of Title 8, Aliens and Nationality. For complete classification of title IV to the Code, see Tables.

Section 503(a) of the Quality Housing and Work Responsibility Act of 1998, referred to in subsec. (b)(6)(B)(ii), is section 503(a) of Pub. L. 105–276 which is set out as an Effective Date of 1998 Amendment note under section 1437 of this title.

The Social Security Act, referred to in subsec. (d)(3)(B)(iii), is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended. Part A of title IV of the Act is classified generally to part A (§601 et seq.) of subchapter IV of chapter 7 of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

Section 1437bb of this title, referred to in subsec. (f)(2)(C), was repealed by Pub. L. 104–330, title V, §501(a), Oct. 26, 1996, 110 Stat. 4041.

Section 811, referred to in subsec. (f)(2)(C), means section 811 of the United States Housing Act of 1937, but that Act does not contain a section 811.

PRIOR PROVISIONS

A prior section 3 of act Sept. 1, 1937, ch. 896, 50 Stat. 889, as amended, established the United States Housing Authority and was classified to section 1403 of this title, prior to the general revision of this chapter by Pub. L. 93–383.

Prior similar provisions were contained in section 2 of act Sept. 1, 1937, ch. 896, 50 Stat. 888, which was classified to section 1402 of this title prior to the general revision of this chapter by Pub. L. 93–383.

AMENDMENTS

2008—Subsec. (b)(4). Pub. L. 110–289 inserted "or any deferred Department of Veterans Affairs disability benefits that are received in a lump sum amount or in pro-

Case: 14-1458 Document: 00116584262 Page: 57 Date Filed: 05/20/2016 Entry ID: 5996970159

spective monthly amounts'' before ''may not be considered''.

2000—Subsec. (b)(3)(E)(iii). Pub. L. 106–402 substituted ''section 15002 of this title'' for ''section 6001 of this title''.

1999—Subsec. (f)(1). Pub. L. 106–74, §214(a)(1), inserted '', or the owner responsible for determining the participant's eligibility or level of benefits,'' after ''A public housing agency'' and '', or to the owner responsible for determining the participant's eligibility or level of benefits'' before period at end.

Subsec. (f)(2)(C). Pub. L. 106–74, §214(a)(2), added subpar. (C).

1998—Subsec. (a)(1). Pub. L. 105–276, §507(c), inserted ''and subject to the requirement under paragraph (3)'' after ''paragraph (2)'' in third sentence.

Subsec. (a)(2). Pub. L. 105–276, §523, amended par. (2) generally. For prior text, see 1996 Amendment note below.

Subsec. (a)(3). Pub. L. 105–276, §507(a), added par. (3).

Subsec. (a)(4), (5). Pub. L. 105–276, §524(a), added pars. (4) and (5).

Subsec. (b)(1). Pub. L. 105–276, §506(1), inserted after second sentence ''The term 'public housing' includes dwelling units in a mixed finance project that are assisted by a public housing agency with capital or operating assistance.''

Subsec. (b)(2). Pub. L. 105–276, §508(c)(1), substituted ''limits for Westchester and Rockland Counties'' for ''limits for Westchester County'', inserted ''each'' before ''such county'', substituted ''include Westchester or Rockland Counties'' for ''include Westchester County'' and ''included Westchester and Rockland Counties'' for ''included Westchester County'', and inserted at end ''In determining areas that are designated as difficult development areas for purposes of the low-income housing tax credit, the Secretary shall include Westchester and Rockland Counties, New York, in the New York City metropolitan area.''

Subsec. (b)(3)(A). Pub. L. 105–276, §506(2)(A), struck out at end ''In determining priority for admission to housing under this chapter, the Secretary shall give preference to single persons who are elderly, disabled, or displaced persons before single persons who are eligible under clause (v) of the first sentence.''

Subsec. (b)(3)(B). Pub. L. 105–276, §506(2)(B), substituted ''public housing agency plan'' for ''regulations of the Secretary'' in second sentence.

Subsec. (b)(3)(E). Pub. L. 105–276, §506(3), inserted at end ''Notwithstanding any other provision of law, no individual shall be considered a person with disabilities, for purposes of eligibility for low-income housing under this subchapter, solely on the basis of any drug or alcohol dependence. The Secretary shall consult with other appropriate Federal agencies to implement the preceding sentence.''

Subsec. (b)(5). Pub. L. 105–276, §508(a), amended par. (5) generally, substituting present provisions for provisions which had defined ''adjusted income'' as income which remained after excluding $550 for each member of family in household under 18 years of age, disabled, or a student, $400 for any elderly or disabled family, the amount by which medical and related expenses exceeded 3 percent of income, child care expenses, 10 percent of earned income, and any payment made for support and maintenance of nonresident child, spouse, or former spouse.

Subsec. (b)(6). Pub. L. 105–276, §546, amended par. (6) generally. Prior to amendment, par. (6) read as follows: ''The term 'public housing agency' means any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing.''

Subsec. (b)(9) to (13). Pub. L. 105–276, §506(4), added pars. (9) to (13).

Subsec. (c). Pub. L. 105–276, §508(b)(1)(A), which directed the amendment of subsec. (c) by striking out the undesignated par. after par. (3), was executed by striking out concluding provisions after par. (5), to reflect

the probable intent of Congress. Concluding provisions read as follows: ''The earnings of and benefits to any public housing resident resulting from participation in a program providing employment training and supportive services in accordance with the Family Support Act of 1988, section 1437t of this title, or any comparable Federal, State, or local law shall not be considered as income for the purposes of determining a limitation on the amount of rent paid by the resident during—

''(1) the period that the resident participates in such program; and

''(2) the period that—

''(A) begins with the commencement of employment of the resident in the first job acquired by the person after completion of such program that is not funded by assistance under this chapter; and

''(B) ends on the earlier of—

''(i) the date the resident ceases to continue employment without good cause as the Secretary shall determine; or

''(ii) the expiration of the 18-month period beginning on the date referred to in subparagraph (A).''

Subsec. (c)(1). Pub. L. 105–276, §520(a), inserted before period at end of second sentence '', but does not include the costs associated with the demolition of or remediation of environmental hazards associated with public housing units that will not be replaced on the project site, or other extraordinary site costs as determined by the Secretary''.

Subsecs. (d), (e). Pub. L. 105–276, §508(b)(1)(B), added subsecs. (d) and (e).

Subsec. (f). Pub. L. 105–276, §508(d)(1), added subsec. (f).

1996—Subsec. (a)(2). Pub. L. 104–99, §402(b)(1), (f), temporarily amended par. (2) generally, substituting

''(2) Notwithstanding paragraph (1), a public housing agency may—

''(A) adopt ceiling rents that reflect the reasonable market value of the housing, but that are not less than the monthly costs—

''(i) to operate the housing of the agency; and

''(ii) to make a deposit to a replacement reserve (in the sole discretion of the public housing agency); and

''(B) allow families to pay ceiling rents referred to in subparagraph (A), unless, with respect to any family, the ceiling rent established under this paragraph would exceed the amount payable as rent by that family under paragraph (1).'' for

''(2)(A) Any public housing agency may provide that each family residing in a public housing project owned and operated by such agency (or in low-income housing assisted under section 1437f of this title that contains more than 2,000 dwelling units) shall pay as monthly rent an amount determined by such agency to be appropriate that does not exceed a maximum amount that—

''(i) is established by such agency and approved by the Secretary;

''(ii) is not more than the amount payable as rent by such family under paragraph (1); and

''(iii) is not less than the average monthly amount of debt service and operating expenses attributable to dwelling units of similar size in public housing projects owned and operated by such agency.

''(B) The terms of all ceiling rents established prior to December 15, 1989, shall be extended without time limitation.'' See Effective and Termination Dates of 1996 Amendments note below.

Subsec. (b)(5)(F). Pub. L. 104–330, §501(b)(1)(A)(i), inserted ''and'' after semicolon.

Subsec. (b)(5)(G). Pub. L. 104–330, §501(b)(1)(A)(ii), (iii), redesignated subpar. (H) as (G) and struck out former subpar. (G) which read as follows: ''excessive travel expenses, not to exceed $25 per family per week, for employment- or education-related travel, except that this subparagraph shall apply only to families assisted by Indian housing authorities; and''.

Subsec. (b)(5)(H). Pub. L. 104–330, §501(b)(1)(A)(iii), redesignated subpar. (H) as (G).

Pub. L. 104–99, §402(c), (f), temporarily added subpar. (H) which read "for public housing, any other adjustments to earned income established by the public housing agency. If a public housing agency adopts other adjustments to income pursuant to subparagraph (H), the Secretary shall not take into account any reduction of or increase in the public housing agency's per unit dwelling rental income resulting from those adjustments when calculating the contributions under section 1437g of this title for the public housing agency for the operation of the public housing." See Effective and Termination Dates of 1996 Amendments note below.

Subsec. (b)(6). Pub. L. 104–330, §501(b)(1)(B), struck out at end "The term includes any Indian housing authority."

Subsec. (b)(7). Pub. L. 104–330, §501(b)(1)(C), inserted "and" before "the Trust" and struck out ", and Indian tribes" after "Pacific Islands".

Subsec. (b)(9) to (12). Pub. L. 104–330, §501(b)(1)(D), struck out pars. (9) to (12) which read as follows:

"(9) The term 'Indian' means any person recognized as being an Indian or Alaska Native by an Indian tribe, the Federal Government, or any State.

"(10) The term 'Indian area' means the area within which an Indian housing authority is authorized to provide low-income housing.

"(11) The term 'Indian housing authority' means any entity that—

"(A) is authorized to engage in or assist in the development or operation of low-income housing for Indians; and

"(B) is established—

"(i) by exercise of the power of self-government of an Indian tribe independent of State law; or

"(ii) by operation of State law providing specifically for housing authorities for Indians, including regional housing authorities in the State of Alaska.

"(12) The term 'Indian tribe' means any tribe, band, pueblo, group, community, or nation of Indians or Alaska Natives."

1994—Subsec. (b)(3)(B). Pub. L. 103–233 substituted "includes families with children and" for "means families with children".

1992—Subsec. (a)(1). Pub. L. 102–550, §185(c)(4), substituted "section 1437f(o) or (y) of this title or paying rent under section 1437f(c)(3)(B) of this title" for "section 1437f(o) of this title".

Subsec. (a)(2)(A). Pub. L. 102–550, §102(a), struck out "for not more than a 5-year period" after "monthly rent".

Subsec. (a)(2)(B). Pub. L. 102–550, §102(b), struck out first sentence which read as follows: "The 5-year limitation established in subparagraph (A) shall not apply to any family residing in a public housing project administered by an Indian public housing agency." and substituted "without time limitation" for "for the 5-year period beginning on December 15, 1989".

Subsec. (b)(3). Pub. L. 102–550, §621, amended par. (3) generally, substituting present provisions for provisions relating to families consisting of single persons, elderly families, handicapped persons, displaced persons, and families with household heads 50 years old or older and the priorities for admission of such families and persons to housing under this chapter.

Subsec. (b)(4). Pub. L. 102–550, §103(a)(1), inserted "and any amounts which would be eligible for exclusion under section 1382b(a)(7) of this title" after "family".

Subsec. (b)(5)(B). Pub. L. 102–550, §625(a)(1), inserted "or disabled" after "elderly".

Subsec. (b)(5)(D). Pub. L. 102–550, §103(a)(2)(A), added subpar. (D) and struck out former subpar. (D) which read as follows: "(i) child care expenses to the extent necessary to enable another member of the family to be employed or to further his or her education; or (ii) excessive travel expenses, not to exceed $25 per family per week, for employment or education related travel, except that this clause shall apply only to families assisted by Indian housing authorities;".

Subsec. (b)(5)(G). Pub. L. 102–550, §103(a)(2)(B)–(D), added subpar. (G).

Subsec. (c)(4), (5). Pub. L. 102–550, §622(c), which directed the amendment of subsec. (c) by inserting pars. (4) and (5) after "project.", was executed by making the insertion after "project." at the end of par. (3), to reflect the probable intent of Congress.

1990—Pub. L. 101–625, §515(b), added concluding undesignated par. directing that earnings and benefits to public housing residents resulting from participation in programs providing employment training and supportive services not be considered as income.

Subsec. (a)(1). Pub. L. 101–625, §572(1), substituted "low-income families" for "lower income families" in introductory provisions.

Subsecs. (a)(2)(A), (b)(1). Pub. L. 101–625, §572(2), substituted "low-income housing" for "lower income housing" wherever appearing.

Subsec. (b)(2). Pub. L. 101–625, §573(d), inserted sentences at end relating to determination or establishment of median incomes and income ceilings and limits for Westchester County and for metropolitan statistical areas outside Westchester County.

Pub. L. 101–625, §572(1), substituted "low-income families" for "lower income families" wherever appearing.

Subsec. (b)(3). Pub. L. 101–625, §574, inserted sentence at end relating to effect of temporary absence of child from the home due to placement in foster care on considerations of family composition and size.

Pub. L. 101–625, §573(a), substituted "(D) and any other single persons. In no event may any single person under clause (D) be provided a housing unit assisted under this chapter of 2 bedrooms or more." for "(D) other single persons in circumstances described in regulations of the Secretary." In first sentence, struck out after first sentence "In no event shall more than 15 per centum of the units under the jurisdiction of any public housing agency be occupied by single persons under clause (D).", and struck out third from last sentence which was executed (to reflect the probable intent of Congress) by striking out third sentence from end which read as follows: "The Secretary may increase the limitation described in the second sentence of this paragraph to not more than 30 per centum if, following consultation with the public housing agency involved, the Secretary determines that the dwelling units involved are neither being occupied, nor are likely to be occupied within the next 12 months, by families or persons described in clauses (A), (B), and (C), due to the condition or location of such dwelling units, and that such dwelling units may be occupied if made available to single persons described in clause (D)."

Subsec. (b)(4). Pub. L. 101–625, §573(b), inserted before period at end ", except that any amounts not actually received by the family may not be considered as income under this paragraph".

Subsec. (b)(5)(A). Pub. L. 101–625, §573(c)(1), substituted "$550" for "$480".

Subsec. (b)(5)(C). Pub. L. 101–625, §573(c)(2), struck out "elderly" before "family" in cl. (i) and struck out "and" at end.

Subsec. (b)(5)(E), (F). Pub. L. 101–625, §573(c)(3), added subpars. (E) and (F).

Subsecs. (b)(6), (10), (11)(A), (c). Pub. L. 101–625, §572(2), substituted "low-income housing" for "lower income housing" wherever appearing.

1989—Subsec. (a)(2)(A). Pub. L. 101–235, §302(1), substituted "5-year period" for "3-year period".

Subsec. (a)(2)(B). Pub. L. 101–235, §302(2), substituted "5-year limitation" for "3-year limitation" and inserted at end "The terms of all ceiling rents established prior to December 15, 1989, shall be extended for the 5-year period beginning on December 15, 1989."

1988—Subsec. (a). Pub. L. 100–242, §102(a), designated existing provisions as par. (1), substituted "Except as provided in paragraph (2), a" for "A", redesignated former pars. (1) to (3) as subpars. (A) to (C), respectively, and added par. (2).

Subsec. (b)(3). Pub. L. 100–242, §170(c), in cl. (A), substituted "sixty-two years of age," for "sixty-two years of age or", and ", has a developmental disability as defined in section 6001(7) of this title" for "or in section

102 of the Developmental Disabilities Services and Facilities Construction Amendments of 1970".

Pub. L. 100–242, §111, inserted provisions relating to determination of priority admission to public housing projects designed for elderly families.

Subsec. (b)(5)(D). Pub. L. 100–358, §4(a), designated existing provisions as cl. (i) and added cl. (ii).

Subsec. (b)(6). Pub. L. 100–358, §4(b), inserted at end "The term includes any Indian housing authority."

Subsec. (b)(7). Pub. L. 100–358, §4(c), struck out ", bands, groups, and Nations, including Alaska Indians, Aleuts, and Eskimos, of the United States" after "and Indian tribes".

Subsec. (b)(9) to (12). Pub. L. 100–358, §4(d)–(g), added pars. (9) to (12).

1984—Subsec. (b)(2). Pub. L. 98–479, §102(b)(1), inserted provision at end that such ceilings shall be established in consultation with the Secretary of Agriculture for any rural area, as defined in section 1490 of this title, taking into account the subsidy characteristics and types of programs to which such ceilings apply.

Subsec. (b)(4). Pub. L. 98–479, §102(b)(2), inserted ", in consultation with the Secretary of Agriculture" at end.

Subsec. (b)(5)(C). Pub. L. 98–479, §102(b)(3), designated existing provision as cl. (i), added cl. (ii), and inserted "the amount by which the aggregate of the following expenses of the family" in provisions preceding cl. (i).

1983—Subsec. (a). Pub. L. 98–181, §206(a), in provisions preceding par. (1), inserted provision requiring annual review of family income, and inserted "(other than a family assisted under section 1437f(o) of this title)".

Subsec. (b)(2). Pub. L. 98–181, §206(b), qualified the term "very low-income families" in authorizing the Secretary to establish, where necessary, variations in income ceilings higher or lower than 50 per centum of the median for the area.

Subsec. (b)(3). Pub. L. 98–181, §202, inserted provision at end of par. (3) authorizing increase from 15 to 30 per centum in the single person occupancy limitation for nonoccupancy of the involved dwelling units.

Subsec. (b)(5). Pub. L. 98–181, §206(c), amended par. (5) generally, substituting provisions designating cls. (A) to (D) for prior exclusion from "adjusted income" of such amounts or types of income as the Secretary might prescribe, taking into account the number of minor children and other appropriate factors.

1981—Pub. L. 97–35 added subsecs. (a) and (c) and designated provisions constituting former section as subsec. (b), in subsec. (b) as so designated, substituted provisions defining "lower income housing", "lower income families", "families", "income", "adjusted income", "public housing agency", "State", and "Secretary" for provisions defining "lower-income housing", "low-income families", "development", "operation", "acquisition cost", "public housing agency", "State", "Secretary", and "low-income housing project".

1979—Par. (1). Pub. L. 96–153 substituted provisions that the rental for a dwelling shall not exceed certain portion of the resident family's income to be established by the Secretary, and that in the case of a very low income family 25 per centum and in other cases 30 per centum of family income for provisions that such rental shall not exceed one-fourth of the family's income as defined by the Secretary.

1978—Par. (2)(D). Pub. L. 95–557 substituted "15 per cent" for "10 per cent".

1976—Par. (2). Pub. L. 94–375 struck out "and" before cl. (C), added cl. (D), and two provisos relating to the percentage of units to be occupied by single persons and the priority to be given to single persons who are elderly, handicapped, or displaced, following cl. (D).

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by title V of Pub. L. 105–276 effective and applicable beginning upon Oct. 1, 1999, except as otherwise provided, with provision that Secretary may implement amendment before such date, except to extent that such amendment provides otherwise, and with savings provision, see section 503 of Pub. L. 105–276, set out as a note under section 1437 of this title.

Pub. L. 105–276, title V, §507(d), Oct. 21, 1998, 112 Stat. 2526, provided that: "The amendments under this section [amending this section] are made on, and shall apply beginning upon, the date of the enactment of this Act [Oct. 21, 1998]."

Pub. L. 105–276, title V, §508(c)(2), Oct. 21, 1998, 112 Stat. 2529, provided that: "The amendments made by this paragraph [probably means this subsection, amending this section] are made on, and shall apply beginning upon, the date of the enactment of this Act [Oct. 21, 1998]."

Pub. L. 105–276, title V, §524(b), Oct. 21, 1998, 112 Stat. 2568, provided that: "The amendment made by this paragraph [probably means this section, amending this section] is made on, and shall apply beginning upon, the date of the enactment of this Act [Oct. 21, 1998]."

EFFECTIVE AND TERMINATION DATES OF 1996 AMENDMENTS

Pub. L. 105–276, title V, §514(f), Oct. 21, 1998, 112 Stat. 2548, provided that: "Section 402 of The Balanced Budget Downpayment Act, I [Pub. L. 104–99, see note below], and the amendments made by such section shall cease to be effective on the date of the enactment of this Act [Oct. 21, 1998]. Notwithstanding the inclusion in this Act [see Tables for classification] of any provision extending the effectiveness of such section or such amendments, such provision included in this Act shall not take effect."

Amendment by Pub. L. 104–330 effective Oct. 1, 1997, except as otherwise expressly provided, see section 107 of Pub. L. 104–330, set out as an Effective Date note under section 4101 of Title 25, Indians.

Section 402(f) of Pub. L. 104–99, as amended by Pub. L. 104–204, title II, §201(c)(2), Sept. 26, 1996, 110 Stat. 2893; Pub. L. 105–65, title II, §201(d)(2), Oct. 27, 1997, 111 Stat. 1364, provided that: "This section [amending this section, sections 1437d to 1437f, 1437n, 1437v, and 13615 of this title, and section 1701s of Title 12, Banks and Banking, enacting provisions set out as a note under this section and sections 1437 and 1437d of this title, and amending provisions set out as a note under section 1437f of this title] shall be effective upon the enactment of this Act [Jan. 26, 1996] and only for fiscal years 1996, 1997, and 1998."

EFFECTIVE DATE OF 1992 AMENDMENT

Section 103(a)(3) of title I of Pub. L. 102–550 provided that: "To the extent that the amendments made by paragraphs (1) and (2) [amending this section] result in additional costs under this title [see Tables for classification], such amendments shall be effective only to the extent that amounts to cover such additional costs are provided in advance in appropriation Acts."

Amendment by subtitles B through F of title VI [§§621–685] of Pub. L. 102–550 applicable upon expiration of 6-month period beginning Oct. 28, 1992, except as otherwise provided, see section 13642 of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Section 573(f) of Pub. L. 101–625 provided that: "The Secretary shall issue regulations implementing subsections (a) and (d) [sic] the amendments made by this section [amending this section] not later than the expiration of the 90-day period beginning on the date of the enactment of this Act [Nov. 28, 1990]. The regulations may not take effect until after September 30, 1991."

EFFECTIVE DATE OF 1988 AMENDMENT

Section 6 of Pub. L. 100–358 provided that: "The Secretary of Housing and Urban Development may carry out programs to provide lower income housing on Indian reservations and other Indian areas only in accordance with the amendments made by this Act [enacting sections 1437aa to 1437ee of this title, amending this section and section 1437c of this title, and enacting provisions set out as a note under section 1437 of this title], commencing on whichever of the following occurs earlier:

"(1) EFFECTIVE DATE OF REGULATIONS.—The effective date of regulations issued under section 205 of the United States Housing Act of 1937 [former section 1437ee of this title].

"(2) 90 DAYS.—The expiration of the 90-day period beginning on the date of the enactment of this Act [June 29, 1988]."

### EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–35 effective Oct. 1, 1981, see section 371 of Pub. L. 97–35, set out as an Effective Date note under section 3701 of Title 12, Banks and Banking.

### EFFECTIVE DATE OF 1979 AMENDMENT

Section 202(c) of Pub. L. 96–153, which provided that amendment by section 202(a) of Pub. L. 96–153 (amending this section and section 1437f of this title) shall become effective on Jan. 1, 1980, except that the amount of the tenant contribution required of families whose occupancy of housing units assisted under this chapter commenced prior to that date shall be determined in accordance with the provisions of this chapter in effect on Dec. 31, 1979, so long as such occupancy was continuous thereafter, was repealed by Pub. L. 97–35, title III, §322(h)(1), Aug. 13, 1981, 95 Stat. 404.

### EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–557 effective Oct. 1, 1978, see section 206(h) of Pub. L. 95–557, set out as a note under section 1437c of this title.

### EFFECTIVE DATE

Section effective on such date or dates as the Secretary of Housing and Urban Development shall prescribe, but not later than eighteen months after Aug. 22, 1974, except that all of the provisions of par. (1) shall become effective on the same date, see section 201(b) of Pub. L. 93–383, set out as a note under section 1437 of this title.

The Department of Housing and Urban Development adopted an interim rule, 24 CFR 860.409, Sept. 26, 1975, 40 F.R. 44326, which provided: "The effective date of section 3(1) of the United States Housing Act of 1937, as amended [par. (1) of this section], shall be the date that these regulations [sections 860.401 to 860.409 of Title 24, CFR] are published in the Federal Register (September 26, 1975)."

### REGULATIONS

Section 402(b)(2) of Pub. L. 104–99 provided that:

"(A) IN GENERAL.—The Secretary shall, by regulation, after notice and an opportunity for public comment, establish such requirements as may be necessary to carry out section 3(a)(2)(A) of the United States Housing Act of 1937 [42 U.S.C. 1437a(a)(2)(A)], as amended by paragraph (1).

"(B) TRANSITION RULE.—Prior to the issuance of final regulations under paragraph (1), a public housing agency may implement ceiling rents, which shall be not less than the monthly costs to operate the housing of the agency and—

"(i) determined in accordance with section 3(a)(2)(A) of the United States Housing Act of 1937, as that section existed on the day before enactment of this Act [Jan. 26, 1996];

"(ii) equal to the 95th percentile of the rent paid for a unit of comparable size by tenants in the same public housing project or a group of comparable projects totaling 50 units or more; or

"(iii) equal to the fair market rent for the area in which the unit is located."

[Section 402(b)(2) of Pub. L. 104–99, set out above, effective Jan. 26, 1996, and only for fiscal years 1996, 1997, and 1998, and to cease to be effective Oct. 21, 1998, see Effective and Termination Dates of 1996 Amendments notes above.]

Section 191 of title I of Pub. L. 102–550 provided that: "The Secretary of Housing and Urban Development shall issue any final regulations necessary to implement the provisions of this title [see Tables for classification] and the amendments made by this title not later than the expiration of the 180-day period beginning on the date of the enactment of this Act [Oct. 28, 1992], except as expressly provided otherwise in this title and the amendments made by this title. Such regulations shall be issued after notice and opportunity for public comment pursuant to the provisions of section 553 of title 5, United States Code (notwithstanding subsections (a)(2), (b)(B), and (d)(3) of such section)."

### SAVINGS PROVISION

Pub. L. 105–276, title V, §508(b)(2), Oct. 21, 1998, 112 Stat. 2528, provided that: "Notwithstanding the amendment made by paragraph (1) [amending this section], the provisions of the undesignated paragraph at the end of section 3(c)(3) of the United States Housing Act of 1937 [see 1996 and 1992 Amendment notes above], as such section was in effect immediately before the enactment of this Act [Oct. 21, 1998], shall continue to apply until the effective date under section 503 of this Act [set out as a note under section 1437 of this title]. Notwithstanding the amendment made by subsection (a) of this section [amending this section], nor the applicability under section 402(f) of The Balanced Budget Downpayment Act, I [Pub. L. 104–99] (42 U.S.C. 1437a note) of the amendments made by such section 402 [see Effective and Termination Dates of 1996 Amendments note set out above], nor any repeal of such section 402(f), the provisions of section 3(b)(5)(G) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b)(5)(G)), as such section was in effect immediately before the date of the enactment of this Act, shall continue to apply until the effective date under section 503 of this Act."

### TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

### TRANSITIONAL CEILING RENTS

Pub. L. 105–276, title V, §519(d), Oct. 21, 1998, 112 Stat. 2561, provided that: "Notwithstanding section 3(a)(1) of the United States Housing Act of 1937 (42 U.S.C. 1437a[(a)](1)), during the period ending upon the later of the implementation of the formulas established pursuant to subsections (d)(2) and (e)(2) of [section 9 of] such Act [42 U.S.C. 1437g(d)(2), (e)(2)] (as amended by this section) and October 1, 1999, a public housing agency may take any of the following actions with respect to public housing:

"(1) NEW PROVISIONS.—An agency may—

"(A) adopt and apply ceiling rents that reflect the reasonable market value of the housing, but that are not less than—

"(i) for housing other than housing predominantly for elderly or disabled families (or both), 75 percent of the monthly cost to operate the housing of the agency;

"(ii) for housing predominantly for elderly or disabled families (or both), 100 percent of the monthly cost to operate the housing of the agency; and

"(iii) the monthly cost to make a deposit to a replacement reserve (in the sole discretion of the public housing agency); and

"(B) allow families to pay ceiling rents referred to in subparagraph (A), unless, with respect to any family, the ceiling rent established under this paragraph would exceed the amount payable as rent by that family under paragraph (1).

"(2) CEILING RENTS FROM BALANCED BUDGET ACT, I.—An agency may utilize the authority under section 3(a)(2) of the United States Housing Act of 1937 (42 U.S.C. 1437a(a)(2)), as in effect immediately before the enactment of this Act [Oct. 21, 1998], notwithstanding any amendment to such section made by this Act.

"(3) TRANSITIONAL CEILING RENTS FOR BALANCED BUDGET ACT, I.—An agency may utilize the authority

with respect to ceiling rents under section 402(b)(2) of The Balanced Budget Downpayment Act, I [Pub. L. 104–99] (42 U.S.C. 1437a note), notwithstanding any other provision of law (including the expiration of the applicability of such section or the repeal of such section)."

CERTAIN PAYMENTS MADE TO VICTIMS OF NAZI PERSECUTION DISREGARDED IN DETERMINING ELIGIBILITY FOR AND AMOUNT OF NEED-BASED BENEFITS AND SERVICES

Pub. L. 103–286, §1, Aug. 1, 1994, 108 Stat. 1450, provided that:

"(a) IN GENERAL.—Payments made to individuals because of their status as victims of Nazi persecution shall be disregarded in determining eligibility for and the amount of benefits or services to be provided under any Federal or federally assisted program which provides benefits or services based, in whole or in part, on need.

"(b) APPLICABILITY.—Subsection (a) shall apply to determinations made on or after the date of the enactment of this Act [Aug. 1, 1994] with respect to payments referred to in subsection (a) made before, on, or after such date.

"(c) PROHIBITION AGAINST RECOVERY OF VALUE OF EXCESSIVE BENEFITS OR SERVICES PROVIDED DUE TO FAILURE TO TAKE ACCOUNT OF CERTAIN PAYMENTS MADE TO VICTIMS OF NAZI PERSECUTION.—No officer, agency, or instrumentality of any government may attempt to recover the value of excessive benefits or services provided before the date of the enactment of this Act [Aug. 1, 1994] under any program referred to in subsection (a) by reason of any failure to take account of payments referred to in subsection (a).

"(d) NOTICE TO INDIVIDUALS WHO MAY HAVE BEEN DENIED ELIGIBILITY FOR BENEFITS OR SERVICES DUE TO THE FAILURE TO DISREGARD CERTAIN PAYMENTS MADE TO VICTIMS OF NAZI PERSECUTION.—Any agency of government that has not disregarded payments referred to in subsection (a) in determining eligibility for a program referred to in subsection (a) shall make a good faith effort to notify any individual who may have been denied eligibility for benefits or services under the program of the potential eligibility of the individual for such benefits or services.

"(e) REPAYMENT OF ADDITIONAL RENT PAID UNDER HUD HOUSING PROGRAMS BECAUSE OF FAILURE TO DISREGARD REPARATION PAYMENTS.—

"(1) AUTHORITY.—To the extent that amounts are provided in appropriation Acts for payments under this subsection, the Secretary of Housing and Urban Development shall make payments to qualified individuals in the amount determined under paragraph (3).

"(2) QUALIFIED INDIVIDUALS.—For purposes of this subsection, the term 'qualified individual' means an individual who—

"(A) has received any payment because of the individual's status as a victim of Nazi persecution;

"(B) at any time during the period beginning on February 1, 1993 and ending on April 30, 1993, resided in a dwelling unit in housing assisted under any program for housing assistance of the Department of Housing and Urban Development under which rent payments for the unit were determined based on or taking into consideration the income of the occupant of the unit;

"(C) paid rent for such dwelling unit for any portion of the period referred to in subparagraph (B) in an amount determined in a manner that did not disregard the payment referred to in subparagraph (A); and

"(D) has submitted a claim for payment under this subsection as required under paragraph (4).
The term does not include the successors, heirs, or estate of an individual meeting the requirements of the preceding sentence.

"(3) AMOUNT OF PAYMENT.—The amount of a payment under this subsection for a qualified individual shall be equal to the difference between—

"(A) the sum of the amount of rent paid by the individual for rental of the dwelling unit of the individual assisted under a program for housing assistance of the Department of Housing and Urban Development, for the period referred to in paragraph (2)(B), and

"(B) the sum of the amount of rent that would have been payable by the individual for rental of such dwelling unit for such period if the payments referred to in paragraph (2)(A) were disregarded in determining the amount of rent payable by the individual for such period.

"(4) SUBMISSION OF CLAIMS.—A payment under this subsection for an individual may be made only pursuant to a written claim for such payment by such individual submitted to the Secretary of Housing and Urban Development in the form and manner required by the Secretary before—

"(A) in the case of any individual notified by the Department of Housing and Urban Development orally or in writing that such specific individual is eligible for a payment under this subsection, the expiration of the 6-month period beginning on the date of receipt of such notice; and

"(B) in the case of any other individual, the expiration of the 12-month period beginning on the date of the enactment of this Act [Aug. 1, 1994]."

INAPPLICABILITY OF CERTAIN 1992 AMENDMENTS TO INDIAN PUBLIC HOUSING

Section 626 of Pub. L. 102–550 provided that: "The amendments made by this subtitle [subtitle B (§§ 621–626) of title VI of Pub. L. 102–550, amending this section and sections 1437c to 1437f, 1437l, 1437o, 1438, and 8013 of this title] shall not apply with respect to lower income housing developed or operated pursuant to a contract between the Secretary of Housing and Urban Development and an Indian housing authority."

BUDGET COMPLIANCE

Section 573(e) of Pub. L. 101–625 provided that: "The amendments made by subsections (b) and (c) [amending this section] shall apply only to the extent approved in appropriations Acts."

MEDIAN AREA INCOME

Section 567 of Pub. L. 100–242 provided that: "For purposes of calculating the median income for any area that is not within a metropolitan statistical area (as established by the Office of Management and Budget) for programs under title I of the Housing and Community Development Act of 1974 [42 U.S.C. 5301 et seq.], the United States Housing Act of 1937 [42 U.S.C. 1437 et seq.], the National Housing Act [12 U.S.C. 1701 et seq.], or title V of the Housing Act of 1949 [42 U.S.C. 1471 et seq.], the Secretary of Housing and Urban Development or the Secretary of Agriculture (as appropriate) shall use whichever of the following is higher:

"(1) the median income of the county in which the area is located; or

"(2) the median income of the entire nonmetropolitan area of the State."

DETERMINATION OF RENT PAYABLE BY TENANTS OCCUPYING ASSISTED HOUSING; DELAYED APPLICATION OR STAGED IMPLEMENTATION OF AMENDED PROVISIONS

Section 206(d) of Pub. L. 98–181 provided that:

"(1) The following provisions of this section apply to determinations of the rent to be paid by or the contribution required of a tenant occupying housing assisted under the authorities amended by this section [amending this section] or subsections (a) through (h) of section 322 of the Housing and Community Development Amendments of 1981 [amending sections 1437 to 1437d, 1437f, 1437g, 1437l, 1437t, and 1437l of this title and sections 1701s and 1715z–1 of Title 12, Banks and Banking, and repealing provisions set out as notes under this section and section 1701s of Title 12] (hereinafter referred to as 'assisted housing') on or before the effective date of regulations implementing this section:

Case: Case 1-15-1456 Document: Document 00116384622 Page: Page: 62 Date Date Filed: Filed 05/20/19/2016 Entry Entry ID: 5969956970159

Page 3723 TITLE 42—THE PUBLIC HEALTH AND WELFARE §1437b

"(A) Notwithstanding any other provision of this section or subsections (a) through (h) of section 322 of the Housing and Community Development Amendments of 1981, the Secretary of Housing and Urban Development (hereinafter referred to as the 'Secretary') may provide for delayed applicability, or for staged implementation, of the procedures for determining rents or contributions, as appropriate, required by such provisions if the Secretary determines that immediate application of such procedures would be impracticable, would violate the terms of existing leases, or would result in extraordinary hardship for any class of tenants.

"(B) The Secretary shall provide that the rent or contribution, as appropriate, required to be paid by a tenant shall not increase as a result of the amendments made by this section and subsections (a) through (h) of section 322 of the Housing and Community Development Amendments of 1981, and as a result of any other provision of Federal law or regulation, by more than 10 per centum during any twelve-month period, unless the increase above 10 per centum is attributable to increases in income which are unrelated to such amendments, law, or regulation.

"(2) Tenants of assisted housing other than those referred to in paragraph (1) shall be subject to immediate rent payment or contribution determinations in accordance with applicable law and without regard to the provisions of paragraph (1), but the Secretary shall provide that the rent or contribution payable by any such tenant who is occupying assisted housing on the effective date of any provision of Federal law or regulation shall not increase, as a result of any such provision of Federal law or regulation, by more than 10 per centum during any twelve-month period, unless the increase above 10 per centum is attributable to increases in income which are unrelated to such law or regulation.

"(3) In the case of tenants receiving rental assistance under section 521(a)(1) of the Housing Act of 1949 [section 1490a(a)(1) of this title] on the effective date of this section [Nov. 30, 1983] whose assistance is converted to assistance under section 8 of the United States Housing Act of 1937 [section 1437f of this title] on or after such date, the Secretary shall provide that the rent or contribution payable by any such tenant shall not increase, as a result of such conversion, by more than 10 per centum during any twelve-month period, unless the increase above 10 per centum is attributable to increases in income which are unrelated to such conversion or to any provision of Federal law or regulation.

"(4)(A) Notwithstanding any other provision of law, in the case of the conversion of any assistance under section 101 of the Housing and Urban Development Act of 1965 [12 U.S.C. 1701s], section 236(f)(2) of the National Housing Act [12 U.S.C. 1715z–1(f)(2)], or section 23 of the United States Housing Act of 1937 [section 1421b of this title] (as in effect before the date of the enactment of the Housing and Community Development Act of 1974 [Aug. 22, 1974]) to assistance under section 8 of the United States Housing Act of 1937, any increase in rent payments or contributions resulting from such conversion, and from the amendments made by this section of any tenant benefitting from such assistance who is sixty-two years of age or older may not exceed 10 per centum per annum.

"(B) In the case of any such conversion of assistance occurring on or after October 1, 1981, and before the date of the enactment of this section [Nov. 30, 1983], the rental payments due after such date of enactment by any tenant benefitting from such assistance who was sixty-two years of age or older on the date of such conversion shall be computed as if the tenant's rental payment or contribution had, on the date of conversion, been the lesser of the actual rental payment or contribution required, or 25 per centum of the tenant's income.

"(5) The limitations on increases in rent contained in paragraphs (1)(B), (2), (3), and (4) shall remain in effect and may not be changed or superseded except by another provision of law which amends this subsection.

"(6) As used in this subsection, the term 'contribution' means an amount representing 30 per centum of a tenant's monthly adjusted income, 10 per centum of the tenant's monthly income, or the designated amount of welfare assistance, whichever amount is used to determine the monthly assistance payment for the tenant under section 3(a) of the United States Housing Act of 1937 [subsec. (a) of this section].

"(7) The provisions of subsections (a) through (h) of section 322 of the Housing and Community Development Amendments of 1981 shall be implemented and fully applicable to all affected tenants no later than five years following the date of enactment of such amendments [Aug. 13, 1981], except that the Secretary may extend the time for implementation if the Secretary determines that full implementation would result in extraordinary hardship for any class of tenants.''

Prior provisions for determining rent payable by tenants occupying assisted housing under and authorizing delayed application or staged implementation of provisions amended by section 322 of Pub. L. 97–35 were contained in Pub. L. 97–35, title III, §322(i), Aug. 13, 1981, 95 Stat. 404, which was repealed by Pub. L. 98–181, title II, §206(e), Nov. 30, 1983, 97 Stat. 1181.

ESTABLISHMENT OF INCREASED MONTHLY RENTAL CHARGE FOR FAMILY OCCUPYING LOW-INCOME HOUSING UNIT; ADJUSTMENT FACTORS

Section 202 of Pub. L. 93–383 provided that: "To the extent that section 3(1) of the United States Housing Act of 1937, as amended by section 201(a) of this Act [par. (1) of this section], would require the establishment of an increased monthly rental charge for any family which occupies a low-income housing unit as of the effective date of such section 3(1) (other than by reason of the provisions relating to welfare assistance payments) [see Effective Date note set out above], the required adjustment shall be made, in accordance with regulations of the Secretary, as follows: (A) the first adjustment shall not exceed $5 and shall become effective as of the month following the month of the first review of the family's income pursuant to section 6(c)(2) of such Act [section 1437d(c)(2) of this title] which occurs at least six months after the effective date of such section 3(1), and (B) subsequent adjustments, each of which shall not exceed $5, shall be made at six-month intervals over whatever period is necessary to effect the full required increase in the family's rental charge.''

§1437a–1. Repealed. Pub. L. 105–276, title V, §582(a)(1), Oct. 21, 1998, 112 Stat. 2643

Section, Pub. L. 101–625, title V, §519, Nov. 28, 1990, 104 Stat. 4202, authorized public housing rent waiver for police officers. See section 1437a(a)(4) of this title.

EFFECTIVE DATE OF REPEAL

Repeal effective and applicable beginning upon Oct. 1, 1999, except as otherwise provided, with provision that Secretary may implement the repeal before such date, and with savings provision, see section 503 of Pub. L. 105–276, set out as an Effective Date of 1998 Amendment note under section 1437 of this title.

§1437b. Loans and commitments to make loans for low-income housing projects

(a) Authority of Secretary; interest rates; repayment date; use as security for obligations of public housing agency

The Secretary may make loans or commitments to make loans to public housing agencies to help finance the development, acquisition, or operation of low-income housing projects by such agencies. Any contract for such loans and any amendment to a contract for such

Case:Case4458-1456cumDentment0601c594626Fagee:Fage: 63ate EdatedFiledFb0d502019/2016ntry EntryE5969957159

THE 189TH GENERAL COURT OF
## THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs

site search

Options

| Massachusetts Laws | Bills | State Budget | People | Committees | Reports | Educate & Engage | Events |

MyLegislature

Home   Bills & Laws   Laws   General Laws   PART I   TITLE III   CHAPTER 30A   Section 14

Massachusetts Laws

- Massachusetts Constitution
- General Laws
- Session Laws
- Rules

## General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT | | NEXT |
| TITLE III | LAWS RELATING TO STATE OFFICERS | PREV NEXT | |
| CHAPTER 30A | STATE ADMINISTRATIVE PROCEDURE | PREV NEXT | |
| Section 14 | Judicial review | PREV NEXT | |

Section 14. Except so far as any provision of law expressly precludes judicial review, any person or appointing authority aggrieved by a final decision of any agency in an adjudicatory proceeding, whether such decision is affirmative or negative in form, shall be entitled to a judicial review thereof, as follows:?

Where a statutory form of judicial review or appeal is provided such statutory form shall govern in all respects, except as to standards for review. The standards for review shall be those set forth in paragraph (7) of this section, except so far as statutes provide for review by trial de novo. Insofar as the statutory form of judicial review or appeal is silent as to procedures provided in this section, the provisions of this section shall govern such procedures.

Where no statutory form of judicial review or appeal is provided, judicial review shall be obtained by means of a civil action, as follows:

(1) Proceedings for judicial review of an agency decision shall be instituted in the superior court for the county (a) where the plaintiffs or any of them reside or have their principal place of business within the commonwealth, or (b) where the agency has its principal office, or (c) of Suffolk. The court may grant a change of venue upon good cause shown. The action shall, except as otherwise provided by law, be commenced in the court within thirty days after receipt of notice of the final decision of the agency or if a petition for rehearing has been timely filed with the agency, within thirty days after receipt of notice of agency denial of such petition for rehearing. Upon application made within the thirty-day period or any extension thereof, the court may for good cause shown extend the time.

(2) Service shall be made upon the agency and each party to the agency proceeding in accordance with the Massachusetts Rules of Civil Procedure governing service of process. For the purpose of such service the agency upon request shall certify to the plaintiff the names and addresses of all such parties as disclosed by its records, and service upon parties so

ADD. 18

certified shall be sufficient. All parties to the proceeding before the agency shall have the right to intervene in the proceeding for review. The court may in its discretion permit other interested persons to intervene.

(3) The commencement of an action shall not operate as a stay of enforcement of the agency decision, but the agency may stay enforcement, and the reviewing court may order a stay upon such terms as it considers proper.

(4) The agency shall, by way of answer, file in the court the original or a certified copy of the record of the proceeding under review. The record shall consist of (a) the entire proceedings, or (b) such portions thereof as the agency and the parties may stipulate, or (c) a statement of the case agreed to by the agency and the parties. The expense of preparing the record may be assessed as part of the costs in the case, and the court may, regardless of the outcome of the case, assess any one unreasonably refusing to stipulate to limit the record, for the additional expenses of preparation caused by such refusal. The court may require or permit subsequent corrections or additions to the record when deemed desirable.

(5) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the court.

(6) If application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material to the issues in the case, and that there was good reason for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon such conditions as the court deems proper. The agency may modify its findings and decision by reason of such additional evidence and shall file with the reviewing court, to become part of the record, the additional evidence, together with any modified or new findings or decision.

(7) The court may affirm the decision of the agency, or remand the matter for further proceedings before the agency; or the court may set aside or modify the decision, or compel any action unlawfully withheld or unreasonably delayed, if it determines that the substantial rights of any party may have been prejudiced because the agency decision is?

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Based upon an error of law; or

(d) Made upon unlawful procedure; or

(e) Unsupported by substantial evidence; or

(f) Unwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or

(g) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

The court shall make the foregoing determinations upon consideration of the entire record, or such portions of the record as may be cited by the parties. The court shall give due weight to

ADD. 19

the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.

If the court finds that the action of the appointing authority in discharging, removing, suspending, laying off, lowering in rank or compensation or abolishing his position, or the action of the commission confirming the action taken by the appointing authority, was not justified, the employee shall be reinstated in his office or position without loss of compensation and the court shall assess reasonable costs against the employer.

Show / Hide Site Map

Copyright © 2015 The General Court, All Rights Reserved

ADD. 20

Case:Case 15-1458  Document 00115946262  Page: 66  Date Filed: 05/01/2016  Entry ID: 5969947 0159

THE 189TH GENERAL COURT OF
## THE COMMONWEALTH OF MASSACHUSETTS

Home   Glossary   FAQs
site search
Options

Massachusetts Laws | Bills | State Budget | People | Committees | Reports | Educate & Engage | Events
MyLegislature

Home   Bills & Laws   Laws   General Laws   PART I   TITLE XV   CHAPTER 93   Section 103

Massachusetts Laws

# General Laws

Print Page

| PART I | ADMINISTRATION OF THE GOVERNMENT | | NEXT |
| TITLE XV | REGULATION OF TRADE | PREV | NEXT |
| CHAPTER 93 | REGULATION OF TRADE AND CERTAIN ENTERPRISES | | NEXT |
| Section 103 | Equal rights; age and handicap; violations; remedies | PREV | NEXT |

Massachusetts Constitution

General Laws

Session Laws

Rules

Section 103. (a) Any person within the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real and personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.

(b) Any person whose rights under the provisions of subsection (a) have been violated may commence a civil action for injunctive and other appropriate equitable relief, including, but not limited to, the award of compensatory and exemplary damages. Said civil action shall be instituted either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which the person whose conduct complained of resides or has his principal place of business.

(c) A violation of subsection (a) shall be established if, based upon the totality of circumstances, it is shown that any individual is denied any of the rights protected by subsection (a).

(d) An aggrieved person who prevails in an action authorized by subsection (b), in addition to other damages, shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be determined by the court.

Copyright © 2015 The General Court, All Rights Reserved

ADD. 21

Case:Case4:15-1456cumDentum00ntt5346252age:Page: 67ate Elate: Filed/15/2016ntry EntSy5969870159



Massachusetts Laws    Bills    State Budget    People    Committees    Reports    Educate & Engage    Events

MyLegislature

Home    Bills & Laws    Laws    General Laws    PART III    TITLE IV    CHAPTER 249    Section 4

## Massachusetts Laws

- Massachusetts Constitution
- General Laws
- Session Laws
- Rules

## General Laws

Print Page

| | |
|---|---|
| **PART III** | **COURTS, JUDICIAL OFFICERS AND PROCEEDINGS IN CIVIL CASES**    PREV   NEXT |
| **TITLE IV** | **CERTAIN WRITS AND PROCEEDINGS IN SPECIAL CASES**    PREV   NEXT |
| **CHAPTER 249** | **AUDITA QUERELA, CERTIORARI, MANDAMUS AND QUO WARRANTO**    PREV   NEXT |
| **Section 4** | **Action in the nature of certiorari; limitation; joinder of party defendant; injunction; judgment**    PREV   NEXT |

Section 4. A civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal, may be brought in the supreme judicial or superior court or, if the matter involves any right, title or interest in land, or arises under or involves the subdivision control law, the zoning act or municipal zoning, or subdivision ordinances, by?laws or regulations, in the land court or, if the matter involves fence viewers, in the district court. Such action shall be commenced within sixty days next after the proceeding complained of. Where such an action is brought against a body or officer exercising judicial or quasi-judicial functions to prevent the body or officer from proceeding in favor of another party, or is brought with relation to proceedings already taken, such other party may be joined as a party defendant by the plaintiff or on motion of the defendant body or officer or by application to intervene. Such other party may file a separate answer or adopt the pleadings of the body or officer. The court may at any time after the commencement of the action issue an injunction and order the record of the proceedings complained of brought before it. The court may enter judgment quashing or affirming such proceedings or such other judgment as justice may require.

Show / Hide Site Map

Copyright © 2016 The General Court, All Rights Reserved

ADD. 22

is income. However, we value the house under the rule in § 416.1140.

[45 FR 65547, Oct. 3, 1980, as amended at 49 FR 48038, Dec. 10, 1984; 57 FR 53850, Nov. 13, 1992; 59 FR 33907, July 1, 1994; 70 FR 6344, Feb. 7, 2005]

### § 416.1104 Income we count.

We have described generally what income is and is not for SSI purposes (§ 416.1103). There are different types of income, earned and unearned, and we have rules for counting each. The earned income rules are described in §§ 416.1110 through 416.1112 and the unearned income rules are described in §§ 416.1120 through 416.1124. One type of unearned income is in-kind support and maintenance (food or shelter). The way we value it depends on your living arrangement. These rules are described in §§ 416.1130 through 416.1148 of this part. In some situations we must consider the income of certain people with whom you live as available to you and part of your income. These rules are described in §§ 416.1160 through 416.1169. We use all of these rules to determine the amount of your countable income—the amount that is left after we subtract what is not income or is not counted.

[45 FR 65547, Oct. 3, 1980, as amended at 65 FR 16815, Mar. 30, 2000; 70 FR 6345, Feb. 7, 2005]

EARNED INCOME

### § 416.1110 What is earned income.

Earned income may be in cash or in kind. We may include more of your earned income than you actually receive. We include more than you actually receive if amounts are withheld from earned income because of a garnishment or to pay a debt or other legal obligation, or to make any other payments. Earned income consists of the following types of payments:

(a) *Wages*—(1) *Wages paid in cash—general.* Wages are what you receive (before any deductions) for working as someone else's employee. Wages are the same for SSI purposes as for the social security retirement program's earnings test. (See § 404.429(c) of this chapter.) Wages include salaries, commissions, bonuses, severance pay, and any other special payments received because of your employment.

(2) *Wages paid in cash to uniformed service members.* Wages paid in cash to uniformed service members include basic pay, some types of special pay, and some types of allowances. Allowances for on-base housing or privatized military housing are unearned income in the form of in-kind support and maintenance. Cash allowances paid to uniformed service members for private housing are wages.

(3) *Wages paid in kind.* Wages may also include the value of food, clothing, shelter, or other items provided instead of cash. We refer to this type of income as in-kind earned income. However, if you are a domestic or agricultural worker, the law requires us to treat your in-kind pay as unearned income.

(b) *Net earnings from self-employment.* Net earnings from self-employment are your gross income from any trade or business that you operate, less allowable deductions for that trade or business. Net earnings also include your share of profit or loss in any partnership to which you belong. For taxable years beginning before January 1, 2001, net earnings from self-employment under the SSI program are the same net earnings that we would count under the social security retirement insurance program and that you would report on your Federal income tax return. (See § 404.1080 of this chapter.) For taxable years beginning on or after January 1, 2001, net earnings from self-employment under the SSI program will also include the earnings of statutory employees. In addition, for SSI purposes only, we consider statutory employees to be self-employed individuals. Statutory employees are agent or commission drivers, certain full-time life insurance salespersons, home workers, and traveling or city salespersons. (*See* § 404.1008 of this chapter for a more detailed description of these types of employees).

(c) *Refunds of Federal income taxes and advance payments by employers made in accordance with the earned income credit provisions of the Internal Revenue Code.* Refunds on account of earned income credits are payments made to you under the provisions of section 32 of the Internal Revenue Code of 1986, as amended. These *refunds* may be greater

ADD. 23

than taxes you have paid. You may receive earned income tax credit payments along with any other Federal income tax refund you receive because of overpayment of your income tax, (Federal income tax refunds made on the basis of taxes you have already paid are not income to you as stated in §416.1103(d).) Advance payments of earned income tax credits are made by your employer under the provisions of section 3507 of the same code. You can receive earned income tax credit payments only if you meet certain requirements of family composition and income limits.

(d) *Payments for services performed in a sheltered workshop or work activities center.* Payments for services performed in a sheltered workshop or work activities center are what you receive for participating in a program designed to help you become self-supporting.

(e) *Certain royalties and honoraria.* Royalties that are earned income are payments to an individual in connection with any publication of the work of the individual. (See §416.1110(b) if you receive a royalty as part of your trade or business. See §416.1121(c) if you receive another type of royalty.) Honoraria that are earned income are those portions of payments, such as an honorary payment, reward, or donation, received in consideration of services rendered for which no payment can be enforced by law. (See §416.1120 if you receive another type of honorarium.)

[45 FR 65547, Oct. 3, 1980, as amended at 48 FR 23179, May 24, 1983; 50 FR 48574, Nov. 26, 1985; 56 FR 3212, Jan. 29, 1991; 59 FR 43471, Aug. 24, 1994; 75 FR 1273, Jan. 11, 2010; 75 FR 54287, Sept. 7, 2010]

**§416.1111 How we count earned income.**

(a) *Wages.* We count wages at the earliest of the following points: when you receive them or when they are credited to your account or set aside for your use. We determine wages for each month. We count wages for services performed as a member of a uniformed service (as defined in §404.1330 of this chapter) as received in the month in which they are earned.

(b) *Net earnings from self-employment.* We count net earnings from self-employment on a taxable year basis. However, we divide the total of these earnings equally among the months in the taxable year to get your earnings for each month. For example, if your net earnings for a taxable year are $2,400, we consider that you received $200 in each month. If you have net losses from self-employment, we divide them over the taxable year in the same way, and we deduct them only from your other earned income.

(c) *Payments for services in a sheltered workshop or activities center.* We count payments you receive for services performed in a sheltered workshop or work activities center when you receive them or when they are set aside for your use. We determine the amount of the payments for each calendar quarter.

(d) *In-kind earned income.* We use the current market value of in-kind earned income for SSI purposes. (See §416.1101 for a definition of current market value.) If you receive an item that is not fully paid for and are responsible for the unpaid balance, only the paid-up value is income to you. (See the example in §416.1123(c)).

(e) *Royalties and honoraria.* We count payments of royalties to you in connection with any publication of your work, and honoraria, to the extent received for services rendered, at the earliest of the following points: when you receive them, when they are credited to your account, or when they are set aside for your use. (See §416.1111(b) if you receive royalties as part of your trade or business.)

[45 FR 65547, Oct. 3, 1980, as amended at 48 FR 23179, May 24, 1983; 48 FR 30357, July 1, 1983; 50 FR 48574, Nov. 26, 1985; 58 FR 63889, Dec. 3, 1993; 59 FR 43471, Aug. 24, 1994; 71 FR 45378, Aug. 9, 2006]

**§416.1112 Earned income we do not count.**

(a) *General.* While we must know the source and amount of all of your earned income for SSI, we do not count all of it to determine your eligibility and benefit amount. We first exclude income as authorized by other Federal laws (see paragraph (b) of this section). Then we apply the other exclusions in the order listed in paragraph (c) of this section to the rest of your income in the month. We never reduce your

(d) *Alien has a sponsor and a parent or a spouse with deemable resources.* Resources may be deemed to an alien from both a sponsor and a spouse or parent (if the alien is a child) provided that the sponsor and the spouse or parent are not the same person and the conditions for each rule are met.

(e) *Alien's sponsor is also the alien's ineligible spouse or parent.* If the sponsor is also the alien's ineligible spouse or parent who lives in the same household, the spouse-to-spouse or parent-to-child deeming rules apply instead of the sponsor-to-alien deeming rules. If the spouse or parent deeming rules cease to apply, the sponsor deeming rules will begin to apply. The spouse or parent rules may cease to apply if an alien child reaches age 18 or if either the spouse who is the ineligible spouse or parent, or the alien moves to a separate household.

(f) *Alien's sponsor also is the ineligible spouse or parent of another SSI beneficiary.* If the sponsor is also the ineligible spouse or ineligible parent of an SSI beneficiary other than the alien, the sponsor's resources are deemed to the alien under the rules in paragraph (a), and to the eligible spouse or child under the rules in §§416.1202, 1205, 1234, 1236, and 1237.

[52 FR 8888, Mar. 20, 1987, as amended at 61 FR 1712, Jan. 23, 1996; 70 FR 41138, July 18, 2005; 73 FR 28036, May 15, 2008]

### §416.1204a Deeming of resources where Medicaid eligibility is affected.

Section 416.1161a of this part describes certain circumstances affecting Medicaid eligibility in which the Department will not deem family income to an individual. The Department will follow the same standards, procedures, and limitations set forth in that section with respect to deeming of resources.

[49 FR 5747, Feb. 15, 1984]

### §416.1205 Limitation on resources.

(a) *Individual with no eligible spouse.* An aged, blind, or disabled individual with no spouse is eligible for benefits under title XVI of the Act if his or her nonexcludable resources do not exceed $1,500 prior to January 1, 1985, and all other eligibility requirements are met.

An individual who is living with an ineligible spouse is eligible for benefits under title XVI of the Act if his or her nonexcludable resources, including the resources of the spouse, do not exceed $2,250 prior to January 1, 1985, and all other eligibility requirements are met.

(b) *Individual with an eligible spouse.* An aged, blind, or disabled individual who has an eligible spouse is eligible for benefits under title XVI of the Act if their nonexcludable resources do not exceed $2,250 prior to January 1, 1985, and all other eligibility requirements are met.

(c) *Effective January 1, 1985 and later.* The resources limits and effective dates for January 1, 1985 and later are as follows:

| Effective date | Individual | Individual and spouse |
|---|---|---|
| Jan. 1, 1985 | $1,600 | $2,400 |
| Jan. 1, 1986 | 1,700 | 2,550 |
| Jan. 1, 1987 | 1,800 | 2,700 |
| Jan. 1, 1988 | 1,900 | 2,850 |
| Jan. 1, 1989 | 2,000 | 3,000 |

[50 FR 38982, Sept. 26, 1985]

### §416.1207 Resources determinations.

(a) *General.* Resources determinations are made as of the first moment of the month. A resource determination is based on what assets an individual has, what their values are, and whether or not they are excluded as of the first moment of the month.

(b) *Increase in value of resources.* If, during a month, a resource increases in value or an individual acquires an additional resource or replaces an excluded resource with one that is not excluded, the increase in the value of the resources is counted as of the first moment of the next month.

(c) *Decrease in value of resources.* If, during a month, a resource decreases in value or an individual spends a resource or replaces a resource that is not excluded with one that is excluded, the decrease in the value of the resources is counted as of the first moment of the next month.

(d) *Treatment of items under income and resource counting rules.* Items received in cash or in kind during a month are evaluated first under the income counting rules and, if retained until the first moment of the following

1002

Program for the Elderly (24 CFR 891, subpart B); Section 202 Direct Loans for Housing for the Elderly and Persons with Disabilities (24 CFR part 891, subpart E) and the Section 811 Supportive Housing for Persons with Disabilities (24 CFR part 891, subpart C). Unless specified in the regulations for each of the programs listed in paragraph (d) of this section or in another regulatory section of this part 5, subpart F, the regulations in part 5, subpart F, generally are not applicable to these programs; and

(e) Determining earned income disregard for persons with disabilities, as provided in §5.617, for the following programs: HOME Investment Partnerships Program (24 CFR part 92); Housing Opportunities for Persons with AIDS (24 CFR part 574); Supportive Housing Program (McKinney Act Homeless Assistance) (24 CFR part 583); and the Housing Choice Voucher Program (24 CFR part 982).

[66 FR 6222, Jan. 19, 2001]

### § 5.603 Definitions.

As used in this subpart:

(a) *Terms found elsewhere in part 5*—(1) *Subpart A.* The terms *1937 Act, elderly person, public housing, public housing agency (PHA), responsible entity* and *Section 8* are defined in §5.100.

(2) *Subpart D.* The terms "disabled family", "elderly family", "family", "live-in aide", and "person with disabilities" are defined in §5.403.

(b) The following terms shall have the meanings set forth below:

*Adjusted income.* See §5.611.

*Annual income.* See §5.609.

*Child care expenses.* Amounts anticipated to be paid by the family for the care of children under 13 years of age during the period for which annual income is computed, but only where such care is necessary to enable a family member to actively seek employment, be gainfully employed, or to further his or her education and only to the extent such amounts are not reimbursed. The amount deducted shall reflect reasonable charges for child care. In the case of child care necessary to permit employment, the amount deducted shall not exceed the amount of employment income that is included in annual income.

*Dependent.* A member of the family (except foster children and foster adults) other than the family head or spouse, who is under 18 years of age, or is a person with a disability, or is a full-time student.

*Disability assistance expenses.* Reasonable expenses that are anticipated, during the period for which annual income is computed, for attendant care and auxiliary apparatus for a disabled family member and that are necessary to enable a family member (including the disabled member) to be employed, provided that the expenses are neither paid to a member of the family nor reimbursed by an outside source.

*Economic self-sufficiency program.* Any program designed to encourage, assist, train, or facilitate the economic independence of HUD-assisted families or to provide work for such families. These programs include programs for job training, employment counseling, work placement, basic skills training, education, English proficiency, workfare, financial or household management, apprenticeship, and any program necessary to ready a participant for work (including a substance abuse or mental health treatment program), or other work activities.

*Extremely low income family.* A family whose annual income does not exceed 30 percent of the median income for the area, as determined by HUD, with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 30 percent of the median income for the area if HUD finds that such variations are necessary because of unusually high or low family incomes.

*Full-time student.* A person who is attending school or vocational training on a full-time basis.

*Imputed welfare income.* See §5.615.

*Low income family.* A family whose annual income does not exceed 80 percent of the median income for the area, as determined by HUD with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 80 percent of the median income for the area on the basis of HUD's findings that such variations are necessary because of unusually high or low family incomes.

78

ADD. 26

*Medical expenses.* Medical expenses, including medical insurance premiums, that are anticipated during the period for which annual income is computed, and that are not covered by insurance.

*Monthly adjusted income.* One twelfth of adjusted income.

*Monthly income.* One twelfth of annual income.

*Net family assets.* (1) Net cash value after deducting reasonable costs that would be incurred in disposing of real property, savings, stocks, bonds, and other forms of capital investment, excluding interests in Indian trust land and excluding equity accounts in HUD homeownership programs. The value of necessary items of personal property such as furniture and automobiles shall be excluded.

(2) In cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust. Any income distributed from the trust fund shall be counted when determining annual income under §5.609.

(3) In determining net family assets, PHAs or owners, as applicable, shall include the value of any business or family assets disposed of by an applicant or tenant for less than fair market value (including a disposition in trust, but not in a foreclosure or bankruptcy sale) during the two years preceding the date of application for the program or reexamination, as applicable, in excess of the consideration received therefor. In the case of a disposition as part of a separation or divorce settlement, the disposition will not be considered to be for less than fair market value if the applicant or tenant receives important consideration not measurable in dollar terms.

(4) For purposes of determining annual income under §5.609, the term "net family assets" does not include the value of a home currently being purchased with assistance under part 982, subpart M of this title. This exclusion is limited to the first 10 years after the purchase date of the home.

*Owner* has the meaning provided in the relevant program regulations. As used in this subpart, where appro-

priate, the term "owner" shall also include a "borrower" as defined in part 891 of this title.

*Responsible entity.* For §5.611, in addition to the definition of "responsible entity" in §5.100, and for §5.617, in addition to only that part of the definition of "responsible entity" in §5.100 which addresses the Section 8 program covered by §5.617 (public housing is not covered by §5.617), "responsible entity" means:

(1) For the HOME Investment Partnerships Program, the participating jurisdiction, as defined in 24 CFR 92.2;

(2) For the Rent Supplement Payments Program, the owner of the multifamily project;

(3) For the Rental Assistance Payments Program, the owner of the Section 236 project;

(4) For the Housing Opportunities for Persons with AIDS (HOPWA) program, the applicable "State" or "unit of general local government" or "nonprofit organization" as these terms are defined in 24 CFR 574.3, that administers the HOPWA Program;

(5) For the Shelter Plus Care Program, the "Recipient" as defined in 24 CFR 582.5;

(6) For the Supportive Housing Program, the "recipient" as defined in 24 CFR 583.5;

(7) For the Section 202 Supportive Housing Program for the Elderly, the "Owner" as defined in 24 CFR 891.205;

(8) For the Section 202 Direct Loans for Housing for the Elderly and Persons with Disabilities), the "Borrower" as defined in 24 CFR 891.505; and

(9) For the Section 811 Supportive Housing Program for Persons with Disabilities, the "owner" as defined in 24 CFR 891.305.

*Tenant rent.* The amount payable monthly by the family as rent to the unit owner (Section 8 owner or PHA in public housing). (This term is not used in the Section 8 voucher program.)

*Total tenant payment.* See §5.613.

*Utility allowance.* If the cost of utilities (except telephone) and other housing services for an assisted unit is not included in the tenant rent but is the responsibility of the family occupying the unit, an amount equal to the estimate made or approved by a PHA or

HUD of the monthly cost of a reasonable consumption of such utilities and other services for the unit by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment.

*Utility reimbursement.* The amount, if any, by which the utility allowance for a unit, if applicable, exceeds the total tenant payment for the family occupying the unit. (This definition is not used in the Section 8 voucher program, or for a public housing family that is paying a flat rent.)

*Very low income family.* A family whose annual income does not exceed 50 percent of the median family income for the area, as determined by HUD with adjustments for smaller and larger families, except that HUD may establish income ceilings higher or lower than 50 percent of the median income for the area if HUD finds that such variations are necessary because of unusually high or low family incomes.

*Welfare assistance.* Welfare or other payments to families or individuals, based on need, that are made under programs funded, separately or jointly, by Federal, State or local governments (including assistance provided under the Temporary Assistance for Needy Families (TANF) program, as that term is defined under the implementing regulations issued by the Department of Health and Human Services at 45 CFR 260.31).

*Work activities.* See definition at section 407(d) of the Social Security Act (42 U.S.C. 607(d)).

[61 FR 54498, Oct. 18, 1996, as amended at 65 FR 16716, Mar. 29, 2000; 65 FR 55161, Sept. 12, 2000; 66 FR 6223, Jan. 19, 2001; 67 FR 47432, July 18, 2002]

FAMILY INCOME

## § 5.609  Annual income.

(a) *Annual income* means all amounts, monetary or not, which:

(1) Go to, or on behalf of, the family head or spouse (even if temporarily absent) or to any other family member; or

(2) Are anticipated to be received from a source outside the family during the 12-month period following ad-mission or annual reexamination effective date; and

(3) Which are not specifically excluded in paragraph (c) of this section.

(4) Annual income also means amounts derived (during the 12-month period) from assets to which any member of the family has access.

(b) Annual income includes, but is not limited to:

(1) The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services;

(2) The net income from the operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family;

(3) Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation is permitted only as authorized in paragraph (b)(2) of this section. Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from all net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD;

(4) The full amount of periodic amounts received from Social Security, annuities, insurance policies, retirement funds, pensions, disability or death benefits, and other similar types of periodic receipts, including a lump-sum amount or prospective monthly

amounts for the delayed start of a periodic amount (except as provided in paragraph (c)(14) of this section);

(5) Payments in lieu of earnings, such as unemployment and disability compensation, worker's compensation and severance pay (except as provided in paragraph (c)(3) of this section);

(6) *Welfare assistance payments.* (i) Welfare assistance payments made under the Temporary Assistance for Needy Families (TANF) program are included in annual income only to the extent such payments:

(A) Qualify as assistance under the TANF program definition at 45 CFR 260.31; and

(B) Are not otherwise excluded under paragraph (c) of this section.

(ii) If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustment by the welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare assistance income to be included as income shall consist of:

(A) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

(B) The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph shall be the amount resulting from one application of the percentage.

(7) Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from organizations or from persons not residing in the dwelling;

(8) All regular pay, special pay and allowances of a member of the Armed Forces (except as provided in paragraph (c)(7) of this section).

(9) For section 8 programs only and as provided in 24 CFR 5.612, any financial assistance, in excess of amounts received for tuition, that an individual receives under the Higher Education Act of 1965 (20 U.S.C. 1001 *et seq.*), from private sources, or from an institution of higher education (as defined under the Higher Education Act of 1965 (20 U.S.C. 1002)), shall be considered income to that individual, except that financial assistance described in this paragraph is not considered annual income for persons over the age of 23 with dependent children. For purposes of this paragraph, "financial assistance" does not include loan proceeds for the purpose of determining income.

(c) Annual income does not include the following:

(1) Income from employment of children (including foster children) under the age of 18 years;

(2) Payments received for the care of foster children or foster adults (usually persons with disabilities, unrelated to the tenant family, who are unable to live alone);

(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains and settlement for personal or property losses (except as provided in paragraph (b)(5) of this section);

(4) Amounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member;

(5) Income of a live-in aide, as defined in §5.403;

(6) Subject to paragraph (b)(9) of this section, the full amount of student financial assistance paid directly to the student or to the educational institution;

(7) The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

(8)(i) Amounts received under training programs funded by HUD;

(ii) Amounts received by a person with a disability that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

(iii) Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and which are made solely to

allow participation in a specific program;

(iv) Amounts received under a resident service stipend. A resident service stipend is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the PHA or owner, on a part-time basis, that enhances the quality of life in the development. Such services may include, but are not limited to, fire patrol, hall monitoring, lawn maintenance, resident initiatives coordination, and serving as a member of the PHA's governing board. No resident may receive more than one such stipend during the same period of time;

(v) Incremental earnings and benefits resulting to any family member from participation in qualifying State or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives, and are excluded only for the period during which the family member participates in the employment training program;

(9) Temporary, nonrecurring or sporadic income (including gifts);

(10) Reparation payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

(11) Earnings in excess of $480 for each full-time student 18 years old or older (excluding the head of household and spouse);

(12) Adoption assistance payments in excess of $480 per adopted child;

(13) [Reserved]

(14) Deferred periodic amounts from supplemental security income and social security benefits that are received in a lump sum amount or in prospective monthly amounts.

(15) Amounts received by the family in the form of refunds or rebates under State or local law for property taxes paid on the dwelling unit;

(16) Amounts paid by a State agency to a family with a member who has a developmental disability and is living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home; or

(17) Amounts specifically excluded by any other Federal statute from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs that includes assistance under any program to which the exclusions set forth in 24 CFR 5.609(c) apply. A notice will be published in the FEDERAL REGISTER and distributed to PHAs and housing owners identifying the benefits that qualify for this exclusion. Updates will be published and distributed when necessary.

(d) *Annualization of income.* If it is not feasible to anticipate a level of income over a 12-month period (*e.g.*, seasonal or cyclic income), or the PHA believes that past income is the best available indicator of expected future income, the PHA may annualize the income anticipated for a shorter period, subject to a redetermination at the end of the shorter period.

[61 FR 54498, Oct. 18, 1996, as amended at 65 FR 16716, Mar. 29, 2000; 67 FR 47432, July 18, 2002; 70 FR 77743, Dec. 30, 2005]

§ 5.611  Adjusted income.

Adjusted income means annual income (as determined by the responsible entity, defined in §5.100 and §5.603) of the members of the family residing or intending to reside in the dwelling unit, after making the following deductions:

(a) *Mandatory deductions.* In determining adjusted income, the responsible entity must deduct the following amounts from annual income:

(1) $480 for each dependent;

(2) $400 for any elderly family or disabled family;

(3) The sum of the following, to the extent the sum exceeds three percent of annual income:

(i) Unreimbursed medical expenses of any elderly family or disabled family; and

(ii) Unreimbursed reasonable attendant care and auxiliary apparatus expenses for each member of the family who is a person with disabilities, to the extent necessary to enable any member of the family (including the member who is a person with disabilities) to be

ADD. 30

**§ 982.5 Notices required by this part.**

Where part 982 requires any notice to be given by the PHA, the family or the owner, the notice must be in writing.

## Subpart B—HUD Requirements and PHA Plan for Administration of Program

SOURCE: 60 FR 34696, July 3, 1995, unless otherwise noted.

**§ 982.51 PHA authority to administer program.**

(a) The PHA must have authority to administer the program. The PHA must provide evidence, satisfactory to HUD, of its status as a PHA, of its authority to administer the program, and of the PHA jurisdiction.

(b) The evidence submitted by the PHA to HUD must include enabling legislation and a supporting legal opinion satisfactory to HUD. The PHA must submit additional evidence when there is a change that affects its status as a PHA, authority to administer the program, or the PHA jurisdiction.

[60 FR 34695, July 3, 1995, as amended at 64 FR 26641, May 14, 1999]

**§ 982.52 HUD requirements.**

(a) The PHA must comply with HUD regulations and other HUD requirements for the program. HUD requirements are issued by HUD headquarters, as regulations, FEDERAL REGISTER notices or other binding program directives.

(b) The PHA must comply with the consolidated ACC and the PHA's HUD-approved applications for program funding.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995]

**§ 982.53 Equal opportunity requirements and protection for victims of domestic violence.**

(a) The tenant-based program requires compliance with all equal opportunity requirements imposed by contract or federal law, including the authorities cited at 24 CFR 5.105(a) and title II of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq.

(b) Civil rights certification. The PHA must submit a signed certification to HUD that:

(1) The PHA will administer the program in conformity with the Fair Housing Act, Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act.

(2) The PHA will affirmatively further fair housing in the administration of the program.

(c) Obligation to affirmatively further fair housing. The PHA shall affirmatively further fair housing as required by § 903.7(o) of this title.

(d) State and local law. Nothing in part 982 is intended to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder. However, such State and local laws shall not change or affect any requirement of this part, or any other HUD requirements for administration or operation of the program.

(e) Protection for victims of domestic violence, dating violence, and stalking. The PHA must apply 24 CFR part 5, subpart L, in all applicable cases where there is involved incidents of, or criminal activity related to, domestic violence, dating violence, and stalking.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 63 FR 23859, Apr. 30, 1998; 64 FR 26641, May 14, 1999; 64 FR 56911, Oct. 21, 1999; 73 FR 72344, Nov. 28, 2008]

**§ 982.54 Administrative plan.**

(a) The PHA must adopt a written administrative plan that establishes local policies for administration of the program in accordance with HUD requirements. The administrative plan and any revisions of the plan must be formally adopted by the PHA Board of Commissioners or other authorized PHA officials. The administrative plan states PHA policy on matters for which the PHA has discretion to establish local policies.

(b) The administrative plan must be in accordance with HUD regulations and requirements. The administrative

yet have a SEMAP rating, HUD will consider the PHA's SEMAP certification.

(3) HUD approval of success rate payment standard amounts shall be for all unit sizes in the FMR area. A PHA may opt to establish a success rate payment standard amount for one or more unit sizes in all or a designated part of the PHA jurisdiction within the FMR area.

(f) *Payment standard protection for PHAs that meet deconcentration objectives.* Paragraph (f) of this section applies only to a PHA with jurisdiction in an FMR area where the FMR had previously been set at the 50th percentile rent to provide a broad range of housing opportunities throughout a metropolitan area, pursuant to §888.113(c), but is now set at the 40th percentile rent.

(1) Such a PHA may obtain HUD Field Office approval of a payment standard amount based on the 50th percentile rent if the PHA scored the maximum number of points on the deconcentration bonus indicator in §985.3(h) in the prior year, or in two of the last three years.

(2) HUD approval of payment standard amounts based on the 50th percentile rent shall be for all unit sizes in the FMR area that had previously been set at the 50th percentile rent pursuant to §888.113(c). A PHA may opt to establish a payment standard amount based on the 50th percentile rent for one or more unit sizes in all or a designated part of the PHA jurisdiction within the FMR area.

(g) *HUD review of PHA payment standard schedules.* (1) HUD will monitor rent burdens of families assisted in a PHA's voucher program. HUD will review the PHA's payment standard for a particular unit size if HUD finds that 40 percent or more of such families occupying units of that unit size currently pay more than 30 percent of adjusted monthly income as the family share. Such determination may be based on the most recent examinations of family income.

(2) After such review, HUD may, at its discretion, require the PHA to modify payment standard amounts for any unit size on the PHA payment standard schedule. HUD may require the PHA to establish an increased payment standard amount within the basic range.

[64 FR 26648, May 14, 1999; 64 FR 49658, Sept. 14, 1999, as amended at 64 FR 56914, Oct. 21, 1999; 65 FR 16822, Mar. 30, 2000; 65 FR 58874, Oct. 2, 2000; 66 FR 30568, June 6, 2001; 67 FR 56688, Sept. 4, 2002; 80 FR 8246, Feb. 17, 2015]

**§982.504 Payment standard for family in restructured subsidized multifamily project.**

(a) This section applies to HCV assistance if all the following conditions are applicable:

(1) Such HCV assistance is provided to a family pursuant to 24 CFR 401.421 when HUD has approved a restructuring plan, and the participating administrative entity has approved the use of tenant-based assistance to provide continued assistance for such families. Such tenant-based voucher assistance is provided for a family previously receiving project-based assistance in an eligible project (as defined in §401.2 of this title) at the time when the project-based assistance terminates.

(2) The family chooses to remain in the restructured project with HCV assistance under the program and leases a unit that does not exceed the family unit size;

(3) The lease for such assisted tenancy commences during the first year after the project-based assistance terminates.

(b) The initial payment standard for the family under such initial lease is the sum of the reasonable rent to owner for the unit plus the utility allowance for tenant-paid utilities. (Determination of such initial payment standard for the family is not subject to paragraphs (c)(1) and (c)(2) of §982.505. Except for determination of the initial payment standard as specifically provided in paragraph (b) of this section, the payment standard and housing assistance payment for the family during the HAP contract term shall be determined in accordance with §982.505.)

[64 FR 26649, May 14, 1999, as amended at 80 FR 8247, Feb. 17, 2015]

**§982.505 How to calculate housing assistance payment.**

(a) *Use of payment standard.* A payment standard is used to calculate the

monthly housing assistance payment for a family. The "payment standard" is the maximum monthly subsidy payment.

(b) *Amount of monthly housing assistance payment.* The PHA shall pay a monthly housing assistance payment on behalf of the family that is equal to the *lower* of:

(1) The payment standard for the family minus the total tenant payment; or

(2) The gross rent minus the total tenant payment.

(c) *Payment standard for family.* (1) The payment standard for the family is the lower of:

(i) The payment standard amount for the family unit size; or

(ii) The payment standard amount for the size of the dwelling unit rented by the family.

(2) If the PHA has established a separate payment standard amount for a designated part of an FMR area in accordance with § 982.503 (including an exception payment standard amount as determined in accordance with § 982.503(b)(2) and § 982.503(c)), and the dwelling unit is located in such designated part, the PHA must use the appropriate payment standard amount for such designated part to calculate the payment standard for the family. The payment standard for the family shall be calculated in accordance with this paragraph and paragraph (c)(1) of this section.

(3) *Decrease in the payment standard amount during the HAP contract term.* If the amount on the payment standard schedule is decreased during the term of the HAP contract, the lower payment standard amount generally must be used to calculate the monthly housing assistance payment for the family beginning at the effective date of the family's second regular reexamination following the effective date of the decrease in the payment standard amount. The PHA must determine the payment standard for the family as follows.

(i) *Step 1:* At the first regular reexamination following the decrease in the payment standard amount, the PHA shall determine the payment standard for the family in accordance with paragraphs (c)(1) and (c)(2) of this section

(using the decreased payment standard amount).

(ii) *Step 2* (first reexamination payment standard amount): The PHA shall compare the payment standard amount from step 1 to the payment standard amount last used to calculate the monthly housing assistance payment for the family. The payment standard amount used by the PHA to calculate the monthly housing assistance payment at the first regular reexamination following the decrease in the payment standard amount is the higher of these two payment standard amounts. The PHA shall advise the family that the application of the lower payment standard amount will be deferred until the second regular reexamination following the effective date of the decrease in the payment standard amount.

(iii) *Step 3* (second reexamination payment standard amount): At the second regular reexamination following the decrease in the payment standard amount, the lower payment standard amount shall be used to calculate the monthly housing assistance payment for the family unless the PHA has subsequently increased the payment standard amount, in which case the payment standard amount is determined in accordance with paragraph (c)(4) of this section.

(4) *Increase in the payment standard amount during the HAP contract term.* If the payment standard amount is increased during the term of the HAP contract, the increased payment standard amount shall be used to calculate the monthly housing assistance payment for the family beginning at the effective date of the family's first regular reexamination on or after the effective date of the increase in the payment standard amount.

(5) *Change in family unit size during the HAP contract term.* Irrespective of any increase or decrease in the payment standard amount, if the family unit size increases or decreases during the HAP contract term, the new family unit size must be used to determine the payment standard amount for the family beginning at the family's first regular reexamination following the change in family unit size.

(d) *PHA approval of higher payment standard for the family as a reasonable accommodation.* If the family includes a person with disabilities and requires a higher payment standard for the family, as a reasonable accommodation for such person, in accordance with part 8 of this title, the PHA may establish a higher payment standard for the family within the basic range.

[64 FR 26649, May 14, 1999, as amended at 64 FR 56914, Oct. 21, 1999; 65 FR 16822, Mar. 30, 2000; 65 FR 42509, July 10, 2000; 66 FR 30568, June 6, 2001; 67 FR 56689, Sept. 4, 2002; 80 FR 8247, Feb. 17, 2014]

### §982.506 Negotiating rent to owner.

The owner and the family negotiate the rent to owner. At the family's request, the PHA must help the family negotiate the rent to owner.

[63 FR 23861, Apr. 30, 1998. Redesignated at 64 FR 26648, May 14, 1999]

### §982.507 Rent to owner: Reasonable rent.

(a) *PHA determination.* (1) Except as provided in paragraph (c) of this section, the PHA may not approve a lease until the PHA determines that the initial rent to owner is a reasonable rent.

(2) The PHA must redetermine the reasonable rent:

(i) Before any increase in the rent to owner;

(ii) If there is a five percent decrease in the published FMR in effect 60 days before the contract anniversary (for the unit size rented by the family) as compared with the FMR in effect 1 year before the contract anniversary; or

(iii) If directed by HUD.

(3) The PHA may also redetermine the reasonable rent at any other time.

(4) At all times during the assisted tenancy, the rent to owner may not exceed the reasonable rent as most recently determined or redetermined by the PHA.

(b) *Comparability.* The PHA must determine whether the rent to owner is a reasonable rent in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities to be provided by the owner in accordance with the lease.

(c) *Units assisted by low-income housing tax credits or assistance under HUD's HOME Investment Partnerships (HOME) program.* (1) *General.* For a unit receiving low-income housing tax credits (LIHTCs) pursuant to section 42 of the Internal Revenue Code of 1986 or receiving assistance under HUD's HOME Program (for which the regulations are found in 24 CFR part 92), a rent comparison with unassisted units is not required if the voucher rent does not exceed the rent for other LIHTC- or HOME-assisted units in the project that are not occupied by families with tenant-based assistance.

(2) *LIHTC.* If the rent requested by the owner exceeds the LIHTC rents for non-voucher families, the PHA must perform a rent comparability study in accordance with program regulations and the rent shall not exceed the lesser of the:

(i) Reasonable rent as determined pursuant to a rent comparability study; and

(ii) The payment standard established by the PHA for the unit size involved.

(3) *HOME Program.* [Reserved]

(d) *Owner certification of rents charged for other units.* By accepting each monthly housing assistance payment from the PHA, the owner certifies that the rent to owner is not more than rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

[63 FR 23861, Apr. 30, 1998. Redesignated at 64 FR 26648, May 14, 1999; 79 FR 36164, June 25, 2014]

### §982.508 Maximum family share at initial occupancy.

At the time the PHA approves a tenancy for initial occupancy of a dwelling unit by a family with tenant-based assistance under the program, and where the gross rent of the unit exceeds the applicable payment standard for the family, the family share must not exceed 40 percent of the family's

537

(3) Interim examinations must be conducted in accordance with policies in the PHA administrative plan.

(c) *Family reporting of change.* The PHA must adopt policies prescribing when and under what conditions the family must report a change in family income or composition.

(d) *Effective date of reexamination.* (1) The PHA must adopt policies prescribing how to determine the effective date of a change in the housing assistance payment resulting from an interim redetermination.

(2) At the effective date of a regular or interim reexamination, the PHA must make appropriate adjustments in the housing assistance payment in accordance with §982.505.

(e) *Family member income.* Family income must include income of all family members, including family members not related by blood or marriage. If any new family member is added, family income must include any income of the additional family member. The PHA must conduct a reexamination to determine such additional income, and must make appropriate adjustments in the housing assistance payment.

(f) *Accuracy of family income data.* The PHA must establish procedures that are appropriate and necessary to assure that income data provided by applicant or participant families is complete and accurate.

(g) *Execution of release and consent.* (1) As a condition of admission or for continued assistance under the program, the PHA shall require the family head, and such other family members as the PHA designates, to execute a HUD-approved release and consent form (including any release and consent as required under §5.230 of this title) authorizing any depository or private source of income, or any Federal, State or local agency, to furnish or release to the PHA or HUD such information as the PHA or HUD determines to be necessary.

(2) The PHA and HUD must limit the use or disclosure of information obtained from a family or from another source pursuant to this release and consent to purposes directly in connection with administration of the program.

(Information collection requirements contained in this section have been approved by the Office of Management and Budget under control number 2577–0169.)

[63 FR 23861, Apr. 30, 1998, as amended at 64 FR 13057, Mar. 16, 1999; 64 FR 26649, May 14, 1999; 64 FR 56915, Oct. 21, 1999; 65 FR 16822, Mar. 30, 2000; 80 FR 8247, Feb. 17, 2015]

EDITORIAL NOTE: At 64 FR 26649, May 14, 1999, §982.516 was amended in paragraph (e) by removing the reference to ''and family unit size''; however paragraph (e) does not contain this phrase.

## §982.517 Utility allowance schedule.

(a) *Maintaining schedule.* (1) The PHA must maintain a utility allowance schedule for all tenant-paid utilities (except telephone), for cost of tenant-supplied refrigerators and ranges, and for other tenant-paid housing services (e.g., trash collection (disposal of waste and refuse)).

(2) The PHA must give HUD a copy of the utility allowance schedule. At HUD's request, the PHA also must provide any information or procedures used in preparation of the schedule.

(b) *How allowances are determined.* (1) The utility allowance schedule must be determined based on the typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type in the same locality. In developing the schedule, the PHA must use normal patterns of consumption for the community as a whole and current utility rates.

(2)(i) A PHA's utility allowance schedule, and the utility allowance for an individual family, must include the utilities and services that are necessary in the locality to provide housing that complies with the housing quality standards. However, the PHA may not provide any allowance for non-essential utility costs, such as costs of cable or satellite television.

(ii) In the utility allowance schedule, the PHA must classify utilities and other housing services according to the following general categories: space heating; air conditioning; cooking; water heating; water; sewer; trash collection (disposal of waste and refuse); other electric; refrigerator (cost of tenant-supplied refrigerator); range (cost

539

of tenant-supplied range); and other specified housing services. The PHA must provide a utility allowance for tenant-paid air-conditioning costs if the majority of housing units in the market provide centrally air-conditioned units or there is appropriate wiring for tenant-installed air conditioners.

(3) The cost of each utility and housing service category must be stated separately. For each of these categories, the utility allowance schedule must take into consideration unit size (by number of bedrooms), and unit types (e.g., apartment, row-house, town house, single-family detached, and manufactured housing) that are typical in the community.

(4) The utility allowance schedule must be prepared and submitted in accordance with HUD requirements on the form prescribed by HUD.

(c) *Revisions of utility allowance schedule.* (1) A PHA must review its schedule of utility allowances each year, and must revise its allowance for a utility category if there has been a change of 10 percent or more in the utility rate since the last time the utility allowance schedule was revised. The PHA must maintain information supporting its annual review of utility allowances and any revisions made in its utility allowance schedule.

(2) At HUD's direction, the PHA must revise the utility allowance schedule to correct any errors, or as necessary to update the schedule.

(d) *Use of utility allowance schedule.* (1) The PHA must use the appropriate utility allowance for the size of dwelling unit actually leased by the family (rather than the family unit size as determined under the PHA subsidy standards).

(2) At reexamination, the PHA must use the PHA current utility allowance schedule.

(e) *Higher utility allowance as reasonable accommodation for a person with disabilities.* On request from a family that includes a person with disabilities, the PHA must approve a utility allowance which is higher than the applicable amount on the utility allowance schedule if a higher utility allowance is needed as a reasonable accommodation in accordance with 24 CFR part 8 to

make the program accessible to and usable by the family member with a disability.

(Information collection requirements contained in this section have been approved by the Office of Management and Budget under control number 2577–0169.)

[63 FR 23861, Apr. 30, 1998, as amended at 80 FR 8247, Feb. 17, 2015]

### § 982.521   Rent to owner in subsidized project.

(a) *Applicability to subsidized project.* This section applies to a program tenancy in any of the following types of federally subsidized project:

(1) An insured or non-insured Section 236 project;

(2) A Section 202 project;

(3) A Section 221(d)(3) below market interest rate (BMIR) project; or

(4) A Section 515 project of the Rural Development Administration.

(b) *How rent to owner is determined.* The rent to owner is the subsidized rent as determined in accordance with requirements for the applicable federal program listed in paragraph (a) of this section. This determination is not subject to the prohibition against increasing the rent to owner during the initial lease term (see § 982.309).

[65 FR 16822, Mar. 30, 2000, as amended at 80 FR 8247, Feb. 17, 2015]

## Subpart L—Family Obligations; Denial and Termination of Assistance

SOURCE: 60 FR 34695, July 3, 1995, unless otherwise noted.

### § 982.551   Obligations of participant.

(a) *Purpose.* This section states the obligations of a participant family under the program.

(b) *Supplying required information*—(1) The family must supply any information that the PHA or HUD determines is necessary in the administration of the program, including submission of required evidence of citizenship or eligible immigration status (as provided by 24 CFR part 5). "Information" includes any requested certification, release or other documentation.

(2) The family must supply any information requested by the PHA or HUD

the tenant or immediate family member of the tenant is the victim.

(m) *Alcohol abuse by household members.* The members of the household must not abuse alcohol in a way that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

(n) *Other housing assistance.* An assisted family, or members of the family, may not receive Section 8 tenant-based assistance while receiving another housing subsidy, for the same unit or for a different unit, under any duplicative (as determined by HUD or in accordance with HUD requirements) federal, State or local housing assistance program.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 61 FR 11119, Mar. 18, 1996; 61 FR 13627, Mar. 27, 1996; 61 FR 27163, May 30, 1996; 64 FR 26650, May 14, 1999; 66 FR 28805, May 24, 2001; 73 FR 72345, Nov. 28, 2008; 75 FR 66264, Oct. 27, 2010]

### § 982.552  PHA denial or termination of assistance for family.

(a) *Action or inaction by family.* (1) A PHA may deny assistance for an applicant or terminate assistance for a participant under the programs because of the family's action or failure to act as described in this section or § 982.553. The provisions of this section do not affect denial or termination of assistance for grounds other than action or failure to act by the family.

(2) Denial of assistance for an applicant may include any or all of the following: denying listing on the PHA waiting list, denying or withdrawing a voucher, refusing to enter into a HAP contract or approve a lease, and refusing to process or provide assistance under portability procedures.

(3) Termination of assistance for a participant may include any or all of the following: refusing to enter into a HAP contract or approve a lease, terminating housing assistance payments under an outstanding HAP contract, and refusing to process or provide assistance under portability procedures.

(4) This section does not limit or affect exercise of the PHA rights and remedies against the owner under the HAP contract, including termination, suspension or reduction of housing assistance payments, or termination of the HAP contract.

(b) *Requirement to deny admission or terminate assistance.* (1) For provisions on denial of admission and termination of assistance for illegal drug use, other criminal activity, and alcohol abuse that would threaten other residents, see § 982.553.

(2) The PHA must terminate program assistance for a family evicted from housing assisted under the program for serious violation of the lease.

(3) The PHA must deny admission to the program for an applicant, or terminate program assistance for a participant, if any member of the family fails to sign and submit consent forms for obtaining information in accordance with part 5, subparts B and F of this title.

(4) The family must submit required evidence of citizenship or eligible immigration status. See part 5 of this title for a statement of circumstances in which the PHA must deny admission or terminate program assistance because a family member does not establish citizenship or eligible immigration status, and the applicable informal hearing procedures.

(5) The PHA must deny or terminate assistance if any family member fails to meet the eligibility requirements concerning individuals enrolled at an institution of higher education as specified in 24 CFR 5.612.

(c) *Authority to deny admission or terminate assistance*—(1) *Grounds for denial or termination of assistance.* The PHA may at any time deny program assistance for an applicant, or terminate program assistance for a participant, for any of the following grounds:

(i) If the family violates any family obligations under the program (see § 982.551). See § 982.553 concerning denial or termination of assistance for crime by family members.

(ii) If any member of the family has been evicted from federally assisted housing in the last five years;

(iii) If a PHA has ever terminated assistance under the program for any member of the family.

(iv) If any member of the family has committed fraud, bribery, or any other

corrupt or criminal act in connection with any Federal housing program (see also §982.553(a)(1));

(v) If the family currently owes rent or other amounts to the PHA or to another PHA in connection with Section 8 or public housing assistance under the 1937 Act.

(vi) If the family has not reimbursed any PHA for amounts paid to an owner under a HAP contract for rent, damages to the unit, or other amounts owed by the family under the lease.

(vii) If the family breaches an agreement with the PHA to pay amounts owed to a PHA, or amounts paid to an owner by a PHA. (The PHA, at its discretion, may offer a family the opportunity to enter an agreement to pay amounts owed to a PHA or amounts paid to an owner by a PHA. The PHA may prescribe the terms of the agreement.)

(viii) If a family participating in the FSS program fails to comply, without good cause, with the family's FSS contract of participation.

(ix) If the family has engaged in or threatened abusive or violent behavior toward PHA personnel.

(x) If a welfare-to-work (WTW) family fails, willfully and persistently, to fulfill its obligations under the welfare-to-work voucher program.

(xi) If the family has been engaged in criminal activity or alcohol abuse as described in §982.553.

(2) *Consideration of circumstances.* In determining whether to deny or terminate assistance because of action or failure to act by members of the family:

(i) The PHA may consider all relevant circumstances such as the seriousness of the case, the extent of participation or culpability of individual family members, mitigating circumstances related to the disability of a family member, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure.

(ii) The PHA may impose, as a condition of continued assistance for other family members, a requirement that other family members who participated in or were culpable for the action or failure will not reside in the unit. The PHA may permit the other mem-

bers of a participant family to continue receiving assistance.

(iii) In determining whether to deny admission or terminate assistance for illegal use of drugs or alcohol abuse by a household member who is no longer engaged in such behavior, the PHA may consider whether such household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program, or has otherwise been rehabilitated successfully (42 U.S.C. 13661). For this purpose, the PHA may require the applicant or tenant to submit evidence of the household member's current participation in, or successful completion of, a supervised drug or alcohol rehabilitation program or evidence of otherwise having been rehabilitated successfully.

(iv) If the family includes a person with disabilities, the PHA decision concerning such action is subject to consideration of reasonable accommodation in accordance with part 8 of this title.

(v) *Nondiscrimination limitation and protection for victims of domestic violence, dating violence, or stalking.* The PHA's admission and termination actions must be consistent with fair housing and equal opportunity provisions of §5.105 of this title, and with the requirements of 24 CFR part 5, subpart L, protection for victims of domestic violence, dating violence, or stalking.

(d) *Information for family.* The PHA must give the family a written description of:

(1) Family obligations under the program.

(2) The grounds on which the PHA may deny or terminate assistance because of family action or failure to act.

(3) The PHA informal hearing procedures.

(e) *Applicant screening.* The PHA may at any time deny program assistance for an applicant in accordance with the

PHA policy, as stated in the PHA administrative plan, on screening of applicants for family behavior or suitability for tenancy.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 61 FR 13627, Mar. 27, 1996; 63 FR 23865, Apr. 30, 1998; 64 FR 26650, May 14, 1999; 64 FR 49659, Sept. 14, 1999; 64 FR 56915, Oct. 21, 1999; 65 FR 16823, Mar. 30, 2000; 66 FR 28805, May 24, 2001; 70 FR 77744, Dec. 30, 2005; 73 FR 72345, Nov. 28, 2008; 75 FR 66264, Oct. 27, 2010; 80 FR 8247, Feb. 17, 2015]

§ 982.553  Denial of admission and termination of assistance for criminals and alcohol abusers.

(a) *Denial of admission*—(1) *Prohibiting admission of drug criminals.* (i) The PHA *must* prohibit admission to the program of an applicant for three years from the date of eviction if a household member has been evicted from federally assisted housing for drug-related criminal activity. However, the PHA may admit the household if the PHA determines:

(A) That the evicted household member who engaged in drug-related criminal activity has successfully completed a supervised drug rehabilitation program approved by the PHA; or

(B) That the circumstances leading to eviction no longer exist (for example, the criminal household member has died or is imprisoned).

(ii) The PHA must establish standards that prohibit admission if:

(A) The PHA determines that any household member is currently engaging in illegal use of a drug;

(B) The PHA determines that it has reasonable cause to believe that a household member's illegal drug use or a pattern of illegal drug use may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents; or

(C) Any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.

(2) *Prohibiting admission of other criminals*—(i) *Mandatory prohibition.* The PHA *must* establish standards that prohibit admission to the program if any member of the household is subject to

a lifetime registration requirement under a State sex offender registration program. In this screening of applicants, the PHA must perform criminal history background checks necessary to determine whether any household member is subject to a lifetime sex offender registration requirement in the State where the housing is located and in other States where the household members are known to have resided.

(ii) *Permissive prohibitions.* (A) The PHA *may* prohibit admission of a household to the program if the PHA determines that any household member is currently engaged in, or has engaged in during a reasonable time before the admission:

(1) Drug-related criminal activity;

(2) Violent criminal activity;

(3) Other criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity; or

(4) Other criminal activity which may threaten the health or safety of the owner, property management staff, or persons performing a contract administration function or responsibility on behalf of the PHA (including a PHA employee or a PHA contractor, subcontractor or agent).

(B) The PHA may establish a period before the admission decision during which an applicant must not have engaged in the activities specified in paragraph (a)(2)(i) of this section (''reasonable time'').

(C) If the PHA previously denied admission to an applicant because a member of the household engaged in criminal activity, the PHA may reconsider the applicant if the PHA has sufficient evidence that the members of the household are not currently engaged in, and have not engaged in, such criminal activity during a reasonable period, as determined by the PHA, before the admission decision.

(1) The PHA would have ''sufficient evidence'' if the household member submitted a certification that she or he is not currently engaged in and has not engaged in such criminal activity during the specified period and provided supporting information from such sources as a probation officer, a landlord, neighbors, social service agency

544

prompt notice of a decision denying assistance to the applicant. The notice must contain a brief statement of the reasons for the PHA decision. The notice must also state that the applicant may request an informal review of the decision and must describe how to obtain the informal review.

(b) *Informal review process.* The PHA must give an applicant an opportunity for an informal review of the PHA decision denying assistance to the applicant. The administrative plan must state the PHA procedures for conducting an informal review. The PHA review procedures must comply with the following:

(1) The review may be conducted by any person or persons designated by the PHA, other than a person who made or approved the decision under review or a subordinate of this person.

(2) The applicant must be given an opportunity to present written or oral objections to the PHA decision.

(3) The PHA must notify the applicant of the PHA final decision after the informal review, including a brief statement of the reasons for the final decision.

(c) *When informal review is not required.* The PHA is not required to provide the applicant an opportunity for an informal review for any of the following:

(1) Discretionary administrative determinations by the PHA.

(2) General policy issues or class grievances.

(3) A determination of the family unit size under the PHA subsidy standards.

(4) An PHA determination not to approve an extension or suspension of a voucher term.

(5) A PHA determination not to grant approval of the tenancy.

(6) A PHA determination that a unit selected by the applicant is not in compliance with HQS.

(7) An PHA determination that the unit is not in accordance with HQS because of the family size or composition.

(d) *Restrictions on assistance for noncitizens.* The informal hearing provisions for the denial of assistance on the basis of ineligible immigration status are contained in 24 CFR part 5.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 61 FR 13627, Mar. 27, 1996; 64 FR 26850, May 14, 1999]

§ 982.555  **Informal hearing for participant.**

(a) *When hearing is required.* (1) A PHA must give a participant family an opportunity for an informal hearing to consider whether the following PHA decisions relating to the individual circumstances of a participant family are in accordance with the law, HUD regulations and PHA policies:

(i) A determination of the family's annual or adjusted income, and the use of such income to compute the housing assistance payment.

(ii) A determination of the appropriate utility allowance (if any) for tenant-paid utilities from the PHA utility allowance schedule.

(iii) A determination of the family unit size under the PHA subsidy standards.

(iv) A determination to terminate assistance for a participant family because of the family's action or failure to act (see § 982.552).

(v) A determination to terminate assistance because the participant family has been absent from the assisted unit for longer than the maximum period permitted under PHA policy and HUD rules.

(2) In the cases described in paragraphs (a)(1) (iv), (v) and (vi) of this section, the PHA must give the opportunity for an informal hearing before the PHA terminates housing assistance payments for the family under an outstanding HAP contract.

(b) *When hearing is not required.* The PHA is not required to provide a participant family an opportunity for an informal hearing for any of the following:

(1) Discretionary administrative determinations by the PHA.

(2) General policy issues or class grievances.

(3) Establishment of the PHA schedule of utility allowances for families in the program.

ADD. 40

(4) A PHA determination not to approve an extension or suspension of a voucher term.

(5) A PHA determination not to approve a unit or tenancy.

(6) A PHA determination that an assisted unit is not in compliance with HQS. (However, the PHA must provide the opportunity for an informal hearing for a decision to terminate assistance for a breach of the HQS caused by the family as described in §982.551(c).)

(7) A PHA determination that the unit is not in accordance with HQS because of the family size.

(8) A determination by the PHA to exercise or not to exercise any right or remedy against the owner under a HAP contract.

(c) *Notice to family.* (1) In the cases described in paragraphs (a)(1) (i), (ii) and (iii) of this section, the PHA must notify the family that the family may ask for an explanation of the basis of the PHA determination, and that if the family does not agree with the determination, the family may request an informal hearing on the decision.

(2) In the cases described in paragraphs (a)(1) (iv), (v) and (vi) of this section, the PHA must give the family prompt written notice that the family may request a hearing. The notice must:

(i) Contain a brief statement of reasons for the decision,

(ii) State that if the family does not agree with the decision, the family may request an informal hearing on the decision, and

(iii) State the deadline for the family to request an informal hearing.

(d) *Expeditious hearing process.* Where a hearing for a participant family is required under this section, the PHA must proceed with the hearing in a reasonably expeditious manner upon the request of the family.

(e) *Hearing procedures*—(1) *Administrative plan.* The administrative plan must state the PHA procedures for conducting informal hearings for participants.

(2) *Discovery*—(i) *By family.* The family must be given the opportunity to examine before the PHA hearing any PHA documents that are directly relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If the PHA does not make the document available for examination on request of the family, the PHA may not rely on the document at the hearing.

(ii) *By PHA.* The PHA hearing procedures may provide that the PHA must be given the opportunity to examine at PHA offices before the PHA hearing any family documents that are directly relevant to the hearing. The PHA must be allowed to copy any such document at the PHA's expense. If the family does not make the document available for examination on request of the PHA, the family may not rely on the document at the hearing.

(iii) *Documents.* The term "documents" includes records and regulations.

(3) *Representation of family.* At its own expense, the family may be represented by a lawyer or other representative.

(4) *Hearing officer: Appointment and authority.* (i) The hearing may be conducted by any person or persons designated by the PHA, other than a person who made or approved the decision under review or a subordinate of this person.

(ii) The person who conducts the hearing may regulate the conduct of the hearing in accordance with the PHA hearing procedures.

(5) *Evidence.* The PHA and the family must be given the opportunity to present evidence, and may question any witnesses. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

(6) *Issuance of decision.* The person who conducts the hearing must issue a written decision, stating briefly the reasons for the decision. Factual determinations relating to the individual circumstances of the family shall be based on a preponderance of the evidence presented at the hearing. A copy of the hearing decision shall be furnished promptly to the family.

(f) *Effect of decision.* The PHA is not bound by a hearing decision:

(1) Concerning a matter for which the PHA is not required to provide an opportunity for an informal hearing under this section, or that otherwise exceeds the authority of the person

conducting the hearing under the PHA hearing procedures.

(2) Contrary to HUD regulations or requirements, or otherwise contrary to federal, State, or local law.

(3) If the PHA determines that it is not bound by a hearing decision, the PHA must promptly notify the family of the determination, and of the reasons for the determination.

(g) *Restrictions on assistance to noncitizens.* The informal hearing provisions for the denial of assistance on the basis of ineligible immigration status are contained in 24 CFR part 5.

(Approved by the Office of Management and Budget under control number 2577–0169)

[60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 61 FR 13627, Mar. 27, 1996; 64 FR 26650, May 14, 1999; 65 FR 16823, Mar. 30, 2000; 80 FR 8247, Feb. 17, 2015]

## Subpart M—Special Housing Types

SOURCE: 63 FR 23865, Apr. 30, 1998, unless otherwise noted.

### § 982.601 Overview.

(a) *Special housing types.* This subpart describes program requirements for special housing types. The following are the special housing types:

(1) Single room occupancy (SRO) housing;

(2) Congregate housing;

(3) Group home;

(4) Shared housing;

(5) Manufactured home;

(6) Cooperative housing (excluding families that are not cooperative members); and

(7) Homeownership option.

(b) *PHA choice to offer special housing type.* (1) The PHA may permit a family to use any of the following special housing types in accordance with requirements of the program: single room occupancy (SRO) housing, congregate housing, group home, shared housing, manufactured home when the family owns the home and leases the manufactured home space, cooperative housing or homeownership option.

(2) In general, the PHA is not required to permit families (including families that move into the PHA program under portability procedures) to

use any of these special housing types, and may limit the number of families using special housing types.

(3) The PHA must permit use of any special housing type if needed as a reasonable accommodation so that the program is readily accessible to and usable by persons with disabilities in accordance with 24 CFR part 8.

(4) For occupancy of a manufactured home, see § 982.620(a).

(c) *Program funding for special housing types.* (1) HUD does not provide any additional or designated funding for special housing types, or for a specific special housing type (e.g., the homeownership option). Assistance for special housing types is paid from program funding available for the PHA's tenant-based program under the consolidated annual contributions contract.

(2) The PHA may not set aside program funding or program slots for special housing types or for a specific special housing type.

(d) *Family choice of housing and housing type.* The family chooses whether to use housing that qualifies as a special housing type under this subpart, or as any specific special housing type, or to use other eligible housing in accordance with requirements of the program. The PHA may not restrict the family's freedom to choose among available units in accordance with § 982.353.

(e) *Applicability of requirements.* (1) Except as modified by this subpart, the requirements of other subparts of this part apply to the special housing types.

(2) Provisions in this subpart only apply to a specific special housing type. The housing type is noted in the title of each section.

(3) Housing must meet the requirements of this subpart for a single special housing type specified by the family. Such housing is not subject to requirements for other special housing types. A single unit cannot be designated as more than one special housing type.

[63 FR 23865, Apr. 30, 1998, as amended at 65 FR 55162, Sept. 12, 2000; 67 FR 64493, Oct. 18, 2002; 80 FR 8247, Feb. 17, 2015]

ADD. 42

Case:Case:1451458-1456cumentDenturne0t1c69t46262age:Page: 88ate PdatedFileeFiled:050201019/2016Entry EntrySt5969y9470159

*The U.S. Equal Employment Opportunity Commission*

| | | Number |
|---|---|---|
| EEOC | NOTICE | 915.002 |
| | | October 17, 2002 |

1. <u>SUBJECT:</u> EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

2. <u>PURPOSE:</u> This enforcement guidance supersedes the enforcement guidance issued by the Commission on 03/01/99. Most of the original guidance remains the same, but limited changes have been made as a result of: (1) the Supreme Court's decision in US Airways, Inc. v. Barnett, 535 U.S., 122 S. Ct. 1516 (2002), and (2) the Commission's issuance of new regulations under section 501 of the Rehabilitation Act. The major changes in response to the Barnett decision are found on pages 4-5, 44-45, and 61-62. In addition, minor changes were made to certain footnotes and the Instructions for Investigators as a result of the Barnett decision and the new section 501 regulations.

3. <u>EFFECTIVE DATE:</u> Upon receipt.

4. <u>EXPIRATION DATE:</u> As an exception to EEOC Order 205.001, Appendix B, Attachment 4, . a(5), this Notice will remain in effect until rescinded or superseded.

5. <u>ORIGINATOR:</u> ADA Division, Office of Legal Counsel.

6. <u>INSTRUCTIONS:</u> File after Section 902 of Volume II of the Compliance Manual.

---

# Enforcement Guidance:
# Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act

## Table of Contents

<u>INTRODUCTION</u>

<u>GENERAL PRINCIPLES</u>

<u>REQUESTING REASONABLE ACCOMMODATION</u>

<u>REASONABLE ACCOMMODATION AND JOB APPLICANTS</u>

<u>REASONABLE ACCOMMODATION RELATED TO THE BENEFITS AND PRIVILEGES OF EMPLOYMENT</u>

<u>TYPES OF REASONABLE ACCOMMODATIONS RELATED TO JOB PERFORMANCE</u>

<u>JOB RESTRUCTURING</u>

<u>LEAVE</u>

<u>MODIFIED OR PART-TIME SCHEDULE</u>

<u>MODIFIED WORKPLACE POLICIES</u>

## Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008

The Americans with Disabilities Act (ADA) Amendments Act of 2008 was signed into law on September 25, 2008 and becomes effective January 1, 2009. Because this law makes several significant changes, including changes to the definition of the term "disability," the EEOC will be evaluating the impact of these changes on this document and other publications. See the <u>list</u>

ADD. 43

Case:Case 14-1456 14-1456 Document:Document 00116846262 62 Page:Page: 89 89 Date Filed:Date Filed: 01/05/2016 01/05/2016 Entry ID: Entry ID: 5969597 5970159

various cleaning functions, it does make it difficult to adjust to alterations in his daily routine. The employee has had significant difficulty adjusting to the monthly changes in floor assignments. He asks for a reasonable accommodation and proposes three options: staying on one floor permanently, staying on one floor for two months and then rotating, or allowing a transition period to adjust to a change in floor assignments. These accommodations are reasonable because they appear to be feasible solutions to this employee's problems dealing with changes to his routine. They also appear to be effective because they would enable him to perform his cleaning duties.

There are several modifications or adjustments that are not considered forms of reasonable accommodation.[(12)] An employer does not have to eliminate an essential function, i.e., a fundamental duty of the position. This is because a person with a disability who is unable to perform the essential functions, with or without reasonable accommodation,[(13)] is not a "qualified" individual with a disability within the meaning of the ADA. Nor is an employer required to lower production standards -- whether qualitative or quantitative[(14)] -- that are applied uniformly to employees with and without disabilities. However, an employer may have to provide reasonable accommodation to enable an employee with a disability to meet the production standard. While an employer is not required to eliminate an essential function or lower a production standard, it may do so if it wishes.

An employer does not have to provide as reasonable accommodations personal use items needed in accomplishing daily activities both on and off the job. Thus, an employer is not required to provide an employee with a prosthetic limb, a wheelchair, eyeglasses, hearing aids, or similar devices if they are also needed off the job. Furthermore, an employer is not required to provide personal use amenities, such as a hot pot or refrigerator, if those items are not provided to employees without disabilities. However, items that might otherwise be considered personal may be required as reasonable accommodations where they are specifically designed or required to meet job-related rather than personal needs.[(15)]

## **Undue Hardship**

The only statutory limitation on an employer's obligation to provide "reasonable accommodation" is that no such change or modification is required if it would cause "undue hardship" to the employer.[(16)] "Undue hardship" means significant difficulty or expense and focuses on the resources and circumstances of the particular employer in relationship to the cost or difficulty of providing a specific accommodation. Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business.[(17)] An employer must assess on a case-by-case basis whether a particular reasonable accommodation would cause undue hardship. The ADA's "undue hardship" standard is different from that applied by courts under Title VII of the Civil Rights Act of 1964 for religious accommodation.[(18)]

# REQUESTING REASONABLE ACCOMMODATION

1. How must an individual request a reasonable accommodation?

   When an individual decides to request accommodation, the individual or his/her representative must let the employer know that s/he needs an adjustment or change at work for a reason related to a medical condition. To request accommodation, an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation."[(19)]

   Example A: An employee tells her supervisor, "I'm having trouble getting to work at my scheduled starting time because of medical treatments I'm undergoing." This is a request for a reasonable accommodation.

   Example B: An employee tells his supervisor, "I need six weeks off to get treatment for a back problem." This is a request for a reasonable accommodation.

   Example C: A new employee, who uses a wheelchair, informs the employer that her wheelchair cannot fit under the desk in her office. This is a request for reasonable accommodation.

   Example D: An employee tells his supervisor that he would like a new chair because his present

ADD. 44

one is uncomfortable. Although this is a request for a change at work, his statement is insufficient to put the employer on notice that he is requesting reasonable accommodation. He does not link his need for the new chair with a medical condition.

While an individual with a disability may request a change due to a medical condition, this request does not necessarily mean that the employer is required to provide the change. A request for reasonable accommodation is the first step in an informal, interactive process between the individual and the employer. In some instances, before addressing the merits of the accommodation request, the employer needs to determine if the individual's medical condition meets the ADA definition of "disability,"[20] a prerequisite for the individual to be entitled to a reasonable accommodation.

2. May someone other than the individual with a disability request a reasonable accommodation on behalf of the individual?

Yes, a family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability.[21] Of course, the individual with a disability may refuse to accept an accommodation that is not needed.

Example A: An employee's spouse phones the employee's supervisor on Monday morning to inform her that the employee had a medical emergency due to multiple sclerosis, needed to be hospitalized, and thus requires time off. This discussion constitutes a request for reasonable accommodation.

Example B: An employee has been out of work for six months with a workers' compensation injury. The employee's doctor sends the employer a letter, stating that the employee is released to return to work, but with certain work restrictions. (Alternatively, the letter may state that the employee is released to return to a light duty position.) The letter constitutes a request for reasonable accommodation.

3. Do requests for reasonable accommodation need to be in writing?

No. Requests for reasonable accommodation do not need to be in writing. Individuals may request accommodations in conversation or may use any other mode of communication.[22] An employer may choose to write a memorandum or letter confirming the individual's request. Alternatively, an employer may ask the individual to fill out a form or submit the request in written form, but the employer cannot ignore the initial request. An employer also may request reasonable documentation that the individual has an ADA disability and needs a reasonable accommodation. (See Question 6).

4. When should an individual with a disability request a reasonable accommodation?

An individual with a disability may request a reasonable accommodation at any time during the application process or during the period of employment. The ADA does not preclude an employee with a disability from requesting a reasonable accommodation because s/he did not ask for one when applying for a job or after receiving a job offer. Rather, an individual with a disability should request a reasonable accommodation when s/he knows that there is a workplace barrier that is preventing him/her, due to a disability, from effectively competing for a position, performing a job, or gaining equal access to a benefit of employment.[23] As a practical matter, it may be in an employee's interest to request a reasonable accommodation before performance suffers or conduct problems occur.

5. What must an employer do after receiving a request for reasonable accommodation?

The employer and the individual with a disability should engage in an informal process to clarify what the individual needs and identify the appropriate reasonable accommodation.[24] The employer may ask the individual relevant questions that will enable it to make an informed decision about the request. This includes asking what type of reasonable accommodation is needed.[25]

The exact nature of the dialogue will vary. In many instances, both the disability and the type of

ADD. 45

accommodation required will be obvious, and thus there may be little or no need to engage in any discussion. In other situations, the employer may need to ask questions concerning the nature of the disability and the individual's functional limitations in order to identify an effective accommodation. While the individual with a disability does not have to be able to specify the precise accommodation, s/he does need to describe the problems posed by the workplace barrier. Additionally, suggestions from the individual with a disability may assist the employer in determining the type of reasonable accommodation to provide. Where the individual or the employer is not familiar with possible accommodations, there are extensive public and private resources to help the employer identify reasonable accommodations once the specific limitations and workplace barriers have been ascertained.[(26)]

6. May an employer ask an individual for documentation when the individual requests reasonable accommodation?

Yes. When the disability and/or the need for accommodation is not obvious, the employer may ask the individual for reasonable documentation about his/her disability and functional limitations. [(27)] The employer is entitled to know that the individual has a covered disability for which s/he needs a reasonable accommodation.

Reasonable documentation means that the employer may require only the documentation that is needed to establish that a person has an ADA disability, and that the disability necessitates a reasonable accommodation. Thus, an employer, in response to a request for reasonable accommodation, cannot ask for documentation that is unrelated to determining the existence of a disability and the necessity for an accommodation. This means that in most situations an employer cannot request a person's complete medical records because they are likely to contain information unrelated to the disability at issue and the need for accommodation. If an individual has more than one disability, an employer can request information pertaining only to the disability that requires a reasonable accommodation.

An employer may require that the documentation about the disability and the functional limitations come from an appropriate health care or rehabilitation professional. The appropriate professional in any particular situation will depend on the disability and the type of functional limitation it imposes. Appropriate professionals include, but are not limited to, doctors (including psychiatrists), psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists, and licensed mental health professionals.

In requesting documentation, employers should specify what types of information they are seeking regarding the disability, its functional limitations, and the need for reasonable accommodation. The individual can be asked to sign a limited release allowing the employer to submit a list of specific questions to the health care or vocational professional.[(28)]

As an alternative to requesting documentation, an employer may simply discuss with the person the nature of his/her disability and functional limitations. It would be useful for the employer to make clear to the individual why it is requesting information, i.e., to verify the existence of an ADA disability and the need for a reasonable accommodation.

Example A: An employee says to an employer, "I'm having trouble reaching tools because of my shoulder injury." The employer may ask the employee for documentation describing the impairment; the nature, severity, and duration of the impairment; the activity or activities that the impairment limits; and the extent to which the impairment limits the employee's ability to perform the activity or activities (i.e., the employer is seeking information as to whether the employee has an ADA disability).

Example B: A marketing employee has a severe learning disability. He attends numerous meetings to plan marketing strategies. In order to remember what is discussed at these meetings he must take detailed notes but, due to his disability, he has great difficulty writing. The employee tells his supervisor about his disability and requests a laptop computer to use in the meetings. Since neither the disability nor the need for accommodation are obvious, the supervisor may ask the employee for reasonable documentation about his impairment; the nature, severity, and duration of the impairment; the activity or activities that the impairment limits; and the extent to which the impairment limits the employee's ability to perform the activity

ADD. 46

or activities. The employer also may ask why the disability necessitates use of a laptop computer (or any other type of reasonable accommodation, such as a tape recorder) to help the employee retain the information from the meetings.[(29)]

<u>Example C:</u> An employee's spouse phones the employee's supervisor on Monday morning to inform her that the employee had a medical emergency due to multiple sclerosis, needed to be hospitalized, and thus requires time off. The supervisor can ask the spouse to send in documentation from the employee's treating physician that confirms that the hospitalization was related to the multiple sclerosis and provides information on how long an absence may be required from work.[(30)]

If an individual's disability or need for reasonable accommodation is not obvious, and s/he refuses to provide the reasonable documentation requested by the employer, then s/he is not entitled to reasonable accommodation.[(31)] On the other hand, failure by the employer to initiate or participate in an informal dialogue with the individual after receiving a request for reasonable accommodation could result in liability for failure to provide a reasonable accommodation.[(32)]

7. May an employer require an individual to go to a health care professional of the employer's (rather than the employee's) choice for purposes of documenting need for accommodation and disability?

The ADA does not prevent an employer from requiring an individual to go to an appropriate health professional of the employer's choice if the individual provides insufficient information from his/her treating physician (or other health care professional) to substantiate that s/he has an ADA disability and needs a reasonable accommodation. However, if an individual provides insufficient documentation in response to the employer's initial request, the employer should explain why the documentation is insufficient and allow the individual an opportunity to provide the missing information in a timely manner. Documentation is insufficient if it does not specify the existence of an ADA disability and explain the need for reasonable accommodation.[(33)]

Any medical examination conducted by the employer's health professional must be job-related and consistent with business necessity. This means that the examination must be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation.[(34)]If an employer requires an employee to go to a health professional of the employer's choice, the employer must pay all costs associated with the visit(s).

8. Are there situations in which an employer cannot ask for documentation in response to a request for reasonable accommodation?

Yes. An employer cannot ask for documentation when: (1) both the disability and the need for reasonable accommodation are obvious, or (2) the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested.

<u>Example A:</u> An employee brings a note from her treating physician explaining that she has diabetes and that, as a result, she must test her blood sugar several times a day to ensure that her insulin level is safe in order to avoid a hyperglycemic reaction. The note explains that a hyperglycemic reaction can include extreme thirst, heavy breathing, drowsiness, and flushed skin, and eventually would result in unconsciousness. Depending on the results of the blood test, the employee might have to take insulin. The note requests that the employee be allowed three or four 10-minute breaks each day to test her blood, and if necessary, to take insulin. The doctor's note constitutes sufficient documentation that the person has an ADA disability because it describes a substantially limiting impairment and the reasonable accommodation needed as a result. The employer cannot ask for additional documentation.

<u>Example B:</u> One year ago, an employer learned that an employee had bipolar disorder after he requested a reasonable accommodation. The documentation provided at that time from the employee's psychiatrist indicated that this was a permanent condition which would always involve periods in which the disability would remit and then intensify. The psychiatrist's letter explained that during periods when the condition flared up, the person's manic moods or depressive

ADD. 47

episodes could be severe enough to create serious problems for the individual in caring for himself or working, and that medication controlled the frequency and severity of these episodes.

Now, one year later, the employee again requests a reasonable accommodation related to his bipolar disorder. Under these facts, the employer may ask for reasonable documentation on the need for the accommodation (if the need is not obvious), but it cannot ask for documentation that the person has an ADA disability. The medical information provided one year ago established the existence of a long-term impairment that substantially limits a major life activity.

Example C: An employee gives her employer a letter from her doctor, stating that the employee has asthma and needs the employer to provide her with an air filter. This letter contains insufficient information as to whether the asthma is an ADA disability because it does not provide any information as to its severity (i.e., whether it substantially limits a major life activity). Furthermore, the letter does not identify precisely what problem exists in the workplace that requires an air filter or any other reasonable accommodation. Therefore, the employer can request additional documentation.

9. Is an employer required to provide the reasonable accommodation that the individual wants?

The employer may choose among reasonable accommodations as long as the chosen accommodation is effective.[35] Thus, as part of the interactive process, the employer may offer alternative suggestions for reasonable accommodations and discuss their effectiveness in removing the workplace barrier that is impeding the individual with a disability.

If there are two possible reasonable accommodations, and one costs more or is more burdensome than the other, the employer may choose the less expensive or burdensome accommodation as long as it is effective (i.e., it would remove a workplace barrier, thereby providing the individual with an equal opportunity to apply for a position, to perform the essential functions of a position, or to gain equal access to a benefit or privilege of employment). Similarly, when there are two or more effective accommodations, the employer may choose the one that is easier to provide. In either situation, the employer does not have to show that it is an undue hardship to provide the more expensive or more difficult accommodation. If more than one accommodation is effective, "the preference of the individual with a disability should be given primary consideration. However, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations."[36]

Example A: An employee with a severe learning disability has great difficulty reading. His supervisor sends him many detailed memoranda which he often has trouble understanding. However, he has no difficulty understanding oral communication. The employee requests that the employer install a computer with speech output and that his supervisor send all memoranda through electronic mail which the computer can then read to him. The supervisor asks whether a tape recorded message would accomplish the same objective and the employee agrees that it would. Since both accommodations are effective, the employer may choose to provide the supervisor and employee with a tape recorder so that the supervisor can record her memoranda and the employee can listen to them.

Example B: An attorney with a severe vision disability requests that her employer provide someone to read printed materials that she needs to review daily. The attorney explains that a reader enables her to review substantial amounts of written materials in an efficient manner. Believing that this reasonable accommodation would be too costly, the employer instead provides the attorney with a device that allows her to magnify print so that she can read it herself. The attorney can read print using this device, but with such great difficulty it significantly slows down her ability to review written materials. The magnifying device is ineffective as a reasonable accommodation because it does not provide the attorney with an equal opportunity to attain the same level of performance as her colleagues. Without an equal opportunity to attain the same level of performance, this attorney is denied an equal opportunity to compete for promotions. In this instance, failure to provide the reader, absent undue hardship, would violate the ADA.

10. How quickly must an employer respond to a request for reasonable accommodation?

An employer should respond expeditiously to a request for reasonable accommodation. If the

ADD. 48

employer and the individual with a disability need to engage in an interactive process, this too should proceed as quickly as possible.[(37)] Similarly, the employer should act promptly to provide the reasonable accommodation. Unnecessary delays can result in a violation of the ADA.[(38)]

<u>Example A:</u> An employer provides parking for all employees. An employee who uses a wheelchair requests from his supervisor an accessible parking space, explaining that the spaces are so narrow that there is insufficient room for his van to extend the ramp that allows him to get in and out. The supervisor does not act on the request and does not forward it to someone with authority to respond. The employee makes a second request to the supervisor. Yet, two months after the initial request, nothing has been done. Although the supervisor never definitively denies the request, the lack of action under these circumstances amounts to a denial, and thus violates the ADA.

<u>Example B:</u> An employee who is blind requests adaptive equipment for her computer as a reasonable accommodation. The employer must order this equipment and is informed that it will take three months to receive delivery. No other company sells the adaptive equipment the employee needs. The employer notifies the employee of the results of its investigation and that it has ordered the equipment. Although it will take three months to receive the equipment, the employer has moved as quickly as it can to obtain it and thus there is no ADA violation resulting from the delay. The employer and employee should determine what can be done so that the employee can perform his/her job as effectively as possible while waiting for the equipment.

11. May an employer require an individual with a disability to accept a reasonable accommodation that s/he does not want?

No. An employer may not require a qualified individual with a disability to accept an accommodation. If, however, an employee needs a reasonable accommodation to perform an essential function or to eliminate a direct threat, and refuses to accept an effective accommodation, s/he may not be qualified to remain in the job.[(39)]

# REASONABLE ACCOMMODATION AND JOB APPLICANTS

12. May an employer ask whether a reasonable accommodation is needed when an applicant has not asked for one?

An employer may tell applicants what the hiring process involves (e.g., an interview, timed written test, or job demonstration), and may ask applicants whether they will need a reasonable accommodation for this process.

During the hiring process and before a conditional offer is made, an employer generally may not ask an applicant whether s/he needs a reasonable accommodation for the job, except when the employer knows that an applicant has a disability -- either because it is obvious or the applicant has voluntarily disclosed the information -- and could reasonably believe that the applicant will need a reasonable accommodation to perform specific job functions. If the applicant replies that s/he needs a reasonable accommodation, the employer may inquire as to what type. [(40)]

After a conditional offer of employment is extended, an employer may inquire whether applicants will need reasonable accommodations related to anything connected with the job (i.e., job performance or access to benefits/privileges of the job) as long as all entering employees in the same job category are asked this question. Alternatively, an employer may ask a specific applicant if s/he needs a reasonable accommodation if the employer knows that this applicant has a disability -- either because it is obvious or the applicant has voluntarily disclosed the information -- and could reasonably believe that the applicant will need a reasonable accommodation. If the applicant replies that s/he needs a reasonable accommodation, the employer may inquire as to what type.[(41)]

13. Does an employer have to provide a reasonable accommodation to an applicant with a disability even if it believes that it will be unable to provide this individual with a reasonable accommodation on the job?

ADD. 49

Case:Case 15-1458 Document 00116 5946 2262 Page: 95 Date Filed: 01/05/2016 Entry ID: 5969159 70159



# Social Security
Official Social Security Website

## Program Operations Manual System (POMS)

**Effective Dates: 12/11/2013 - Present**

TN 47 (02-13)

# SI 01120.200 Trusts – General, Including Trusts Established Prior to 1/1/00, Trusts Established with the Assets of Third Parties and Trusts Not Subject to Section 1613(e) of the Social Security Act

| Topic | Reference |
|---|---|
| Introduction to Trusts | SI 01120.200A |
| Glossary of Terms – Trusts | SI 01120.200B |
| Policy – Accounts That May Or May Not Be Trusts | SI 01120.200C |
| Policy – Trusts As Resources | SI 01120.200D |
| Policy - Disbursements From Trusts | SI 01120.200E |
| Policy – Home Ownership/Purchase Of A Home By A Trust | SI 01120.200F |
| Policy – Earnings/Additions To Trusts | SI 01120.200G |
| Policy – Medicaid Trusts And Medicaid Qualifying Trusts | SI 01120.200H |
| Policy – Representative Payees And Trusts | SI 01120.200I |
| Procedure – Development And Documentation of Trusts | SI 01120.200J |
| Procedure – Discussing SSI Trust Policy With The Public | SI 01120.200K |
| Examples of Trusts | SI 01120.200L |
| References | SI 01120.200M |

ADD. 50

beneficiary of a trust, the trust is **revocable** regardless of language in the trust to the contrary.

However, many of these States recognize that the grantor cannot unilaterally revoke the trust if there is a named "residual beneficiary" in the trust document who would, for example, receive the principal upon the grantor's death or the occurrence of some other specific event.

Under the modern view, residual beneficiaries are assumed to be created, absent evidence of a contrary intent, when a grantor names heirs, next of kin, or similar groups to receive the remaining assets in the trust upon the grantor's death. In such case, the trust is considered to be irrevocable.

**NOTE:** The policies regarding grantor trusts may or may not apply in your particular State. Field offices should consult regional POMS or your regional office program staff if in doubt.

# E. Policy - Disbursements from trusts

## 1. Trust principal is not a resource

If the trust principal is not a resource, disbursements from the trust may be income to the SSI recipient, depending on the nature of the disbursements. Regular rules to determine when income is available apply.

### a. Disbursements which are income

Cash paid directly from the trust to the individual is unearned income.

Disbursements from the trust to third parties that result in the beneficiary receiving non-cash items (other than food or shelter), are in-kind income if the items would not be a partially or totally excluded non-liquid resource if retained into the month after the month of receipt (see SI 00815.550 and SI 01110.210).

For example, if a trust buys a car for the beneficiary and the beneficiary's spouse already has a car which is excluded for SSI, the second car is income in the month of receipt since it would not be an excluded resource in the following month.

### b. Disbursements which result in receipt of in-kind support and maintenance

Food or shelter received as a result of disbursements from the trust by the trustee to a third party are income in the form of in-kind support and maintenance and are valued under the presumed maximum value (PMV) rule. (See SI 00835.300 for instructions pertaining to the PMV rule. See SI 01120.200F for rules pertaining to a home.)

ADD. 51

Case:Case 15-1458-1456ocumentocument 0601t 6584626Page:Page: 97age: 97ate Fdate: FiledFiled:05/05/2010/2016ntry EDtrySD596995470159

## c. Disbursements which are not income

Disbursements from the trust other than those described in SI 01120.200E.1.a. and SI 01120.200E.1.b. are not income. Such disbursements may take the form of educational expenses, therapy, medical services not covered by Medicaid, phone bills, recreation, entertainment, etc., (see SI 00815.400).

Disbursements made from the trust to a third party that result in the beneficiary receiving non-cash items (other than food or shelter) are not income if those items would become a totally or partially excluded non-liquid resource if retained into the month after the month of receipt (see SI 00815.550 and SI 01110.210).

For example, a trust purchases a computer for the beneficiary. Since the computer would be excluded from resources as household goods in the following month, the computer is not income (see SI 01130.430).

## d. Reimbursements to a third party

Reimbursements made from the trust to a third party for funds expended on behalf of the trust beneficiary are not income.

Existing income and resource rules apply to items a trust beneficiary receives from a third party. If a trust beneficiary receives a non-cash item (other than food or shelter), it is in-kind income if the item would not be a partially or totally excluded non-liquid resource if retained into the month after the month of receipt. If a trust beneficiary receives food or shelter, it is income in the form of in-kind support and maintenance (ISM).

## 2. Trust principal is a resource

### a. Disbursements to or for the benefit of the beneficiary

If the trust principal is a resource to the individual, disbursements from the trust principal received by the individual or that result in receipt of something by the individual are not income, but conversion of a resource. (However, trust earnings are income. See SI 01110.100 for instructions pertaining to conversion of resources from one form to another. See SI 01120.200G.2. for treatment of income when the trust principal is a resource and SI 00830.500 for treatment of dividends and interest as income.)

### b. Disbursements not to or for the benefit of the beneficiary

If the trust is established with the assets of an individual or his or her spouse and the trust (or portion of the trust) is a resource to the individual:

- any disbursement from the trust (or from that portion of the trust that is a resource)

ADD. 52

Case:Case 15-1455 14-1456 Document:Document 00116538462 62 Page:Page: 98 92 Date Filed:Filed: 01/15/2016 10/20/2015 Entry Entry ID:5969347 5969320 0159

that is not made to, or for the benefit of, the individual is considered a transfer of resources as of the date of the payment and is not considered income to the individual (see SI 01150.110); and

- any foreclosure of payment (an instance in which no disbursement can be made to the individual under any circumstances) is considered to be a transfer of resources as of the date of foreclosure. Such foreclosure is not considered income to the individual.

# F. Policy - Home ownership/purchase of a home by a trust

## 1. Home as a resource

If the trustee of a trust which is not a resource for SSI purposes purchases and holds title to a house as a home for the beneficiary, the house would not be a resource to the beneficiary. It would also not be a resource if the beneficiary moved from the house. The trust holds legal title to the house, therefore, the eligible individual would be considered to be living in his or her own home based on having an "equitable ownership under a trust." If the trust is a resource to the individual, the home is subject to exclusion under SI 01130.100.

## 2. Rent-free shelter

An eligible individual does not receive in-kind support and maintenance (ISM) in the form of rent-free shelter while living in a home in which he or she has an ownership interest. Accordingly, an individual with "equitable home ownership under a trust" (see SI 01120.200F.1.) does not receive rent-free shelter. Also, because we consider such an individual to have an ownership interest, payment of rent by the beneficiary to the trust has no effect on the SSI payment.

## 3. Receipt of income from a home purchase

Since the purchase of a home by a trust for the beneficiary establishes an equitable ownership interest for the beneficiary of the trust, the purchase results in the receipt of shelter in the month of purchase that is income in the form of ISM (see SI 00835.400). This ISM is valued at no more than the presumed maximum value (PMV).

Even though the beneficiary has an ownership interest in the home and, if living in the home, does not receive ISM in the form of rent-free shelter, purchase of the home or

ADD. 53

**7420.10G**

VOUCHER PROGRAM GUIDEBOOK
# Housing Choice

*Produced for:*



U.S. Department of Housing and Urban Development
Office of Public and Indian Housing
Washington, DC  20410-6000
www.hud.gov/pih

April 2001

| | | 10/1 | 11/1 | 12/1 | 1/1 | 2/1 |
|---|---|---|---|---|---|---|
| Monthly Gross Income | | 800 | 0/800* | 0/800* | 433* | 433* |
| Monthly Allowances (3 Minors x 480 ) 12 Months) | | 120 | 120 | 120 | 120 | 120 |
| Monthly Adjusted Income | | 680 | 0/680 | 0/680 | 313 | 313 |
| Total Tenant Payment | | 204 | 204* | 204* | 94 | 94 |
| Recalculated TTP | | - | 94*** | 94* | 94 | 94 |
| Rent Credit (204-94=) | | - | 110 | 110 | - | - |

TREATMENT OF DELAYED BENEFIT PAYMENTS: OPTION B

Option B: PHA processes one interim reexamination after unemployment benefits are known.

\* Family's actual income for 11/1 and 12/1 is zero but because the PHA does not process an interim reexamination, the family's TTP continues to be calculated using $800 as monthly gross income. Beginning 1/1, monthly gross income is known to be $100/week, or $433/month.

\*\* The lump sum payment is taken into account by making the recertification retroactive to 11/1. Annual income is calculated as $5,200 ) 12 = $433 monthly gross income.

\*\*\* TTP for November and December recalculated as $433 monthly gross income and $313 monthly adjusted income x .30 = 94 with credit or refund to family of $110/month for each of these two months for difference between TTP paid of $204 and recalculated TTP of $94.

**5.4    DETERMINING INCOME FROM ASSETS**

PHAs are required to include in the calculation of annual income any interest or dividends earned on assets held by the family. See paragraph (3) under Exhibit 5-2 for the full HUD definition of asset income to be included in the calculation of annual income, and see Exhibit 5-3, *Summary of Asset Inclusions and Exclusions,* for a more detailed description.

*Calculation When Assets Exceed $5,000*

When net family assets are $5,000 or less, use the actual income from assets.

When family assets are more than $5,000, use the greater of:

· Actual income from assets; or

· A percentage of the value of such assets based upon the current passbook savings rate as established by HUD. This is called imputed income from assets.

ADD. 55

**EXHIBIT 5-3**
**SUMMARY OF ASSET INCLUSIONS AND EXCLUSIONS**

| A. ASSETS INCLUDE: | B. ASSETS DO NOT INCLUDE: |
|---|---|
| 1. Amounts in savings and checking accounts. | 1. Necessary personal property, except as noted in A.9. |
| 2. Stocks, bonds, savings certificates, money market funds and other investment accounts. | 2. Interest in Indian trust lands. |
| 3. Equity in real property or other capital investments. Equity is the estimated current market value of the asset less the unpaid balance on all loans secured by the assets *and* reasonable costs (such as broker fees) that would be incurred in selling the assets. | 3. Assets that are part of an active business or farming operation.<br><br>4. *NOTE*: Rental properties are considered personal assets held as an investment rather than business assets unless real estate is the applicant's/tenant's main occupation. |
| 4. The cash value of trusts that may be withdrawn by the family. | 5. Assets not controlled by or accessible to the family and which provide no income for the family. |
| 5. IRA, Keogh and similar retirement savings accounts, even though withdrawal would result in a penalty. | 6. Vehicles especially equipped for the disabled. |
| 6. Some contributions to company retirement/ pension funds. Note the discussion below on accessibility of the funds. | 7. Equity in owner-occupied cooperatives and manufactured homes in which the family lives. |
| 7. Assets, which although owned by more than one person, allow unrestricted access by the applicant. | |
| 8. Lump sum receipts such as inheritances, capital gains, lottery winnings, insurance settlements, and other claims. | |
| 9. Personal property held as an investment such as gems, jewelry, coin collections, antique cars, etc. | |
| 10. Cash value of life insurance policies. | |
| 11. Assets disposed of for less than fair market value during the two years preceding certification or recertification. | |

NOTE: A key factor in whether or not to include an asset in the calculation of annual income is whether any member of the family has access to the asset.

ADD. 56

---

COMPARE ACTUAL INCOME FROM ASSETS TO IMPUTED INCOME FROM ASSETS

Applicant has $7,900 in assets. (Assume passbook rate of 3.5 percent.)

Applicant actual income from assets is paid at 1.5% simple interest annually - $119.

| | |
|---|---|
| Assets: | $ 7,900 |
| HUD-determined passbook rate | x  .035 |
| Imputed income from assets | $   277 |

Compare actual interest of $119 to imputed interest of $277. The interest of $277 (the greater of the two) will be used as income from assets in the calculation of annual income.

---

**Additional Guidance On Calculating The Value Of Assets And Income From Assets**

*Contributions to Company Retirement/Pension Funds*

While an individual is employed, count as an asset only amounts the family could withdraw from a company retirement or pension fund without retiring or terminating employment.

After retirement or termination of employment, count as an asset any amount the employee elects to receive as a lump sum from the company retirement/pension fund.

Include in *annual income* any retirement benefits received through periodic payments.

In order to correctly include or exclude as assets any amount now held in retirement/pension funds for employed persons, the PHA must know whether the money is accessible before retirement.

*Equity in Real Property*

Real property includes land or real estate owned by the applicant or participant household. Equity is the portion of the market value of the asset which is owned by the applicant/participant (the amount which would be available to the household if the property were to be sold). It is equal to the market value less any mortgage or loans secured against the property (which must be paid off upon sale of the property).
Calculate equity in real property as follows:

$$Market\ Value - Loan\ (Mortgage) = Equity$$

Calculate the cash value of real property as follows:

$$Equity - Expense\ to\ Convert\ to\ Cash = Cash\ Value$$

Expenses to convert to cash may include costs such as sales commissions, settlement costs, and transfer taxes.

*Assets Disposed of for less than Fair Market Value*

At initial certification or reexamination, PHAs must ask whether a household has disposed of an asset for less than its market value within the past two years. If the family has, the PHA must determine the difference between the cash value of the asset at time of sale or other disposal and the actual payment received of for the asset.

Generally, assets disposed of as a result of a divorce, separation, foreclosure, or bankruptcy are *not* considered assets disposed of for less than fair market value. Some of the types of assets that must be considered include cash, real property, stocks, bonds, and certificates of deposit. They must be counted if the household gave them away or sold them for less than the market value.

HUD does not specify a minimum threshold for counting assets disposed of for less than fair market value. A PHA may establish a threshold in its administrative plan that will enable the PHA to ignore small amounts such as charitable contributions. (HUD Handbook 4350.3, for multifamily subsidized housing, uses $1,000 as a threshold.)

---

ASSET DISPOSED OF FOR LESS THAN FAIR MARKET VALUE: REAL ESTATE

Mrs. Jones "sold" her home to her daughter for $5,000. The home was valued at $19,500 and had no loans secured against it. Mrs. Jones paid broker's fees and settlement costs of $1,700 (8.7% of the sales price – this is a realistic estimate for the locality). The amount to be included in family assets is $12,800.

| | |
|---|---|
| $19,500 | (Market Value) |
| - 1,700 | (Expense to Convert to Cash) |
| $17,800 | (Cash Value) |
| - 5,000 | (Amount Received when Asset Disposed) |
| $12,800 | (Value of Asset Disposed for Less than Fair Market Value) |

---

ASSET DISPOSED OF FOR LESS THAN FAIR MARKET VALUE: STOCKS

Ten months ago the Daniel family gave their son 300 shares of ABC, Inc. stock. The market value was $3,735 ($12.45/share). They incurred a broker's fee of $175 for the transaction.

| | |
|---|---|
| $ 3,735.00 | (Market Value) |
| - 175.00 | (Expense to Convert to Cash) |
| $ 3,560.00 | (Cash Value) |
| - 00 | (Amount Received when Asset Disposed) |
| $ 3,560.00 | (Value of Asset Disposed for Less than Fair Market Value) |

---

Verification of assets disposed of for less than fair market value is generally done by applicant certification. PHAs need verify only those certifications that warrant documentation.

*Valuing Assets*

Because of the requirement to include the greater of the actual interest/dividend income earned or a percentage based upon a HUD published passbook rate when assets are greater than $5,000, the value of assets *may* affect the family's annual income.

The PHA must determine the *market value* of the asset and then calculate the *cash value* by subtracting the estimated expense required were the family to convert the asset to cash.

Expense to convert to cash includes costs such as:

- Penalties for premature withdrawal (e.g. the 10% penalty paid when a retirement account is closed prior to retirement age, or a certificate of deposit is withdrawn prior to maturity);

- Broker and legal fees (e.g. a percentage of the value of the asset incurred in the sale of stocks, bonds, real estate, etc.); and

- Settlement costs incurred in real estate transactions (e.g. the typical percentage of sales price for settlement in the locality).

> *NOTE: PHAs must not require families to dispose of assets in order to determine the costs to convert to cash. These amounts simply reflect a realistic estimate of costs, and by deducting them from the market value of the asset, the imputed income from the asset is based on an amount the family would have in hand if they converted their assets to cash.*

## 5.5 ADJUSTED INCOME

### Definition of Adjusted Income

Adjusted income is the annual income of the members of the family residing in or intending to reside in the dwelling unit, less the following mandatory deductions:

- $480 for each dependent;

- $400 for any elderly family or disabled family;

- Child care;

- Disability assistance; and.

- Medical expenses

ADD. 59